# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ARDAGH METAL PACKAGING USA CORP. f/k/a ARDAGH METAL BEVERAGE USA INC., <br>        Plaintiff <br><br> v. <br><br> AMERICAN CRAFT BREWERY, LLC d/b/a VARIOUS BOSTON BEER BREWERIES, <br>        Defendant | No. 22 CV 7367 <br><br> Judge Jeremy C. Daniel |
| AMERICAN CRAFT BREWERY, LLC <br>        Counter-Claimant <br><br> v. <br><br> ARDAGH METAL PACKAGING USA CORP., <br>        Counter-Defendant | |

## MEMORANDUM OPINION AND ORDER

Ardagh Metal Packaging USA Corp. ("Ardagh") and American Craft Brewery, LLC ("ACB") entered into a contract for the purchase of aluminum beverage cans. Ardagh filed suit against ACB, alleging that ACB breached its purchasing obligations under the contract. (*See generally*, R. 9 ("Compl.").) [1] ACB answered the complaint

---

[1] For consistency purposes, the Court cites to the sealed versions of the parties' CM/ECF filings. The Court is mindful not to reveal information that may be reasonably deemed confidential but, to the extent confidential information is discussed, the Court has done so because it is necessary to explain its reasoning. *See In re Specht,* 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell,* 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

and asserted various counterclaims and affirmative defenses against Ardagh. (R. 23.) Ardagh now moves for partial dismissal of ACB's counterclaims under Federal Rule of Civil Procedure 12(b)(6), to strike certain of ACB's affirmative defenses under Federal Rule of Civil Procedure 12(f), and for a declaratory judgment against ACB on Count II of the complaint under Federal Rule of Civil Procedure 12(c).[2] (R. 32; R. 34; R. 70.) For the reasons below, Ardagh's motion to dismiss is granted in part and denied in part; its motion to strike is granted; and its motion for judgment on the pleadings as to Count II is granted.

## BACKGROUND[3]

Ardagh manufactures and supplies various metal and glass packaging to brand owners. (R. 23 ("Countercls.") ¶ 6.) ACB, a manufacturer of alcoholic beverages, is one of Ardagh's customers. (*Id.* ¶¶ 5–6.) Ardagh and ACB entered into an agreement (the "Initial Agreement"), effective January 1, 2020, pursuant to which Ardagh agreed to supply and ACB agreed to purchase twelve ounce "sleek" aluminum beverage can bodies and associated can ends. (Compl. ¶ 10.) In December 2020, the parties amended their agreement (the "Amended Agreement" and, together with the Initial Agreement, the "Agreement"). (*Id.* ¶ 13.) Relevant here, the Amended Agreement modified the Initial Agreement by: (1) extending the term of the Initial Agreement

---

[2] The Court has subject matter jurisdiction over Ardagh's complaint and ACB's counterclaims pursuant to 28 U.S.C. § 1332 because both parties allege complete diversity of citizenship and damages in excess of $75,000. (R. 9 ¶ 7; R. 23 ¶ 7.)

[3] The factual information is taken from the well-pleaded allegations in Ardagh's complaint and ACB's counterclaims, which are accepted as true for purposes of ruling on a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings. *See Katz-Crank v. Haskett*, 843 F.3d 641, 646 (7th Cir. 2016).

through January 1, 2027; (2) adding twelve ounce and twenty-four ounce "standard" aluminum beverage cans and associated can ends for purchase; and (3) providing minimum can purchase volumes for the years 2021 through 2026 ("Annual Minimum Volume"). (*Id.* ¶ 13; *see also* R. 36-1 at 87–88.)[4]

Ardagh alleges that ACB failed to meet its Annual Minimum Volume purchase obligations for the years 2021 and 2022, and refused to provide reasonable assurances that it would make up its purchasing shortfalls or be able to perform its contractual obligations for the time remaining on the contract. (Compl. ¶¶ 19–29.) Ardagh's two-count complaint raises a claim for breach of contract (Count I) and seeks a declaratory judgment in its favor (Count II). (*See generally,* Compl.)

ACB answered the complaint and asserted various counterclaims and affirmative defenses against Ardagh. (*See generally,* R. 23.) Certain of ACB's counterclaims stem from Ardagh's use of a particular varnish and wax-based lubricant that is alleged to have caused a "dark, sticky buildup" on the beverage cans, resulting in slowdowns and breakdowns on ACB's processing lines. (Countercls. ¶¶ 40–42, 47–49, 58, 61–62.) ACB alleges that Ardagh was aware of the issues that

---

[4] Both parties rely heavily on the terms of the Agreement in advancing their respective claims and counterclaims, but neither party attaches a copy of the document itself to the pleadings. Generally, a court cannot consider materials outside of the pleadings when ruling on a Rule 12(b)(6) or Rule 12(c) motion without converting the motion to one for summary judgment. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing Fed. R. Civ. P. 12(d)). There is, however, an exception to this rule under which the Court may consider documents that are referenced in the complaint, central to the party's claim, and concededly authentic. *See Fin. Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th 654, 663 (7th Cir. 2022); *Brownmark Films,* 682 F.3d at 690. Neither party challenges the applicability of the incorporation-by-reference exception, let alone the Court's ability to consider the Agreement. Because the Agreement meets the exception's requirements, the Court considers it in ruling on the motions pending before it.

its materials caused during the filling process, but continued to use them anyway in breach of the Agreement. (*Id.* ¶¶ 33–39, 42, 45, 51–53, 63.) As a result of Ardagh's alleged use of unsuitable varnish and lubricant, ACB raises counterclaims for breach of contract (Counts II and III), breach of the duty of good faith and fair dealing (Counts IV and V), breach of warranty of fitness for a particular purpose (Counts VI and VII), and negligent misrepresentation (Count VIII). (*See generally,* Countercls.)

Ardagh now moves to dismiss certain of these counterclaims under Rule 12(b)(6), (R. 32), and to strike certain of ACB's affirmative defenses under Rule 12(f). (R. 34.) Ardagh further moves this Court for a declaratory judgment on Count II of the complaint. (R. 70.)

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a claim, not the merits of a case. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022). To survive a Rule 12(b)(6) motion, a claim "must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). In deciding a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). Dismissal is proper where "the allegations . . . , however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

4

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Generally, Rule 12(f) motions are disfavored because of their potential for use as a delay tactic. *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). But where motions to strike "remove unnecessary clutter from the case, they serve to expedite, not delay." *Id.* Whether to strike material under Rule 12(f) is soundly within the court's discretion. *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009) (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir. 1992)).

Finally, Rule 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The same standard governing Rule 12(b)(6) motions applies to Rule 12(c) motions; the only difference between the two is timing. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020). Thus, as with a motion to dismiss, the Court views all facts and inferences in the light most favorable to the non-moving party. *Id.* To succeed on a Rule 12(c) motion, "the moving party must demonstrate that there are no material issues of fact to be resolved." *Id.* (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998)). Accordingly, the Court will not grant a Rule 12(c) motion "unless it appears beyond doubt that the nonmovant cannot prove facts sufficient to support its position, and that the plaintiff is entitled to relief." *Id.* (citing *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020)).

## ANALYSIS

I.    ARDAGH'S RULE 12(B)(6) MOTION TO DISMISS ACB'S COUNTERCLAIMS

    A.    **Breach of Duty of Good Faith and Fair Dealing (Counts VI and VII)**

Ardagh first argues that ACB's breach of the implied covenant of good faith and fair dealing counterclaims must be dismissed as duplicative of ACB's breach of contract counterclaims. (R. 36-1 at 6–8.) ACB alleges that Ardagh's use of unsuitable varnish and wax-based lubricant violated the Agreement's Container Warranty, which requires Ardagh to supply cans free from defects in material, workmanship, and design, as well as the Agreement's Specifications, which requires, among other things, that the cans be suitable in all respects for the intended filling, closing, and packaging of ACB's beverage products in accordance with industry standards. (Countercls. ¶¶ 55, 79–80, 89–90.) In the alternative, ACB alleges that Ardagh's use of these materials, even if not expressly prohibited by the Agreement, arbitrarily and unreasonably deprived ACB of the benefit of its bargain in violation of the implied covenant of good faith and fair dealing. (*Id*. ¶¶ 97–98, 100, 106–107, 109.)

Both parties acknowledge that the Agreement and, therefore, ACB's counterclaims are governed by New York law. (*See* R. 36-1 at 90); *see also NewsSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300, 306 (7th Cir. 2018). Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). The implied covenant "is a pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract, even if the terms of the contract do not explicitly prohibit such conduct." *P.S. Fin., LLC v. Eureka Woodworks, Inc.*, 184 N.Y.S.3d 114, 138 (N.Y. App. Div. 2023). Further, where the contract contemplates the use of discretion, "this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (citation omitted). Because a breach of this implied covenant "is merely a breach of the underlying contract," such a claim will typically be dismissed as duplicative of a breach of contract claim where the two are based on the same facts. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

In this case, Ardagh argues that ACB cannot maintain its breach of implied covenant counterclaims because they are premised on the same conduct that underlies its breach of contract claims—that is, Ardagh's use of unsuitable varnish and wax-lubricant—and seek the same relief—monetary damages for its losses. (R. 36-1 at 7–9.) In response, ACB argues that its breach of implied covenant counterclaims include "express limitations" to avoid duplicating its breach of contract claims. (R. 52 at 7.) Specifically, ACB explains that it pled its breach of implied covenant counterclaims as an alternative theory that only "come[s] into play" where Ardagh's use of the unsuitable varnish and wax constitutes an exercise of discretion, not a breach of an express obligation under the Agreement. (*Id.* at 5–6; *see also* Countercls. ¶¶ 99, 108.)

As the Second Circuit has explained, under New York law, "[a] party certainly cannot succeed on claims for both breach of an express contract term and breach of

the implied covenant based on the same facts, but where [ ] there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative." *Spinelli*, 903 F.3d at 206 (reversing dismissal of breach of implied covenant claim where complaint plausibly alleged that the agreement "if not expressly, at least implicitly" prohibited the defendant's conduct). The Court finds this reasoning applicable here. The Agreement enumerates certain warranties and specifications that speak to the workmanship and exterior coating of the beverage cans, but makes no mention of varnish or lubricant. Nor is it clear whether the Agreement expressly contemplates the particular defect alleged here—that is, Ardagh's use of materials that were incompatible with ACB's processing lines. At the very least, ACB has plausibly alleged that, even if not expressly covered under the Container Warranty or Specifications, the Agreement implicitly prohibits Ardagh from using materials in the manufacture of its cans that deprive ACB of the "fruits of the contract." *P.S. Fin., LLC*, 184 N.Y.S.3d at 138. Although ACB will not be able to recover under both theories, it can, at this stage, proceed on its breach of the implied covenant of good faith and fair dealing counterclaims. *See Spinelli*, 903 F.3d at 206. Ardagh's motion to dismiss Counts IV and V is therefore denied.

> ## B. Breach of Warranty of Fitness for a Particular Purpose (Counts VI and VII)

Next, Ardagh moves to dismiss ACB's counterclaims for breach of warranty of fitness for a particular purpose. ACB alleges that Ardagh breached the implied warranty of fitness by using unsuitable varnish and wax lubricant that rendered the

beverage cans unfit for their intended purpose. (Countercls. ¶¶ 117, 125.) Ardagh argues that these counterclaims must be dismissed because they are barred by the Amended Agreement's warranty disclaimer. (R. 36-1 at 10–11.)

New York's Uniform Commercial Code provides that every contract carries an implied warranty of fitness unless "excluded or modified." *NY Drilling, Inc. v. TJM, Inc. LLC*, 573 F. Supp. 3d 854, 858 (E.D.N.Y. 2021); N.Y. U.C.C. Law § 2-315. To exclude an implied warranty of fitness, "the exclusion must be by a writing and conspicuous." N.Y. U.C.C. Law § 2-316(2). Conspicuous means that the writing is "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." *NY Drilling*, 573 F. Supp. 3d at 858 (quoting N.Y. U.C.C. Law § 1-201(b)(10)). "Whether a term is 'conspicuous' or not is a decision for the court." N.Y. U.C.C. Law § 1-201(b)(10).

In this case, Section 20.8 of the Initial Agreement provides:

> 20.8  <u>EXPRESS WARRANTIES</u>. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH ABOVE, ARDAGH MAKES NO OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, STATUTORY OR ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

(R. 36-1 at 31.) The Agreement's disclaimer meets the statutory requirements to exclude the implied warranty of fitness for a particular purpose. Section 20.8 clearly and explicitly disclaims all implied warranties, including the warranty of fitness for a particular purpose. *See, e.g.,* N.Y. U.C.C. Law § 2-316(2) ("Language to

exclude all implied warranties of fitness is sufficient if it states, for example, that '[t]here are no warranties which extend beyond the description on the face hereof.'").

Further, and contrary to ACB's arguments in response, the disclaimer is sufficiently conspicuous. The disclaimer uses capital letters and is set off in its own discrete paragraph. Of the myriad sections included in the Agreement, only two other paragraphs use text in all capital letters, while the remainder of the Agreement uses regular text. The disclaimer is thus presented in such a way that a "reasonable person . . . ought to have noticed it." *NY Drilling,* 573 F. Supp. 3d at 858 (granting motion to dismiss breach of implied warranty claims where the disclaimer, albeit appearing after the signature block, was set off in its own paragraph, in all capital letters, and clearly and explicitly disclaimed the warranties of fitness and merchantability); *see also Shema Kolainu-Hear Our Voices (SK-HOV) v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 200 (E.D.N.Y. 2010) (finding that disclaimer met statutory requirements for exclusion where the text was "in capital letters in a separate block paragraph and specifically mention[ed]" the warranties being disclaimed).

Nevertheless, ACB contends that there are other factors that may affect the enforceability of the disclaimer, such as whether the provision is substantively unconscionable. (R. 52 at 8, 10.) This argument stems from the principle that, even if a disclaimer meets the basic criteria for validity, New York's U.C.C. "separately provides that a court may void such a clause if it finds it 'to have been unconscionable at the time it was made.'" *SK-HOV*, 832 F. Supp. 2d at 200 (quoting N.Y. U.C.C. Law § 2-302). "'A determination of unconscionability generally requires a showing that the

contract was both procedurally and substantively unconscionable when made,' which means a showing of 'absence of meaningful choice on the part of the parties together with contract terms which are unreasonably favorable to the other party.'" *Red Ft. Cap., Inc. v. Guardhouse Prods. LLC*, 397 F. Supp. 3d 456, 475 (S.D.N.Y. 2019) (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988)). N.Y. U.C.C. Law § 2-316(2).

Beyond asserting that Ardagh was aware of the intended use of the cans when the parties entered into the contract, ACB provides no explanation as to how the warranty disclaimer is procedurally or substantively unconscionable. Rather, the basis for ACB's argument appears to be that a determination of unconscionability should await development of a factual record. (R. 52 at 10.) The determination of unconscionability, however, is a question of law properly before the court on a motion to dismiss. *See I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 211 (S.D.N.Y. 2015). Here, there are no allegations from which this Court can plausibly infer unequal bargaining power, deceptive tactics, or any other procedural irregularities in contract formation between these two commercially sophisticated parties. *See, e.g., SK-HOV*, 832 F. Supp. 2d at 203 (dismissing plaintiffs' breach of warranty claims where there was "no valid ground on which the disclaimer of warranties [ ] might be found unconscionable"). And ACB's conclusory allegation of substantive unconscionability is not sufficient to withstand a motion to dismiss. *See, e.g., id.* at 201 (explaining that allegations of substantive unconscionability, alone,

are not "egregious enough to render the contract unenforceable"). Accordingly, Ardagh's motion to dismiss Counts VI and VII is granted.

### C.    Negligent Misrepresentation (Count VIII)

Finally, Ardagh moves to dismiss ACB's counterclaim for negligent misrepresentation. ACB alleges that Ardagh had a duty to impart correct information regarding the varnish and wax-based lubricant, and ACB reasonably relied on Ardagh's representations regarding these materials to its detriment. (R. 23 ¶¶ 129, 134, 138, 140.) Ardagh moves to dismiss this counterclaim under New York's economic loss rule. (R. 36-1 at 11–12.)

A claim for negligent misrepresentation under New York law requires the plaintiff to plead "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011). Where, however, purely economic damages are pled as a result of the alleged reliance, the pleading "invit[es] application of New York's 'economic loss rule.'" *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007). Under New York's economic loss rule, "a party to a contract that suffers economic loss only"—as opposed to personal injury or property damage—"is, in most cases, limited to recover pursuant to a claim for breach of contract and cannot recover economic or consequential damages in tort." *Avazpour Networking Servs. Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013). The doctrine recognizes that "when a plaintiff suffers only economic loss, 'it loses part of its bargain, and the

parties are relegated to the contractual remedies they negotiated . . ..'" *Id.* (quoted case omitted).

ACB argues that it can proceed under a tort theory of liability because its negligent misrepresentation counterclaim arises, not from a duty imposed under the Agreement, but from a duty arising from the special relationship between the parties given Ardagh's "unique and specialized expertise in manufacturing aluminum cans for beverage distributors." (R. 52 at 12 (citing Countercls. ¶ 129)). New York law allows tort theories of liability to proceed in parallel to breach of contract claims "where a party to a contract can properly allege the breach of a duty owed to the plaintiff that exists separate and apart from the contract." *Avazpour*, 937 F. Supp. 2d at 361. New York courts, however, "regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a 'special relationship.'" *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 334 (S.D.N.Y. 2012) (collecting cases). Further, "knowledge of the particulars of [a] company's business—and of the true situation underlying the misrepresentations pertaining to that business . . . does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004).

In this case, ACB's allegations do not sufficiently explain how Ardagh's manufacturing expertise gives rise to a duty that is separate and apart from the duties owed under the Agreement. Nor has ACB pointed this Court to any authority

13

recognizing a special relationship between two contracting parties in an analogous context. Accordingly, the Court finds that ACB's allegations of Ardagh's "specialized expertise" as to aluminum beverage cans are insufficient to support a duty sounding in tort.

Further, and despite its argument to the contrary, ACB alleges purely economic losses. ACB claims that Ardagh's representations regarding the varnish and wax-lubricant caused "material slowdown, shutdown[,] and breakdown of the Filling Process lines." (Countercls. ¶ 128.) Although ACB attempts to characterize these losses as "property damages," "the cost of repairs and delays resulting from [ ] contractually noncompliant work" are "classic breach of contract damages." *American Constr., Inc. v. Cirocco & Ozzimo, Inc.*, 169 N.Y.S.3d 582, 584 (N.Y. App. Div. 2022). Where, as here, "a plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory[;]" not a tort theory. *Ocean Gate Homeowners Assn, Inc. v. T.W. Finnerty Prop. Mgt., Inc.*, 83 N.Y.S.3d 494, 497 (N.Y. App. Div. 2018). The Court therefore grants Ardagh's motion to dismiss Count VIII.

## II.    ARDAGH'S MOTION TO STRIKE ACB'S AFFIRMATIVE DEFENSES

Next, Ardagh moves to strike ACB's affirmative defenses 1, 3, 8, 9, 10, 11, 14, and 15 as insufficient under the Federal Rules' pleading requirements. (R. 36-2.) Because affirmative defenses are pleadings, they are subject to the same requirements applicable to complaints. *Heller*, 883 F.2d at 1294. Thus, under Rule 8, affirmative defenses must set forth a "short and plain statement" of the basis for the defense. Fed. R. Civ. P. 8(a). Allegations of fraud and mistake must be pled with particularity. *See* Fed. R. Civ. P. 9(b)).

Affirmative defenses that amount to nothing more than "bare bones conclusory allegations" do not suffice under the Federal Rules and may be stricken. *Heller*, 883 F.3d at 1295; *Savis, Inc. v. Cardenas*, No. 18 C 6521, 2019 WL 13083435, at *2 (N.D. Ill. June 21, 2019). In determining the sufficiency of an affirmative defense, courts apply a three-part test: (1) is it an appropriate affirmative defense; (2) is it adequately pled under Rules 8 and 9; and (3) is it pled sufficiently to meet the same standard as required by Rule 12(b)(6) for a complaint. *Bendtrand Glob. Servs. S.A. v. Silvers*, No. 21 C 4684, 2023 WL 6388131, at *1 (N.D. Ill. Sept. 29, 2023) (citing *Surface Shields, Inc. v. Poly-Tak Prot. Sys., Inc.*, 213 F.R.D. 307, 308 (N.D. Ill. 2003)).

In this case, the affirmative defenses challenged by Ardagh amount to a single sentence each in which ACB states the legal theory that allegedly bars Ardagh's claims in conclusory fashion without any allegations supporting the factual basis for the defense. Though ACB, in response, points to certain allegations in its answer and counterclaims to show that factual support exists, these allegations are not mentioned or incorporated by reference in the affirmative defenses. *See, e.g., Reis Robotics USA, Inc. v. Concept Indus., Inc.,* 462 F. Supp. 2d 897, 904 (N.D. Ill. 2006) (striking affirmative defense despite "lengthy counterclaim allegations" because the allegations were not mentioned or incorporated by reference in the affirmative defenses, nor was it clear what portion of the counterclaims were intended to support the affirmative defense). ACB's bare bones pleading does not comport with the Federal Rules and, thus, the Court grants Ardagh's motion to strike. *See, e.g.,*

*Bendtrand*, 2023 WL 6388131, at *2 (granting motion to strike where affirmative defenses were "completely bare bones with not a single fact alleged in support").

### III.    ARDAGH'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNT II

Finally, Ardagh moves for a declaratory judgment against ACB on Count II of the complaint under Rule 12(c). (*See generally*, R. 73.) Specifically, Ardagh seeks a declaration stating that, under Sections 2.2 and 2.2.1 of the Amended Agreement: (1) ACB has a contractual duty to purchase the Annual Minimum Volume of aluminum beverage cans from Ardagh each calendar year from 2021 through 2026; (2) should ACB fail to purchase the minimum number of aluminum cans in a given calendar year, the shortfall must be purchased by ACB the following calendar year; and (3) regardless of any failure by ACB to meet its purchase obligations, the Agreement's termination date is not to extend beyond January 1, 2028. (*Id.* at 5.)

As noted above, the parties' Amended Agreement is governed by New York law. "Under New York law, a contract 'that is clear, complete, and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.'" *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 C 8440 PAC, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 513 Fed. App'x. 109 (2d Cir. 2013) (unpublished) (citing *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011)). When the parties dispute the meaning of the contract, "the threshold question is whether the contract terms are ambiguous, . . . which is a question of law for the Court to decide on a claim-by-claim basis." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 128 (S.D.N.Y. 2014) (citations omitted).

16

The language of a contract is unambiguous where "it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for difference of opinion." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012); *see also Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978). By contrast, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012). Ambiguity can arise from either the language of the contract itself or the inferences that can be drawn therefrom, but ambiguity does not exist simply because the parties urge different interpretations of the contract's language. *Homeward Residential, Inc.*, 298 F.R.D. at 128–29. Additionally, a court must avoid any interpretation of the contract that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 470 (S.D.N.Y. 2021) (internal quotation marks and citations omitted).

Where a contract's language is clear and unambiguous, interpretation is a matter of law, and the Court may decide a claim turning on that interpretation on a Rule 12(c) motion. *See Surrey Propco LLC v. Denihan Ownership Co., LLC*, 614 F. Supp. 3d 62, 69 (S.D.N.Y. 2022). If, however, the language of a contract is ambiguous,

its interpretation presents a question of fact that is not amenable to resolution at the pleadings stage. *See Homeward Residential, Inc.,* 298 F.R.D. at 129.

The parties dispute centers on the meaning of Sections 2.2 and 2.2.1 of the Amended Agreement, which provide, in relevant part, as follows:

> 2.2 <u>Supply Minimum</u>. During the term of the Amended Agreement, ACB will purchase from Ardagh 12 oz. Sleek, 24 oz. and 12 oz. standard can bodies and associated can ends in the Annual Minimum Volume and up to the Annual Maximum Volume as outlined below. *** During the calendar year as noted in the chart below,[5] from 2021 through 2026, customer will purchase the minimum number of 12 oz. Sleek, 24 oz. and 12 oz. standard can bodies and their associated ends for shipment to ACB's US locations and ACB may elect to purchase up to the Annual Maximum Volume per calendar year as noted below, and Ardagh shall supply such Aluminum Beverage Cans as ordered by ACB up to the Annual Maximum Volume per year. Should ACB wish to purchase more than the Annual Maximum Volume in a calendar year, the Parties will work together in good faith regarding Ardagh supplying such quantities.
>
> ******************************************************
>
> 2.2.1 <u>Minimum Volumes</u>. Beginning January 1, 2021, Ardagh shall supply 100% of ACB's orders up to the Annual Maximum Volumes above. Should Customer fail to purchase the Annual Minimum Volumes during the applicable calendar year, the volume shortfall will be purchased by Customer in the following calendar year and the term of this Amended Agreement shall be extended until all such purchases have been made. For clarification, ACB shall be required to purchase such Annual Minimum Volumes as noted above in the relevant calendar year. Should ACB obtain cans or ends exceeding such Annual Minimum Volume from a third party after purchasing the

---

[5] The "chart below" includes "Annual Minimum Volume" and "Annual Maximum Volume" designations for each type of can (12 oz sleek, 12 oz standard, and 24 oz standard). (R. 36-1 at 88.) The chart is further broken down by year, beginning with 2021 and continuing for each year until 2026. (*Id.*)

18

> minimum noted above, any and all costs associated with
> such third-party supply are the responsibility of Customer.

(R. 36-1 at 87–88.)

Ardagh argues that the language of these provisions makes clear that ACB has a contractual duty to purchase the Annual Minimum Volumes during each calendar year and that any shortfall in a given year must be cured within the following calendar year to avoid breach of the Agreement. (R. 73 at 9–18.) It follows that, should ACB fail to meet its purchasing obligations in 2026, the final calendar year of the Agreement, the term of the contract (and, therefore, ACB's ability to cure) shall not extend beyond January 1, 2028 (the end of the "following calendar year"). (*See id*.) ACB, on the other hand, contends that the Amended Agreement provides no limitations on the extent to which shortfalls may be rolled over into subsequent years and contemplates a flexible extension policy under which the terms of the contract may be extended until all Annual Minimum Volumes are purchased. (R. 82 at 9–18.) In other words, ACB argues that its obligations to purchase Annual Minimum Volumes can be rolled over into subsequent years perpetually. Alternatively, ACB advances that Section 2.2 is ambiguous, thereby precluding judgment on the pleadings at this stage. (*Id.* at 18–19.)

Here, the language of the Amended Agreement clearly and unambiguously requires that ACB purchase the Annual Minimum Volume of cans that correspond to each calendar year from 2021 through 2026. Sections 2.2 and 2.2.1 use mandatory language, *i.e.* "will" and "shall be required," when describing ACB's minimum purchase requirements for these years. *See Hegazy v. Halal Guys, Inc.*, No. 22 C 1880,

2023 WL 8924092, at *4 (S.D.N.Y. Dec. 27, 2023) (explaining that language such as "must," "shall," and "will," create mandatory, not optional, terms). By contrast, the Amended Agreement uses permissive terms, *i.e.,* "may elect," when describing the Annual Maximum Volume of purchases per year. *See Novelty Crystal Corp. v. PSA Institutional Partners, L.P.* 850 N.Y.S.2d 497, 499 (N.Y. App. Div. 2008) (providing that "may" is a permissive term, whereas "will" is mandatory). "A contract should be construed, wherever possible, in such a way as to reconcile and give effect to all of its provisions." *Id.* Applying that principle here, it is clear that the Amended Agreement contemplated a minimum purchasing requirement applicable to each of the calendar years from 2021 through 2026. (*See* R. 36-1 at 88 ("During the calendar year as noted in the chart below, from 2021 through 2026, customer [ACB] *will purchase at least the minimum number of* 12 oz. Sleek, 24 oz. and 12 oz. standard can bodies and their associated ends . . ."); *id.* ("ACB *shall be required* to purchase such Annual Minimum Volumes as noted above in the relevant calendar year.").) Any contrary interpretation would render the distinction between the mandatory "will" as to the Annual Minimum Volumes and the discretionary "may" as to the Annual Maximum Volumes meaningless. *See Matter of Edelen*, 195 N.Y.S.3d 741, 744 (N.Y. App. Div. 2023) (explaining that courts "should seek an interpretation which does not render any term or phrase of a contract meaningless or superfluous").

This same principle undercuts ACB's perpetual rollover argument. Indeed, ACB advances a reading of the contract that would provide for "an adaptable minimum-maximum volume framework" and would avoid termination of the contract

unless and until ACB meets its Annual Minimum Volume purchasing obligations. (R. 82 at 9–10.) Such a reading, however, defies the basic tenets of contract interpretation. First, interpreting the Amended Agreement as allowing for perpetual rollover until all minimum volume purchases have been made would render Section 2.2's chart and its corresponding Annual Minimum Volume requirements for each calendar year meaningless. *See Edelen*, 195 N.Y.S.3d at 744.

Second, Section 2.2.1 provides that, "[s]hould [ACB] fail to purchase the Annual Minimum Volumes during the applicable calendar year, the volume shortfall will be purchased by [ACB] *in the following calendar year . . .*." (R. 36-1 at 88 (emphasis added).) The plain and ordinary meaning of the term "following," is "[t]hat comes after or next in order, sequence, or time; succeeding, subsequent, ensuing." *See Following*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/following_adj. Employing the term "following" before the singular phrase "calendar year" thus runs counter to ACB's perpetual rollover position and, instead, contemplates a limited, one-year cure period for any shortfall. *See Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12–13 (2d Cir. 2019) (applying New York law and explaining that the words and phrases used in an agreement "must be given their plain meaning so as to define the rights of the parties").

The remainder of the foregoing provision, which reads, "the term of this Amended Agreement shall be extended until all such purchases have been made[,]" (R. 36-1 at 88), does not alter this conclusion. ACB contends that this provision makes clear that any purchasing shortfalls will continue to rollover into the "following

21

calendar year[s]" indefinitely until "all [Annual Minimum Volume] purchases have been made." (R. 82 at 13.) This interpretation, however, does not give effect to the contract as a whole. *See Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956) ("The rules of construction of contracts require [courts] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."). Here, the Amended Agreement defines ACB's purchasing obligations by each "calendar year," from 2021 through 2026, and provides for a clear end date of January 1, 2027. (*See* R. 36-1 at 87.) This end date was specifically negotiated by the parties as part of their amendment to the terms of the Original Agreement, which originally provided for an end date of January 1, 2024. (R. 36-1 at 18; *see also id.* at 87 (". . . ACB and Ardagh desire to modify the Original Agreement . . . (iii) to extend the Original Agreement to January 1, 2027, as described herein.").) Had the parties intended for a "flexible" and "long-term" structure, as ACB so contends, the inclusion of a defined end date would not be necessary. *See A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 332 (S.D.N.Y. 2013) ("The parties' intent is derived from the plain meaning of the language employed in the agreements . . . when the agreements are read as a whole.").

The Court recognizes that the Amended Agreement's "Term" provision states that the January 1, 2027 end date "may be extended per the Minimum Volume Section 2.2.2 [*sic*].[6]" (R. 36-1 at 86.) In turn, Section 2.2.1 provides that "the volume

---

[6] ACB advises the Court that the Amended Agreement's "Term Provision" contains a typo wherein it refers to § 2.2.2 "rather than the relevant § 2.2.1." (R. 82 at 16 n.10.)

shortfall will be purchased by [ACB] in the following calendar year and the term of this Amended Agreement shall be extended until all such purchases have been made." (*Id.* at 88.) According to ACB, these provisions show that the end date of the Amended Agreement is determinable, not by the defined date of January 1, 2027, but by the date in which all Annual Minimum Volume purchases have been made. (R. 18 at 82.) But such an interpretation is not commercially reasonable since no rational commercial entity would incur obligations in exchange for a purely discretionary option to perform. *See Cambridge Cap. LLC*, 565 F. Supp. 3d at 470. Indeed, such an interpretation would effectively render ACB's promises under the contract illusory. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 440 (2015) (explaining that one of the traditional principles of contract law is to "avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract").

By contrast, the argument advanced by Ardagh that these provisions work in tandem to extend the contract, at most, to January 1, 2028 (assuming a 2026 purchasing shortfall) is commercially sensible. As explained above, the plain meaning of the term "following calendar year" implies a one-year cure period to make up any purchasing shortfall from the previous calendar year. Giving effect to both the "following calendar year" provision and the term-extension provision that allows the contract to be extended beyond the defined January 1, 2027 end date means that ACB would have from January 1, 2027 to December 31, 2027 to make up any shortfalls for failing to meet its Annual Minimum Volume purchases in 2026. *See, e.g., Ruttenberg*

23

*v. Davidge Data Sys. Corp.*, 626 N.Y.S.2d 174, 177 (N.Y. App. Div. 1995) ("An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation.").

For these reasons, the Court concludes that Sections 2.2 and 2.2.1 of the Amended Agreement are not ambiguous. Rather, the contract's terms plainly impose an Annual Minimum Volume purchase obligation on ACB for each calendar year from 2021 through 2026; that any purchasing shortfall during the applicable calendar year shall be cured within the following calendar year; and, because the cure period for any 2026 purchasing shortfall would extend from January 1, 2027 to December 31, 2027 (*i.e.,* the "following calendar year"), the contract may be extended beyond the defined end date of January 1, 2027, until all such purchases are made, but terminate no later than January 1, 2028. Accordingly, Ardagh's motion for judgment on the pleadings on Count II of the complaint is granted.

## CONCLUSION

Ardagh Metal Packaging USA Corp.'s partial motion to dismiss Defendant American Craft Brewery, LLC's counterclaims [32] is granted in part and denied in part; its motion to strike affirmative defenses [34] is granted; and its motion for judgment on the pleadings [70] is granted. American Craft Brewery shall have 21 to amend its counterclaims and affirmative defenses.

Date: February 26, 2024

JEREMY C. DANIEL
United States District Judge

24