**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ARDAGH METAL PACKAGING USA CORP., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN CRAFT BREWERY LLC, <br><br> Defendant. | Case No. 1:22-cv-07367 (JCD) (JA) <br><br> **DEFENDANT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT** |

**DEFENDANT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS TO PLAINTIFF'S COMPLAINT**

Defendant American Craft Brewery LLC ("ACB" or "Defendant"), by and through its undersigned counsel of record, hereby submits its Amended Answer, Affirmative Defenses and Counterclaims to the Complaint filed by Ardagh Metal Packaging USA Corp. ("Plaintiff" or "Ardagh") (ECF 1), as follows:

**ANSWER**

Defendant denies each and every allegation, matter, and thing contained in the Complaint filed by Plaintiff Ardagh, unless herein specifically admitted or otherwise qualified. With respect to Ardagh's use of headings that may be construed as allegations, they are denied.

**NATURE OF THE CASE**

1.      This is a breach of contract action that arises out of ACB's failure to purchase the contractual minimum volumes of certain aluminum beverage can containers in 2021 and 2022, its refusal to provide reasonable assurances of its future performance of its contractual obligations, and its anticipated failure to purchase a minimum volume of certain aluminum beverage can containers in each of ███ through ███, all in material breach of ACB's contractual obligations

pursuant to the Aluminum Beverage Can Supply Agreement, effective as of January 1, 2020 (the "Initial Agreement"), as amended by the First Amendment to Can Supply Agreement effective as of December 22, 2020 (the "Amendment" and together with the Initial Agreement, the "Amended Agreement").

**ANSWER:** **Defendant admits that it is a party to the Aluminum Beverage Can Supply Agreement, as amended by the First Amendment to Can Supply Agreement, and admits that the contract speaks for itself. Defendant denies the remaining allegations in Paragraph 1.**

2. Based upon ACB's material breach of the Amended Agreement, Ardagh seeks its available remedies, including recovery of damages in the tens of millions of dollars and more, far in excess of $75,000 exclusive of interest, costs, and attorneys' fees.

**ANSWER:** **Defendant denies the allegations in Paragraph 2.**

3. In the alternative, Ardagh seeks specific performance requiring ACB to perform its obligations under the Amended Agreement, including the timely purchase of the contractual minimum volumes of aluminum beverage can containers for each of 2021, 2022, ███████████

██████

**ANSWER:** **Defendant denies the allegations in Paragraph 3.**

## PARTIES, JURISDICTION, AND VENUE

4. Ardagh is a corporation organized and existing under Delaware law with its principal place of business in Chicago, Illinois. For diversity purposes, Ardagh is a citizen of the State of Delaware and the State of Illinois.

**ANSWER:** **Defendant admits the allegations of Paragraph 4 upon information and belief.**

5. ACB is a limited liability company existing and organized under Massachusetts law with a principal place of business in Boston, Massachusetts.

**ANSWER:     Defendant admits the allegations in Paragraph 5.**

6.      The sole member of ACB is Boston Beer Company, Inc., a corporation organized and existing under Massachusetts law with a principal place of business in Boston, Massachusetts. For diversity purposes, ACB is a citizen of the Commonwealth of Massachusetts.

**ANSWER:     Defendant denies the allegations in the first sentence of Paragraph 6. The allegations in the second sentence state a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that it is a citizen of Massachusetts for purposes of subject-matter jurisdiction.**

7.      The Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1) because the controversy is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:     Paragraph 7 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that it is a citizen of Massachusetts for purposes of subject matter jurisdiction.**

8.      The Court has personal jurisdiction over ACB because ACB continuously conducts business and sells its products in Illinois and this action arises out of specific activities undertaken by ACB within and affecting the State of Illinois, including:

(a)      ACB is registered with the Illinois Secretary of State to do business in Illinois;

(b)      ACB continuously does business in Illinois, including by advertising its products throughout Illinois and selling its products throughout Illinois;

(c)      ACB contracted with Ardagh, a corporation with its principal place of business located in Illinois;

(d)     ACB conducted negotiations of the Amended Agreement in Illinois by directing its communications regarding the contract into Illinois;

(e)     All notices under the Amended Agreement were to be provided to Ardagh in Illinois, and ACB employees and executives regularly communicated regarding the Amended Agreement with Ardagh employees and executives in Illinois;

(f)     ACB made payments to Ardagh under the Amended Agreement in Illinois;

(g)     The testing of ACB's beverages for the cans produced under the Amended Agreement took place in Illinois;

(h)     The artwork and graphic design for the cans produced under the Amended Agreement took place in Illinois; and

(i)     ACB personnel travelled to Ardagh's facilities in Illinois related to the foregoing design work.

**ANSWER:     Paragraph 8 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits the allegations in subparagraphs (a), (d), (e), (f), and (i) of Paragraph 8. Defendant admits the allegations in subparagraph (c) of Paragraph 8 upon information and belief. Defendant admits that it advertises its products and sells its products in Illinois, but denies any remaining allegations in subparagraph (b) of Paragraph 8. Defendant denies the remaining allegations in Paragraph 8.**

9.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district—namely, ACB contracted with Ardagh, a corporation with its principal place of business located in this judicial district, to purchase certain aluminum beverage can containers and thereafter failed to honor its obligations to Ardagh.

**ANSWER:** **Paragraph 9 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that ACB and Ardagh entered into the Aluminum Beverage Can Supply Agreement and the First Amendment to Can Supply Agreement. ACB further admits, upon information and belief, that Ardagh has its principal place of business in this District. Defendant denies the remaining allegations in Paragraph 9.**

<u>FACT ALLEGATIONS</u>

**The Amended Agreement and Ardagh's Reasonable Reliance on ACB's Promises**

10.     Effective January 1, 2020, Ardagh and ACB entered into the Initial Agreement pursuant to which Ardagh agreed to supply, and ACB agreed to purchase, a minimum volume of certain aluminum beverage ███████████████████, referred to as ██████████ cans, in each of 2020, 2021, and 2022.

**ANSWER:** **Defendant admits that Ardagh and ACB entered into the Initial Agreement effective January 1, 2020. The Initial Agreement speaks for itself and Defendant denies any allegation that the contractual duties set forth in the Initial Agreement are as Plaintiff may specifically allege herein. Defendant denies the remaining allegations in Paragraph 10, and the preceding section heading.**

11.     Beginning only months after the effective date of the Initial Agreement, ACB requested certain modifications of the Initial Agreement.  In response to ACB's request, Ardagh engaged in negotiations with ACB for modification of the Initial Agreement.

**ANSWER:** **Defendant admits the allegations in Paragraph 11 that the parties engaged in negotiations regarding potential modifications of the Initial Agreement. Defendant denies the remaining allegations in Paragraph 11.**

12.     ACB sought modification to:

    1.      extend the term of the Initial Agreement through ██████████;

    2.      add additional ███████████████████ cans ████████████████

████ for purchase;

    3.      increase the annual minimum purchase and supply requirements for ████████

████████████████████████ that are the subject of the Initial Agreement through ████████

████; and

    4.      reserve Ardagh's production capacity up to annual maximum volumes.

**ANSWER:    Defendant admits the allegations in Paragraph 12 that the parties engaged in negotiations regarding potential modifications of the Initial Agreement. Defendant denies the remaining allegations in Paragraph 12.**

13.     Effective December 22, 2020, Ardagh and ACB entered into the Amendment, which extended the term of the Initial Agreement through ██████████, added additional ██ ████████████████████ cans █████████████████ for purchase, and set specific annual minimum purchase requirements for ██████████████████████████████ that are the subject of the Amended Agreement ████████████, which the Amendment refers to as the "Annual Minimum Volume" for each ████████.

**ANSWER:    Defendant admits the allegations in Paragraph 13 that the parties entered into the Amendment which amended the Initial Agreement. The Amendment and Initial Agreement speak for themselves and Defendant denies any allegation that the contractual duties set forth in the Amendment or Initial Agreement are as Plaintiff may specifically allege herein. Defendant denies the remaining allegations in Paragraph 13.**

14.     Section 2.2 of the Amended Agreement requires ACB to purchase enumerated minimum volumes: █████████████████████████████████████████



**ANSWER:** **Defendant admits that the first sentence included in Paragraph 14 accurately quotes Section 2.2 of the Amended Agreement. Defendant further admits that the chart included in Paragraph 14 quotes the chart included in Section 2.2 of the Amended Agreement. The Amended Agreement speaks for itself and Defendant denies any allegations that the contractual duties set forth in the Amended Agreement are as Plaintiff may specifically allege herein. Defendant denies the remaining allegations in Paragraph 14.**

15. Section 2.2's Annual Minimum Volumes is a non-discretionary requirement of ACB with no predicate conditions: ██████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████ (Emphasis added.)

**ANSWER:** **Defendant states that the Amended Agreement speaks for itself and denies any**

allegations that Plaintiff's interpretation and the contractual duties set forth in the Amended Agreement are as Plaintiff may specifically allege herein. Defendant denies the remaining allegations in Paragraph 15.

16.    Section 2.2.1 of the Amended Agreement requires



**ANSWER:    Defendant admits that the block quote in Paragraph 16 accurately quotes a portion of Section 2.2.1 of the Amended Agreement. The Amended Agreement speaks for itself and Defendant denies any allegations that Plaintiff's interpretation and the contractual duties set forth in the Amended Agreement are as Plaintiff may specifically allege herein. Defendant denies the remaining allegations in Paragraph 16.**

17.    In reliance on ACB's request to amend the Initial Agreement and ACB's contractual obligation to purchase the Annual Minimum Volumes agreed to in the Amendment, Ardagh reserved manufacturing capacity and invested capital to create and to operate additional manufacturing capacity to supply ACB with ACB's required minimum (and maximum) container purchases at the expense of selling and contracting that same capacity to other customers.

**ANSWER:    Defendant lacks knowledge or information to admit or deny the allegations in Paragraph 17 that Ardagh relied, and therefore denies them. Defendant denies the remaining allegations in Paragraph 17.**

18.     In reasonable reliance upon ACB's representations in negotiations of the Initial Agreement, ACB's representations in negotiations of the Amendment, and ACB's contractual commitments in the Amended Agreement, Ardagh has spent millions of dollars to ensure it would meet its obligations to ACB under the Amended Agreement.  These expenditures include but are not limited to incurring labor and energy costs; purchasing aluminum and other materials; and purchasing, installing, and operating new production equipment.

**ANSWER:     Defendant lacks knowledge or information to admit or deny the allegations in Paragraph 18 that Ardagh relied, and therefore denies them. Defendant denies the remaining allegations in Paragraph 18.**

**ACB Breaches the Amended Agreement.**

19.     In 2021, ACB failed and refused to purchase the defined Annual Minimum Volumes of the 

**ANSWER:     Defendant denies the allegations in Paragraph 19 and in the section heading preceding Paragraph 19.**

20.     Specifically, for the ▮▮▮▮▮ can, ACB was required to purchase ▮▮▮▮ cans in 2021, but it purchased ▮▮▮▮▮▮▮▮ cans.

**ANSWER:     Defendant denies the allegations in Paragraph 20.**

21.     For the ▮▮▮▮▮ can, ACB was required to purchase ▮▮▮▮▮ in 2021, but it purchased ▮▮▮▮▮▮ cans.

**ANSWER:     Defendant denies the allegations in Paragraph 21.**

22.     For the ▮▮▮ can, ACB was required to purchase ▮▮▮▮ cans in 2021, but it purchased ▮▮▮▮▮▮ cans.

**ANSWER:     Defendant denies the allegations in Paragraph 22.**

23.     The following tables show the Annual Minimum Volumes set forth in the Amended Agreement; ACB's actual purchases in 2021; ACB's purchases in 2022 (based on actual purchases through November and ACB's December forecast); ███████████████████████████ ███████████████████████; and the corresponding shortfalls, with all volumes expressed in thousands of units.

**A.**     ████████

███

███

███

**ANSWER:**     **Defendant denies the allegations in Paragraph 23.**

24.     ACB failed and refused to purchase the Annual Minimum Volumes in 2021 and in 2022.

**ANSWER:**     **Defendant denies the allegations in Paragraph 24.**

25.     In 2022, the Amended Agreement requires ACB to purchase ████████████ cans, but ACB purchased ████████████████ cans, which did not satisfy ACB's obligation to make up its 2021 purchase shortfall, let alone begin to meet its █████ can purchase requirement for 2022.

**ANSWER:**     **Defendant denies the allegations in Paragraph 25.**

26.     In 2022, the Amended Agreement requires ACB to purchase ████████████ █████ cans, but ACB failed to make the ████████ cans purchases to satisfy ACB's obligation to make up any purchase shortfall in the next subsequent year as well as ACB's █ ██████████ can purchase required for 2022.

**ANSWER:**     **Defendant denies the allegations in Paragraph 26.**

27.     In 2022, the Amended Agreement requires ACB to purchase ████████ cans and ACB is expected to purchase ████████████ cans, which would satisfy ACB's obligation to make up its 2021 purchase shortfall but leaves ACB having met ███ ████████████ can purchase requirement for 2022.

**ANSWER:**     **Defendant denies the allegations in Paragraph 27.**

28.     Pursuant to the applicable provisions of the Uniform Commercial Code, Ardagh demanded reasonable assurances from ACB that it will (a) cure its current defaults and (b) perform its contractual obligations for future years as required by the Amended Agreement.

**ANSWER:**     **Defendant denies the allegations in Paragraph 28.**

29. ACB has failed and refused to provide Ardagh with reasonable assurances either that it will cure its defaults or perform its contractual obligations for the remaining term of the Amended Agreement.

**ANSWER:** **Defendant denies the allegations in Paragraph 29.**

30. Upon information and belief, ACB knows and expects that it will fail to remedy any of its purchasing shortfalls and will continue to fail to meet the Annual Minimum Volumes for 2021, 2022, and all future years, and the shortfalls will accumulate and compound during the remaining term of the Amended Agreement.

**ANSWER:** **Defendant denies the allegations in Paragraph 30.**

31. Upon information and belief, throughout the term of the Amended Agreement ACB had made other aluminum beverage can purchasing commitments to, and purchases from, a third party, Ball Corporation ("Ball"). At the time that ACB entered into the Amendment with Ardagh, ACB knew or reasonably should have known that its arrangement with Ball would preclude ACB from being able to purchase the Annual Minimum Volumes ███████████.

**ANSWER:** **Defendant admits that it has a contractual relationship with Ball Corporation. Answering further, Ardagh was aware of the contract with Ball, and acknowledged that it knew that ACB's ███ volume will be split between Ardagh and Ball. Defendant denies all remaining allegations in Paragraph 31.**

32. Upon information and belief, ACB entered into the Amended Agreement and has conducted itself during the term of the Amended Agreement with knowledge its representations and omissions would mislead Ardagh or with reckless indifference to the fact its representations and omissions would mislead Ardagh; and with reckless indifference or knowing disregard of the rights of Ardagh, the significant investment of time and resources that Ardagh would be making

in connection with the Amended Agreement, and the harm Ardagh would and is suffering as the result of ACB's continuing breach of the Amended Agreement.

**ANSWER: Defendant denies the allegations in Paragraph 32.**

33.    ACB's failure timely to disclose to Ardagh that ACB would fail to purchase the Annual Minimum Volumes for 2022 and ACB's further failure to provide reasonable forecasts for future years of the term of the Amended Agreement has reduced and precluded Ardagh from avoiding the consequences of ACB's breach, including efforts to identify and contract with a replacement buyer for the 2021, 2022, and future shortfalls of ACB's purchase of Annual Minimum Volumes, as well as avoiding expenditures of additional capital to meet the production requirements of the Amended Agreement.

**ANSWER: Defendant denies the allegations in Paragraph 33.**

34.    All conditions precedent to suit have been satisfied, including Ardagh's compliance with Section 15 of the Amended Agreement.

**ANSWER: Defendant denies the allegations in Paragraph 34.**

35.    Ardagh attempted to settle this dispute through good faith consultation with ACB for several months in the summer and fall of 2022.  These consultations included, without limitation, Ardagh sales personnel repeatedly attempting to discuss the shortfalls with ACB personnel to no avail; Ardagh senior officers requesting reasonable assurances from ACB that it would comply with its obligations under the contract; and Ardagh senior officers initiating consultations directly with ACB senior officers regarding the severity of the breaches and damages and potential remedies.

**ANSWER: Defendant admits that the parties engaged in discussions concerning can volumes including in the summer and fall of 2022, as well as earlier than that timeframe.**

**Defendant denies all remaining allegations in Paragraph 35.**

36.     Because Ardagh's good faith consultations did not result in resolution of the dispute, Ardagh provided ACB with formal written notice of the dispute on October 21, 2022. Because Ardagh and ACB had been engaged in consultations for several months without success, Ardagh proposed that the parties waive ████████████████████████████████ ██████████████████████████████████.

**ANSWER:    Defendant admits that Ardagh provided ACB with written notice of the dispute on October 21, 2022, which letter speaks for itself.  Defendant denies any remaining allegations in Paragraph 36.**

37.     On November 10, 2022, ACB agreed with Ardagh to waive ███████████ ████████████████████████████████████████████████ ███████████████████████████.

**ANSWER:    Defendant admits that it agreed to waive ████████████ █████████████████, conditioned on Ardagh engaging in a good faith negotiations between the appropriate business persons with authority, in advance of mediation. Defendant denies that Ardagh acted in good faith and any remaining allegations in Paragraph 37.**

38.     Ardagh commenced a mediation with JAMS through written request on November 15, 2022.

**ANSWER:    Defendant admits that Ardagh appears to have commenced mediation with JAMS on or about November 15, 2022, however, Ardagh failed on that date to provide to ACB a copy of its submission.**

39. ████████████████████████████████████████████████

██████████████████████████████████

**ANSWER:** **Defendant states that Section 15.3 of the Amended Agreement speaks for itself.**
**Defendant denies any remaining allegations in Paragraph 39.**

40. Following commencement of the mediation, ACB has refused to agree to a
mediator (refusing to even consider or discuss any of the eight mediators recommended by JAMS),
has sought to postpone the mediation until February, and has prevented the mediation from
occurring ████████████████████████████████████████.

**ANSWER:** **Defendant denies the allegations in Paragraph 40. In fact, ACB proposed**
**several mediators to Ardagh in November, 2022 in an attempt to proceed with the mediation,**
**however, Ardagh rejected such proposed mediators.**

41. Despite Ardagh's good faith efforts, the parties failed to resolve this dispute by
mediation ██████████████████████████████████████

**ANSWER:** **Defendant admits that the parties' efforts have not resulted in a settlement.**
**Defendant denies the remaining allegations in Paragraph 41.**

42. Because there has been no mediation and the mediation specified in the Amended
Agreement has failed (due to ACB's refusal to conduct it), Ardagh may pursue this litigation.

**ANSWER:** **Defendant denies that there has been no mediation and that ACB refused to**
**conduct it. Defendant affirmatively states that the parties attended mediation before a**
**JAMS mediator on February 23, 2023, with a second session on April 4, 2023, but no**
**settlement was reached. Defendant denies all remaining allegations in Paragraph 42.**

**COUNT I**
(Breach of the Amended Agreement)

43. Ardagh incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

**ANSWER:** **Defendant incorporates by reference its answers to the above paragraphs as if fully stated herein.**

44. The Amended Agreement is a valid, binding, and enforceable contract.

**ANSWER:** **The allegation in paragraph 44 is a legal conclusion to which no answer is required. To the extent that an answer is required, Defendant denies that it has breached the Agreement and denies that Ardagh may enforce the Agreement due to Ardagh's material breaches of the Agreement.**

45. Ardagh has performed all of its obligations under the Amended Agreement for 2021 and 2022. It remains willing and able to perform its obligations for ███████████████ under the Amended Agreement.

**ANSWER:** **Defendant denies the allegations in Paragraph 45. Answering further, ACB has been unable to make recent purchases of cans from Ardagh due to Ardagh's defective cans. Ardagh also breached the Amended Agreement dating back to 2020, including its failure to deliver cans that meet the required specifications and warranty, that are free from defects, and that are suitable for the proposed uses, including but not limited to under Section 2.2.4 of the First Amendment, which provides: "███████████████████**

**████████████████████████████████████████████**

**████████████████████████████████████████"**

46. Ardagh has satisfied any and all conditions precedent to filing this lawsuit for enforcement of the Amended Agreement.

**ANSWER:** **Defendant denies the allegations in Paragraph 46.**

47.     ACB has breached the Amended Agreement by failing to purchase the 2021 and 2022 Annual Minimum Volumes of the ███████████████████████████████████ ████████████.

**ANSWER:     Defendant denies the allegations in Paragraph 47.**

48.     ACB has breached the Amended Agreement after Ardagh's demand for reasonable assurances by failing to provide Ardagh with reasonable assurances either that it will cure its defaults or perform its contractual obligations for the remaining term of the Amended Agreement.

**ANSWER:     Defendant denies the allegations in Paragraph 48.**

49.     ACB has failed and refused to remedy its material breaches of the Amended Agreement.

**ANSWER:     Defendant denies the allegations in Paragraph 49.**

50.     ACB's behavior in connection with its breaches has been egregious because ACB entered into an aluminum can purchasing agreement with Ball, an act which ACB understood would preclude it from purchasing the Annual Minimum Volumes under the Amended Agreement with Ardagh.

**ANSWER:     Defendant admits that it has a contractual relationship with Ball Corporation. Answering further, Ardagh was aware of the contract with Ball, and acknowledged that it knew that ACB's ████ volume will be split between Ardagh and Ball.  Defendant denies the remaining allegations in Paragraph 50.**

51.     As a direct and proximate result of ACB's breaches of the Amended Agreement, Ardagh has been and continues to be directly damaged in an amount to be proven at trial in the tens of millions of dollars and more, but not less than $75,000, plus prejudgment and post-

judgment interest and all costs, including attorneys' fees, incurred by Ardagh in pursuing this litigation or otherwise enforcing its rights under the Amended Agreement.

**ANSWER:     Defendant denies the allegations in Paragraph 51.**

52.     Ardagh is entitled to an award of direct damages in an amount to be proven at trial in the tens of millions of dollars and more.

**ANSWER:     Defendant denies the allegations in Paragraph 52.**

53.     In the alternative, as a direct and proximate result of ACB's breach of the Amended Agreement, and because there is no other adequate remedy at law, Ardagh is entitled to an order of specific performance requiring ACB to comply with the terms of the Amended Agreement, including purchasing the 2021 and 2022 shortfall Annual Minimum Volumes and the requisite Annual Minimum Volumes in each year thereafter from ███████████████.

**ANSWER:     Defendant denies the allegations in Paragraph 53.**

54.     The cans that ACB is obligated to purchase are not fungible and, due to the massive volume of the Annual Minimum Volumes shortfalls, present special circumstances that may result in Ardagh having to close production lines or facilities due to an inability to sell the cans to another party.

**ANSWER:     Defendant denies the allegations in Paragraph 54.**

55.     The circumstances of the instant case are such that an award of specific performance is proper.

**ANSWER:     Defendant denies the allegations in Paragraph 55.**

56.     Further, ████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

███████████████████████████████████████████

██████████

**ANSWER:** **Defendant states that Section 15.3 of the Amended Agreement speaks for itself.**
**Defendant denies the remaining allegations in Paragraph 56.**

57.      Upon information and belief, ACB's conduct and positions have been and continue
to be egregious within the definition of the Amended Agreement.

**ANSWER:** **Defendant denies the allegations in Paragraph 57.**

58.      Ardagh as the party seeking enforcement is entitled to an award of reasonable costs,
fees and expenses, including attorneys' fees.

**ANSWER:** **Defendant denies the allegations in Paragraph 58.**

**WHEREFORE**, Ardagh respectfully requests that the Court:

(a)      Enter judgment against ACB for breach of the Amended Agreement in an amount
to be determined at trial, but not less than $75,000;

(b)      In the alternative, enter an order of specific performance requiring ACB to comply
with the terms of the Amended Agreement, including purchasing the 2021 shortfall Annual
Minimum Volumes in 2022, the 2022 shortfall Annual Minimum Volumes ██████, and the
requisite Annual Minimum Volumes in each year thereafter ███████████████;

(c)      Award Ardagh pre-judgment and post-judgment interest as permitted by law;

(d)      Award Ardagh costs and reasonable attorneys' fees incurred in pursuing this action
as provided by the Amended Agreement and permitted by law; and

(e)      Award Ardagh such other and further relief as shall be just and proper.

**ANSWER:** **Defendant denies the allegations in the "WHEREFORE" clause of the above**
**Breach of Contract cause of action section.**

## COUNT II
(Declaratory Judgment)

59. Ardagh incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

**ANSWER: Defendant incorporates by reference their answers to the above paragraphs and its factual allegations in its Amended Counterclaim and its Amended Affirmative Defenses as if fully stated herein.**

60. The Amended Agreement is a valid, binding, and enforceable contract.

**ANSWER: The allegation in paragraph 60 is a legal conclusion to which no answer is required. To the extent that an answer is required, Defendant denies that it has breached the Agreement and denies that Ardagh may enforce the Agreement due to Ardagh's material breaches of the Agreement.**

61. The ████████████████████████████████████████████ that Ardagh agreed to make for ACB pursuant to the Amended Agreement are not fungible and have been designed and manufactured specifically for ACB, at ACB's request.

**ANSWER: Defendant denies the allegations in Paragraph 61.**

62. Ardagh fully performed all of its obligations under the Amended Agreement for 2021 and 2022; Ardagh remains willing and able to perform its obligations for ████████ ████████ under the Amended Agreement; and Ardagh has satisfied any and all conditions precedent to enforcement of the Amended Agreement.

**ANSWER: Defendant denies the allegations in Paragraph 62. Answering further, ACB has been unable to make recent purchases of cans from Ardagh due to Ardagh's defective cans. Ardagh also breached the Amended Agreement dating back to 2020, including its failure to deliver cans that meet the required specifications and warranty, that are free from**

defects, and that are suitable for the proposed uses, including but not limited to under Section 2.2.4 of the First Amendment, which provides: "███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████"

63.     ACB has materially breached the Amended Agreement by failing to purchase the 2021 Annual Minimum Volumes of the ███████████████████████████████ ████████████.

**ANSWER:     Defendant denies the allegations in Paragraph 63.**

64.     Despite demand by Ardagh, ACB has failed or refused to remedy its material breach of the Amended Agreement.

**ANSWER:     Defendant denies the allegations in Paragraph 64.**

65.     Despite demand by Ardagh, ACB has failed or refused to provide reasonable assurances that it will remedy its material breaches of the Amended Agreement or perform its purchase obligations for the remaining term of the Amended Agreement.

**ANSWER:     Defendant denies the allegations in Paragraph 65.**

66.     Ardagh is entitled to a declaratory judgment that ACB is in breach of the Amended Agreement for the years 2021, 2022, and that ACB is required to purchase the Annual Minimum Volumes in future years of the term of the Amended Agreement.

**ANSWER:     Defendant denies the allegations in Paragraph 66.**

67.     Further, ████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

██████████████████████████████████████████████████████

████████"

**ANSWER:** **Defendant states that section 15.3 of the Amended Agreement speaks for itself. Defendant denies the allegations in Paragraph 67.**

68. Upon information and belief, ACB's conduct and positions have been and continue to be egregious within the definition of the Amended Agreement.

**ANSWER:** **Defendant denies the allegations in Paragraph 68.**

69. Ardagh as the party seeking enforcement is entitled to an award of reasonable costs, fees and expenses, including attorneys' fees.

**ANSWER:** **Defendant denies the allegations in Paragraph 69.**

WHEREFORE, Ardagh respectfully requests that the Court:

(a)     Declare ACB in breach of the Amended Agreement for the years 2021 and 2022;

(b)     Declare that ACB is required to purchase the Annual Minimum Volumes in future years of the term of the Amended Agreement;

(c)     Enter an order of specific performance requiring ACB to comply with the terms of the Amended Agreement, including purchasing the 2021 shortfall Annual Minimum Volumes in 2022, the 2022 shortfall Annual Minimum Volumes ██████, and the requisite Annual Minimum Volumes in each year thereafter ██████████████████████;

(d)     Award Ardagh pre-judgment and post-judgment interest as permitted by law;

(e)     Award Ardagh costs and reasonable attorneys' fees incurred in pursuing this action as provided by the Amended Agreement and permitted by law; and

(f)     Award Ardagh such other and further relief as shall be just and proper.

**ANSWER:** **Defendant denies the allegations in the "WHEREFORE" clause of the above**

Declaratory Judgment cause of action section.

## JURY TRIAL DEMAND

Ardagh demands a trial by jury for all issues so triable.

**ANSWER:** **Defendant demands a trial by jury for all issues so triable.**

## DEFENDANT'S AMENDED AFFIRMATIVE DEFENSES

Defendant submits the following as its amended affirmative defenses to the causes of action alleged against it by Plaintiff, and in further support of each of its affirmative defenses, Defendant incorporates by reference each of its answers to the above paragraphs of Plaintiff's Complaint (paragraphs 1–69) and each of its allegations in support of Defendant's Amended Counterclaims (paragraphs 1–156) set forth below.

### *First Affirmative Defense*

1.      Plaintiff's claims are barred, in whole or in part, for failure to state a claim upon which relief can be granted. Defendant has in all respects complied with the terms of the parties' January 1, 2020 Can Supply Agreement ("Initial Agreement") and December 2020 First Amendment to Can Supply Agreement ("Amended Agreement") (together, the "Agreements"), has not breached the parties' Agreements, nor has Plaintiff suffered any damage attributable to any alleged breach by Defendant of the parties' Agreements. Plaintiff further misstates the Agreements' terms and meaning. Plaintiff is not entitled to any relief sought by its Complaint.

### *Second Affirmative Defense*

2.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's material breaches of the parties' agreement, including its failure to deliver cans that meet the required specifications and warranty, that are free from defects, and that are suitable for the proposed uses, including but not limited to under Section 2.2.4 of the First Amendment, which provides: "█████████████

23

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████" Ardagh further breached the Amended Agreement dating back to 2020, including its failure to deliver cans that meet the required specifications and warranty, that are free from defects, and that are suitable for the proposed uses including, without limitation, sections 3, 5.2.6 and 6.5 and Appendix A of Exhibit D to the Agreement.

### *Third Affirmative Defense*

3.      The agreement between the parties is subject to rescission, or alternatively reformation, under the doctrine of mutual mistake because it does not represent the meeting of the minds of the parties regarding material terms of their agreement.

4.      At the time the Amended Agreement was executed, the parties understood and agreed that their agreement would permit Defendant to ████████████████████ ██████ in its purchases of Annual Minimum Volume targets for cans and ██████████ to ███████████, and to ████████████████████ Defendant purchased all of the Annual Minimum Volume targets.

5.      Prior to filing its Complaint, Plaintiff (including through its managers and officers) represented to and agreed with Defendant that Defendant is not contractually obligated to purchase the total volume targets each particular year, and may ████████████████████ ██████████████████████████.

6.      Indeed, the written Amended Agreement expressly provides that "███████████ ████████████████████████████████████"

7.      The Amended Agreement also omits ███████████████████ ██████████████████████████ Defendant to purchase the Annual Minimum

Volumes.

8.     The concept of a ███████████████ was expressly discussed by the parties and ultimately rejected.

9.     In fact, Ardagh initially proposed the concept of ████████████████████ ██████████████████████████ as a "flexible" alternative to a "█████████████████████ ██████" which require contracting parties to ███████████████████████████████ ████████████████████████████████████████████.

10.    The Amended Agreement also omits any ████████████████████████████ ██████.

11.    Additionally, the parties agreed to a broad and conspicuous "████████████ ██████████" provision providing: "██████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████" Amended Agreement § 20.9.

12.    Further, at the time the Amended Agreement was executed, both parties understood and agreed that Defendant would purchase approximately ████ of its total ██████████ cans from Plaintiff, while the remainder would be purchased by Defendant from another supplier. ACB acted in good faith relating to this percentage.

13.    To the extent the Amended Agreement does not express the above understandings and agreements, such was unknown to either party and a mutual mistake that does not represent the intent of the parties at the time of execution of the Amended Agreement.

14.    Defendant reasonably relied upon and would not have entered into the Amended

Agreement with Plaintiff but for the above understandings and agreements.

### Fourth Affirmative Defense

15.     Plaintiff is not entitled to the relief sought based on its failure to mitigate its alleged damages.

### Fifth Affirmative Defense

16.     Plaintiff's claims do not lie and are insufficient because there is a lack of cognizable harm, injury, and/or damage.

### Sixth Affirmative Defense

17.     To the extent that Plaintiff has sustained any damages, which Defendant denies, those alleged losses were not directly or proximately caused by any action or inaction by Defendant alleged in Plaintiff's Complaint.

### Seventh Affirmative Defense

18.     Plaintiff's claims are barred, limited, or restricted by the doctrine of setoff.

### Eighth Affirmative Defense

19.     Plaintiff's claims are barred, in whole or in part, by the principles of estoppel.

20.     Defendant incorporates by reference the allegations set in support of Defendant's amended Third Affirmative Defense set forth in Paragraphs 3–14, above.

21.     Further pleading, as a separate and independent ground, at the time the parties entered the Agreements, the market for hard seltzers and other drinks packaged in ▮▮▮▮▮▮ cans was expanding rapidly.

22.     Plaintiff made representations to Defendant regarding its own market studies, which confirmed that demand for ▮▮▮▮▮▮ cans was robust, growing, and supported the Amended Agreement's Annual Minimum Volumes, and that Plaintiff was itself committed to

investing in the market for ██████ cans.

23.    Plaintiff further represented to Defendant at the time of the Amended Agreement that if Defendant did not commit to the Annual Minimum Volumes, Plaintiff's ████ production capacity would be devoted to other motivated customers for ███ cans, and would not be available to Defendant.

24.    Defendant agreed to the Annual Minimum Volumes in the Amended Agreement, and made significant investments to prepare for such volumes, in reliance on Plaintiff's representations.

25.    Further, following a significant downturn in the market in 2021, Defendant had no choice but to reduce the volume of its ████████ can orders from Plaintiff, and worked with Plaintiff to provide revised forecasts for its requirements, including larger forecasts for ████ ██████ cans.

26.    Plaintiff for many months thereafter made representations to Defendant that Plaintiff recognized the demand downturn, that it would work together with Defendant to alleviate the impact of the downturn on both parties and their respective investments, and represented and agreed (as it had prior to the signing of the Amended Agreement) that ACB is not contractually obligated to purchase the total targets each particular year and may ███████████████████ ████████████. Plaintiff did not allege any breach by Defendant, and to the contrary, the parties discussed various business proposals to address the demand downturn.

27.    Plaintiff further represented that Plaintiff had flexibility with demand from other customers that would allow Plaintiff to revise the targeted Annual Minimum Volumes.

28.    Contrary to Plaintiff's prior representations and statements, and after many months of working together constructively on various revised scenarios moving forward, including

Plaintiff's acceptance of reduced forecasts and the parties' cooperative efforts to project additional volume in later years, Plaintiff reversed course and suddenly alleged that Defendant was breaching its alleged purchasing commitments under the Amended Agreement.

29.     Defendant reasonably relied on Plaintiff's representations and conduct to its detriment, including in that Defendant reasonably believed that Plaintiff would continue to work cooperatively with Defendants to alleviate the impact of the downturn on both parties—including to move shortfall volumes to later years—and continued to make purchases from Plaintiff under the parties' Amended Agreement while shortfalls compounded.

30.     Plaintiff intended Defendant to rely on its conduct and representations and knew or should have known that it would ultimately seek to hold Defendant to the Annual Minimum Volumes.

### Ninth Affirmative Defense

31.     Plaintiff's claims are barred, in whole or in part, by the principles of waiver.

32.     Following the significant downturn in the market in 2021, Defendant had no choice but to reduce the volume of its ▮▮▮▮▮ can orders from Plaintiff, and worked with Plaintiff to provide revised forecasts for its requirements.

33.     Plaintiff for many months thereafter made representations to Defendant that Plaintiff recognized the demand downturn, that it would work together with Defendant to alleviate the impact of the downturn on both parties and their respective investments, and represented and agreed (as it had prior to the signing of the Amended Agreement) that ACB is not contractually obligated to purchase the total targets each particular year and may ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. Plaintiff did not allege any breach by Defendant, and to the contrary, the parties discussed various business proposals to address the demand downturn.

34.     Plaintiff further represented that Plaintiff had flexibility with demand from other customers that would allow Plaintiff to revise the targeted Annual Minimum Volumes.

35.     Only after many months of working together constructively on various revised scenarios moving forward, including Plaintiff's acceptance of reduced forecasts and the parties' cooperative efforts to project additional volume in later years, did Plaintiff reverse course and suddenly alleged that Defendant was breaching its alleged purchasing commitments under the Amended Agreement.

36.     Additionally, Plaintiff was at all times aware that Defendant would purchase approximately ▉▉ of its total ▉▉▉▉▉ cans from Plaintiff, while the remainder would be purchased by Defendant from another supplier. ACB acted in good faith relating to this percentage.

37.     By its representations and conduct, including but not limited to those described above, Plaintiff knowingly and intentionally relinquished the right to assert its present claims.

### Tenth Affirmative Defense

38.     Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands. Defendant incorporates by reference the allegations in support of Defendant's estoppel defense set forth in Paragraphs 19–30 above, which describe Plaintiff's inequitable and unconscionable conduct supporting the Defendant's unclean hands defense. Defendant additionally incorporates by reference the allegations set forth in support of ACB's Amended Counterclaims (paragraphs 1–156), which express misrepresentations and omissions related to the ▉▉▉▉ and ▉▉ applied to the cans purchased by ACB further establish Plaintiff's unclean hands.

### Eleventh Affirmative Defense

39.     Plaintiff's claims are barred, in whole or in part, by the principles of acquiescence and consent.

40. Following the significant downturn in the market in 2021, Defendant had no choice but to reduce the volume of its ███████ can orders from Plaintiff, and worked with Plaintiff to provide revised forecasts for its requirements.

41. Plaintiff for many months thereafter made representations to Defendant that Plaintiff recognized the demand downturn, that it would work together with Defendant to alleviate the impact of the downturn on both parties and their respective investments, and represented and agreed (as it had prior to the signing of the Amended Agreement) that ACB is not contractually obligated to purchase the total targets each particular year and may ████████████████ ███████████. Plaintiff did not allege any breach by Defendant, and to the contrary, the parties discussed various business proposals to address the demand downturn.

42. Plaintiff further represented that Plaintiff had flexibility with demand from other customers that would allow Plaintiff to revise the targeted Annual Minimum Volumes.

43. Only after many months of working together constructively on various revised scenarios moving forward, including Plaintiff's acceptance of reduced forecasts and the parties' cooperative efforts to project additional volume in later years, did Plaintiff reverse course and suddenly alleged that Defendant was breaching its alleged purchasing commitments under the Amended Agreement.

44. Additionally, Plaintiff was at all times aware that Defendant would purchase approximately ███ of its total ███████ cans from Plaintiff, while the remainder would be purchased by Defendant from another supplier. ACB acted in good faith relating to this percentage.

45. By its representations and conduct, including but not limited to those described above, Plaintiff acquiesced and consented to Defendant's reduced purchases and to any alleged breach of the parties' Amended Agreement in connection with the Annual Minimum Volumes.

### *Twelfth Affirmative Defense*

46.     Plaintiff's claims are barred, in whole or in part, by the Limitation of Liability provision set forth in the parties' agreement.

### *Thirteenth Affirmative Defense*

47.     Plaintiff's claims do not support an award for attorney's fees.

### *Fourteenth Affirmative Defense*

48.     Plaintiff's claims are barred, in whole or in part, by the doctrine of impossibility.

49.     At the time the parties entered the Agreements, the market for hard seltzers and other drinks packaged in ███████ cans was expanding rapidly. Continued rapid growth and sustained demand in the category was a basic assumption by both parties on which the contract was based.

50.     Indeed, Plaintiff conducted or commissioned its own market studies, which confirmed that demand for ███████ cans was robust, growing, and supported the Amended Agreement's Annual Minimum Volumes and Plaintiff's own investments in the market for ████ ████ cans. Plaintiff further made representations about these studies to Defendant, and represented to Defendant at the time of the Amended Agreement that if Defendant did not commit to the Annual Minimum Volumes, Plaintiff's ██████ production capacity would be devoted to other motivated customers for ████ cans, and would not be available to Defendant.

51.     The significant and unexpected downturn in the market in 2021 rendered impossible Defendant's purchase of ███████ cans from Plaintiff in the volumes contemplated by the Annual Minimum Volumes, and Defendant had no choice but to reduce the volume of its ███████ can orders from Plaintiff.

52.     Defendant's inability to purchase the Annual Minimum Volumes was produced by

an unanticipated change in the market that could not have been foreseen or further guarded against in the Amended Agreement among other factors.

53. Plaintiff for many months thereafter made representations to Defendant that Plaintiff recognized the demand downturn, that it would work together with Defendant to alleviate the impact of the downturn on both parties and their respective investments, and represented and agreed (as it had prior to the signing of the Amended Agreement) that ACB is not contractually obligated to purchase the total targets each particular year and may ██████████████████ ███████████. Plaintiff did not allege any breach by Defendant, and to the contrary, the parties discussed various business proposals to address the demand downturn.

54. Additionally, Defendant was unable to make purchases of additional cans from Plaintiff due to Ardagh's defective cans and Ardagh's misrepresentations about these cans (*see infra*, Amended Counterclaims, ¶¶ 1–3, 65–99, 108–144).

55. In fact, the Amended Agreement expressly provides that in such instance, ACB is relieved of any Annual Minimum Volume obligation. *See* First Amendment § 2.2.4 ("████ ████████████████████████████████████████████████ ████████████████████████████████████████████").

### *Fifteenth Affirmative Defense*

56. Plaintiff's claims are barred, in whole or in part, by the doctrine of impracticability. In support of this defense, Defendant incorporates by reference the allegations in support of Defendant's impossibility defense set forth in Paragraphs 48–55 above.

### *Sixteenth Affirmative Defense*

57. Plaintiff's claims are barred, in whole or in part, because Plaintiff engaged in a course of performance by which it agreed that Defendant was entitled to ████████████████

 accordingly.

### *Seventeenth Affirmative Defense*

58.     Plaintiff's claims are barred, in whole or in part, because the Amended Agreement does not conform to standard industry practice for contracts that contain yearly minimum purchase requirements without an option ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. This contract contains ████████████████████████ ████████████████████████.

### *Reservation of Defenses*

59.     Defendant reserves the right to assert, or seek leave to assert, additional affirmative defenses.

### **DEFENDANT'S AMENDED COUNTERCLAIMS**

Defendant-Counterclaimant American Craft Brewery LLC ("ACB"), for its Counterclaims against Plaintiff-Counter Defendant Ardagh Metal Packaging USA Corp. ("Plaintiff" or "Ardagh"), state and allege as follows:

### **INTRODUCTION**

1.     This counterclaim action arises from Ardagh's failure to deliver aluminum cans to ACB that are free from material defects and that meet the terms and specifications provided under the parties' supply agreement.

2.     ACB has met all of its contractual obligations. Despite Ardagh's recently changed

position on the matter, ACB is not required under the contract to purchase total minimum volume targets each and every year of the contract's term but, instead, ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████. Prior to the litigation, Ardagh readily acknowledged to ACB that ACB is not contractually obligated to purchase the total targets each particular year, and may ██ ████████████████████████ Indeed, in an instance in which ACB does not require the minimum volume target in a particular year, and ████████████████████████ █████████████████████████████████████████████. The contract further █████████████████████████████████████████.

3.    Ardagh, by contrast, has repeatedly breached the agreement and disregarded its obligations to ACB. First, Ardagh intentionally and repeatedly overcharged ACB, failing to implement and abide by the ██████ terms set out in the plain language of the parties' agreement.  Ardagh also breached the agreement and the implied warranty of fitness for a particular purpose by using an unsuitable ██████, as well as a flawed ██████████, that produced defective cans that caused substantial slowdown, clogs, and the shutdown of ACB's production lines, as well as potential contamination of the product.  To make matters worse, Ardagh acknowledged its difficulties with the ██████, and promised ACB that a new type of ██████ was being applied, yet, Ardagh inexplicably misrepresented that fact and did not implement the promised change. Ardagh's breaches, failure to deliver a product free from defects in material, workmanship and design, and misrepresentation caused ACB significant damages.  Indeed, because of Ardagh's failures, ACB was not able to purchase as many cans as it otherwise would have purchased from Ardagh.

4.    On February 23, 2023 and April 4, 2023, ACB and Ardagh met in person at JAMS

in New York City to mediate their disputes before a neutral third-party mediator, but were not successful in achieving a resolution.

## PARTIES, JURISDICTION AND VENUE

5.      ACB is a limited liability company organized under Massachusetts law with its principal place of business in Boston, Massachusetts. ACB is a manufacturer of alcoholic beverages, with brands including Samuel Adams, Twisted Tea, Angry Orchard, and Truly Hard Seltzer.

6.      Ardagh is a corporation incorporated in Delaware with its principal place of business in Chicago, Illinois. Ardagh is a supplier of metal and glass packaging for brand owners. Ardagh is a supplier to ACB of metal cans for ACB's beverage business.

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Ardagh has its principal place of business within this judicial district and a substantial part of the events or omissions giving rise to claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### The Parties' Relationship and Supply Agreement

9.      In 2020, ACB and Ardagh began a contractual business relationship whereby Ardagh supplied ACB with aluminum packaging for ACB's beverage business.

10.     Pursuant to an Agreement, effective January 1, 2020, ACB agreed to purchase from Ardagh certain aluminum beverage can ████████████████████, referred to as ████ ████ cans, in each of 2020, 2021, and 2022.

11.     In December 2020, ACB and Ardagh amended the Agreement and entered into the First Amendment to Can Supply Agreement (the "Amended Agreement") (collectively, the "Agreements").

12.     The Amended Agreement (i) extended the term of the Agreement; (ii) added additional ██████████████ cans and ██████████████ to the list of cans ACB would purchase from Ardagh; and (iii) provided expectations for annual minimum volumes for ██████ ██████ through ████ (the "Annual Minimum Volume Expectations").

13.     The Amended Agreement term runs through ██████████, unless previously terminated in writing by ██████████. *See* Amended Agreement, § 2.1.

14.     The Amended Agreement further provides ██████████████████████. *See* Amended Agreement § 2.1.

15.     The Amended Agreement also expressly permits ACB to ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████. *See* Amended Agreement § 2.2.1 ("██████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████").

16.     The Amended Agreement further provides that in the event ACB ██████████ ████████████████████████████████████████████████████████ ██████████████████████. Amended Agreement § 2.2.3.

17.     The Amended Agreement and its terms were negotiated by the parties at a time of substantial and rapid growth in the relatively new market for hard seltzer products, including

ACB's "Truly" hard seltzer.

18.     For instance, The Boston Beer Company, Inc. ("Boston Beer") reported in its Form 10-K for the fiscal year ended December 26, 2020 filed with the U.S. Securities and Exchange Commission that the hard seltzer category "is growing rapidly" and that "[t]he Company believes that the hard seltzer category comprises approximately 7% of United States beer consumption and that the volume comprising the hard seltzer category grew approximately 160% in 2020."[1]

19.     Indeed, prior to the Amended Agreement, including in 2019 and early 2020, ACB had difficulty procuring enough supplies, including cans, to produce the amount of Truly necessary to meet consumer demand.

20.     Boston Beer reported in its year-end 2020 Form 10-K that:

Beginning in 2019, primarily as a result of higher than anticipated demand for Truly Hard Seltzer and Twisted Tea brands and supply chain constraints, the Company began to have out of stocks and at times has not been able to fully meet Distributor demand, particularly at seasonal peaks during the summer months. In response to these out of stocks, the Company began working with certain Distributors on plans to increase Distributor inventories of packaged inventory of Truly Hard Seltzer and Twisted Tea brands to ensure that drinker demand can be met.

21.     Boston Beer further reported:

In the fourth quarter of 2020, the Company experienced some can . . . shortages that impacted the Company's production schedules. . . . The demand for cans in the beverage industry has significantly increased and there has been a shortage of capacity, as can manufacturers attempt to adjust their supply chains to keep up with the increased demand which has further accelerated during 2020 as the category grew household penetration and alcohol consumption shifted from on-premise to off-premise. In 2020, as the Truly brand family and the Twisted brand families have grown significantly, the Company has experienced supply shortages and in the fourth quarter of 2020, these supply shortages impacted the Company's production schedules. The Company is working closely with its three can suppliers to ensure there are no further supply disruptions and the Company has an adequate supply. The Company currently believes that it will have sufficient supply of cans in 2021.

22.     The demand for hard seltzer products was so great, and domestic can supply was

---

[1] That is, 2.6 times the prior year, a significant amount of growth.

so constrained, that ACB had to resort to ███████████████████████████████████ ███████████████████████.

23.     Ardagh was aware of these market trends, and made representations to ACB regarding its own market studies which confirmed that demand for its ████████ cans was robust, growing, and supported the Amended Agreement's Annual Minimum Volumes, and that Ardagh was itself committed to investing in the market for ████████ cans.

24.     Ardagh further represented to ACB at the time the Amended Agreement was negotiated that if ACB did not commit to the Annual Minimum Volumes, Ardagh's █████ production capacity would be devoted to other customers in need of ███████████, and would not be available to ACB.

25.     The parties negotiated the terms of the First Amendment within the context of, and informed by, this extraordinary shift in the alcoholic beverage industry, in which the market for hard seltzers and other drinks packaged in ████████ cans was expanding rapidly.

26.     Continued rapid growth and sustained demand in the hard seltzer category was a basic assumption by both parties on which the First Amendment was based.

27.     At the time the First Amendment was negotiated and ultimately executed in December 2020, both parties believed the hard seltzer market would continue to grow substantially during the term of the Amended Agreement.

28.     Neither ACB nor Ardagh anticipated in December 2020 that such demand ultimately would not be sustained.

29.     Neither ACB nor Ardagh anticipated in December 2020 the significant and rapid slowdown in growth of the hard seltzer category beginning in 2021.

30.     Indeed, as of April 22, 2021 in a Q1 2021 earnings call, Boston Beer anticipated

that the hard seltzer category would continue to grow an estimated 60–90% in 2021.

31.     Ultimately, ACB was forced to scrap millions of cans of finished Truly product in 2021 as a direct result of decreased volume projections, publicly reporting in Q3 2021 "costs include[ing] inventory obsolescence, destruction costs and other inventory related costs of $54.3 million."

32.     The parties' reasonable beliefs regarding the markets for hard seltzers and ███ ███ cans in December 2020 directly informed the terms of the Amended Agreement.

33.     In particular, at the time the First Amendment was executed, the parties understood and agreed that their agreement would permit ACB to ████████████████████ any shortfalls in its purchases of Annual Minimum Volume targets for cans and associated can ends, and to ████████████████████████ the Annual Minimum Volume targets.

34.     It was the expectation of the parties given the state of the market at the time of negotiation of the First Amendment that ACB would need so many ██████ cans over the term of the Amended Agreement that the Annual Minimum Volumes would be achieved.

35.     It was the expectation of the parties given the state of the market at the time of negotiation of the First Amendment that even if ACB did not purchase the Annual Minimum Volume in any particular year, any shortfalls would be purchased within a reasonable timeframe given the parties' expectations of sustained demand.

36.     Given those expectations, it was commercially reasonable for the Amended Agreement to permit ACB to █████████████████████████████ ██████, and to permit the parties to █████████████████████████ ██████.

37.     Given those expectations, it was also commercially reasonable that neither party ever proposed that the ███████ provision be ████████████████, or include any specific language in the Amended Agreement limiting ACB's ███████ right, or the related █████████████████████ ███████████████████████████████████.

38.     The parties' reasonable expectations in December 2020 regarding ACB's extraordinary and sustained need for ███████ cans directly informed and is consistent with other terms of the First Amendment as well.

39.     The Amended Agreement purposely omitted ████████████████████████ ██████████████████████████████████████████ the Annual Minimum Volumes.

40.     The concept of a ██████████████ was expressly discussed by the parties and ultimately rejected.

41.     In fact, Ardagh initially proposed the concept of ███████████████ ████████████████████ as a "flexible" alternative to a "█████████████████ ███████" which require contracting parties to █████████████████████████ █████████████████████████████████████████.

42.     Ardagh understood in December 2020 when the Amended Agreement was executed that the ███████████████ provisions, purposeful omission of ████████████ ███████, and purposeful omission of ██████████████████████████, meant that Ardagh bore significant risk of any inability by ACB to purchase the full Annual Minimum Volumes.

43.     Also, the parties agreed: "██████████████████████████████ ████████████████████████████████████████████████████████████

██████████████████████████████" *See* First Amendment § 2.2.4.

44.     Ardagh understood and agreed that such risks were a reasonable trade-off for a long-term and mutually-beneficial supply agreement with ACB under which ACB was ultimately obligated to purchase a minimum volume of cans, even if such volumes ████████████ ██████████████████████████.

45.     On information and belief, Ardagh's agreement to bear this risk was further motivated by Ardagh's anticipation that any such risk was mitigated by the fact that Ardagh had other customers who were, as of December 2020, also extraordinarily motivated to purchase █ ██████ cans, and to whom Ardagh could devote any manufacturing capacity unutilized by ACB.

46.     Relatedly and reasonably, considering the other provisions (and omissions) referenced above and the parties' expectations in 2020, the parties agreed to a broad and conspicuous "████████████████████" provision providing: "████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████" Amended Agreement § 20.9.

47.     Each of the above terms was informed by the parties' reasonable expectations in December 2020 given the then-current, extraordinary market conditions. The First Amendment was negotiated and signed in December 2020, shortly after the Agreement was signed in October 2020, due to the parties' needs in this quickly evolving market and to allow for necessary and expected flexibility going forward.

48.     Indeed, during the negotiation of the First Amendment, Robert Sladewski, on behalf of Ardagh, represented to Eric Black at ACB that (a) ACB would not be contractually

obligated to purchase the total volume targets each particular year, and may ███████████ ██████████████████████████████████████████████, and (b) Ardagh would move things around with other existing customer volume or demands if ACB's needs changed. Sladewski and other Ardagh representatives made the same representations and agreements following the execution of the First Amendment including after the market demand changed for ████ cans.

49.     The First Amendment also omits ████████████████████████████████ ████.

50.     ACB has complied with all the terms of the Agreements.

**Ardagh Breaches the ████████████ Provisions in the Agreements**

51.     Section 4 of the Agreement sets forth the parties' agreed-upon pricing terms.

52.     Pursuant to Section 4.4, the parties agreed that prices would have ███████████ ████████████████ as set forth in Exhibit C of the Agreement. The Amended Agreement removed Exhibit C and replaced it with ████████ terms set forth in Exhibit C1.

53.     Exhibit C1 provides that the pricing will incrementally ████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████

54.     Specifically, Exhibit C1 provides for ████████████████████████ ████████████████ for ████████████████ and ████████████████ of █████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████

██████████.

55.    Exhibit C1 also provides that Ardagh will be responsible for ████████ ███████████████████████████████████████████

56.    ACB succeeded in meeting certain of the █████████ provided in Exhibit C1.

57.    Specifically, in 2022, ACB purchased the following amounts of total ██ cans: ██████ in January 2022; ███████ in February 2022; ███████ in March 2022; ███████ in April 2022; ███████ in May 2022; ███████ in June 2022; ███████ in July 2022; ███████ in August 2022; ███████ in September 2022; ███████ in October 2022; ███████ in November 2022, and ███████ in December 2022.

58.    ACB achieved Exhibit C1's █████████████████████ in July 2022.

59.    ACB achieved Exhibit C1's ███████████████████████ in August 2022.

60.    ACB achieved Exhibit C1's ██████████████████████ in October 2022.

61.    Despite ACB achieving three (3) of the █████████ designated in Exhibit C1, Ardagh failed to provide to ACB any of the ████████████ as required by the Agreements.

62.    In September, 2022, ACB notified Ardagh of ACB's objection to Ardagh's inflated, incorrect pricing.  Even after receiving notice, however, Ardagh continued to improperly charge ACB inflated rates that did not include the agreed-upon ████████████.

63.    By failing to track and implement the ██████████████ as required by

Section 4.4 and Exhibit C1, Ardagh breached the Agreements and overcharged ACB.

64.     As a direct and proximate result of Ardagh's breach of Section 4.4 and Exhibit C1 of the Agreements, ACB has sustained significant monetary damages.

**Ardagh Breaches the Specifications in the Agreements by Using an Improper** ███████

65.     Upon the commencement of the parties' relationship in 2020, ACB began using Ardagh's product, i.e., aluminum cans and ████████████, in ACB's beverage filling, closing, packaging and distribution process (the "Filling Process").

66.     Section 2.1 of the Agreement provides that "████████████████████ ████████████████████████████████████████████████ ██████████████████████████████."

67.     Ardagh was obligated to manufacture and deliver cans and ████████████ that meet the terms of the "Specifications" and "Container Warranty" provided under the Agreement.

68.     For example, pursuant to the Container Warranty under Section 20.4 of the Agreement, Ardagh warranted that the supplied aluminum beverage cans ████████████ ██████████████████████████████████████████████████ ████████████.

69.     Similarly, Ardagh is obligated to meet the Specification that the cans "███ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████" including that the cans "████████████████████████ ██████████████████" *See* Agreement, Exhibit D1, at p. 4.

70.     The Specifications also include certain ██████████████████████ ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████. *See* Agreement, Exhibit D1, at p. 10-11, 6.5.1-6.5.10.

71.     Exhibit D1 of the Agreement also provides that "████████████████████ ████████████████████████████████████" Exhibit D1, §6.5.4.

72.     Exhibit D1 of the Agreement also provides that "████████████████████ ██████████████████████████████" Exhibit D1, §6.5.7.

73.     Shortly after ACB began using Ardagh's product, ACB noticed a dark sticky buildup on the cans and on ACB's lines as the Ardagh cans were run through the Filling Process.

74.     The buildup not only covered and ruined the cans, but also spilled over onto ACB's Filling Process lines, slowing down, clogging and causing breakdowns on ACB's lines.

75.     In May, 2020, ACB gave Ardagh notice of the dark, sticky buildup on Ardagh's cans, which, according to Ardagh, appeared to be an issue caused by the ██████ Ardagh utilized.

76.     Can manufacturers use ████████████████████████ for protection of the exterior of the cans and so they run smoothly on the lines of a Filling Process system as the cans are filled, closed, boxed, and shipped.

77.     However, contrary to the Specification requirements in the Agreements, Ardagh had not been using a ██████ that ran properly on the Filling Process' lines, and thus had not manufactured the aluminum beverage cans to be suitable in all respects for the intended ██████ ███████████████████████████████████████████.

78.     Ardagh told ACB that it had been using a ███ called "███ and that ███ caused ███████████████████████. To address the ███ residue concern, Ardagh committed in late May, 2020 to switch its processes for ACB cans to what Ardagh determined as a suitably constituted ████ known as "███"

79.     After meeting with Ardagh to discuss the problems with the cans, receiving Ardagh's assurances that it would substitute the ████ ████ and begin using the ████ ████ in late May, 2020, and believing Ardagh's representations to be in good faith, ACB continued to use Ardagh's cans for its beverage manufacturing.

80.     As ACB continued to purchase Ardagh cans, however, ACB periodically saw further problems with the cans that affected its Filling Process lines.  At times, the lines continued to be significantly slowed by the build-up of a substance, causing the lines to not only run slower, but also to be shut down and cleaned significantly more than is typical for ACB or standard in the industry.

81.     While it is standard that ACB and similar beverage producers shut down their lines once a shift for maintenance and cleaning, the lines running Ardagh cans often had to be shut down four times a shift due to the substance build-up caused by Ardagh's cans.

82.     Each time a line had to be shut down and cleaned, ACB's operations were suspended during the shutdown, which materially reduced ACB's production.

83.     ACB was able to produce approximately ████████████████, or ███████████, on a line that did not use Ardagh cans.  However, an ACB Filling Process line using Ardagh cans only produced approximately ████████████ in a day, for a total of ██████████ on such a line.

84.     In October, 2022, ACB again gave notice to Ardagh of the continued substance

46

build-up issues with the cans.

85.     In January, 2023, as the parties discussed potential corrective action, ACB discovered that Ardagh had in fact not done what Ardagh promised in mid-2020.  Despite its representations that it would switch the ████ to the "████████" on all cans delivered to ACB, Ardagh inexplicably did not adhere to that promise, and only made the ████ change on approximately 25% of the cans.

86.     Ardagh's failure to change the ████ despite promising to do so in mid-2020, caused additional Filling Process line disruption that materially reduced ACB's production.

87.     Because Ardagh's cans continued to be deficient as described herein, ACB could not use Ardagh's cans in the first quarter of 2023, and was forced to purchase cans at a higher cost from a third-party to meet ACB's volume requirements.

88.     Ardagh breached the Agreements by repeatedly failing to (i) use a proper ████ that would allow the cans to run without significant disruption on the Filling Process' lines, (ii) not cause contamination, (iii) meet industry standards, (iv) meet the Specifications and Container Warranty and (v) deliver a product free from defects.

89.     As a direct and proximate result of Ardagh's use of an unsuitable ████ that caused slowdowns, clogs and the shutdown of ACB's production lines, Ardagh breached the Agreements and caused ACB to sustain significant damages.

**Ardagh Breaches the Specifications in the Agreements by Using an Improper ████**

90.     As noted herein, ACB continued to experience significantly slowed production caused by the build-up of a substance on the Filling Process lines that used Ardagh cans.  After ACB gave Ardagh notice in October, 2022 of further, continued deficiencies with a substance build-up on the cans, Ardagh provided an entirely new reason for the problem:  Ardagh's use of a

47

████████████ for the tops of their cans.

91.     Ardagh represented that it had previously used an ██████████ for the ██ ████████████████████, but had changed their processes to a ██████████.

92.     Ardagh knew, and it is common knowledge in the industry, that a beverage manufacturer of ACB's nature and type use higher temperatures to pasteurize their products and kill contaminants, as compared to some other manufacturers.

93.     Prior to Ardagh beginning production of cans for ACB, ACB's product information, its processes and the Specifications were defined and provided to Ardagh.

94.     Ardagh's chosen ██████ melted when used in connection with higher temperatures, which built-up on the cans and ACB's lines.

95.     As was the case with the defective ████ Ardagh's use of a ████████ caused significant build-up on ACB's lines, causing the cans to not only run slower, but causing a need to shut down and clean the lines significantly more than is typical or standard in the industry.

96.     In early 2023, Ardagh acknowledged to ACB that it previously was aware that other similar beverage companies had problems with Ardagh's ██████ on their lines. Despite that knowledge, Ardagh remained silent on the issue and did not inform ACB of the ██████ problem, or make a change to avoid the problem. Indeed, until ACB confronted Ardagh with further concerns in the fall of 2022, Ardagh did nothing to address the defective ███ it used on cans sold to ACB.

97.     Because Ardagh's cans were deficient as described herein, ACB could not use Ardagh's cans in the first quarter of 2023, and ACB was forced to purchase cans at a higher price from a third-party to meet ACB's volume requirements.

98.     Ardagh breached the Agreements by failing to (i) use a proper ██████ on the ██

███████ that would allow the cans to run without significant disruption on the Filling Process' lines, (ii) not cause contamination, (iii) meet industry standards, (iv) meet the Specifications and Container Warranty, and (v) deliver a product free from defects.

99.     As a direct and proximate result of Ardagh's breach and use of a ████████ ███████ that caused slowdowns, clogs and the shutdown of ACB's production lines, ACB sustained significant damages.

## CAUSES OF ACTION

### COUNT I (Breach of Contract – ██████████████)

100.    ACB incorporates by reference paragraphs 1-99 of these Counterclaims as if fully set forth and repeated herein.

101.    The Agreements are valid and enforceable agreements.

102.    Section 4.4 Exhibit C1 of the Agreements obligate Ardagh to provide ACB with █████████████████████████████████████████████████████ set forth in Exhibit C1.

103.    ACB fully performed its obligations pursuant to the terms of the Agreements.

104.    ACB surpassed the ███████████████████████ set forth in Exhibit C1.

105.    Ardagh breached its obligations under the Agreements by failing to provide ACB with ██████████████████████████████████, as required by Section 4.4 of the Agreement and Exhibit C1 of the Agreements.

106.    ACB gave notice to Ardagh of the failures describe herein.

107.    As a direct and proximate result of Ardagh's material breach of the Agreements, ACB has suffered significant monetary damages, totaling in excess of $75,000.00

### COUNT II (Breach of Contract – ██████████

108.    ACB incorporates by reference paragraphs 1-107 of these Counterclaims as if fully set forth and repeated herein.

109.    The Agreements are valid and enforceable agreements.

110.    ACB fully performed its obligations pursuant to the terms of the Agreements.

111.    As detailed above, the Agreement requires, among other things, that cans manufactured by Ardagh for ACB meet certain Specifications provided in Exhibit D1 of the Agreement and that the cans meet the Container Warranty.

112.    Included among the Specifications in Exhibit D1 of the Agreement is the requirement that the cans are suitable in all respects for the intended ███████████████████ ██████████████████████████████.

113.    Section 20.4 of the Agreement's Container Warranty requires, among other things, that Ardagh supply aluminum beverage cans to ACB ████████████████████████ ██████████████████████.

114.    By using a ██████ that caused buildup, slowdown, shutdown and disruption on ACB's Filling Process's lines, Ardagh failed to manufacture cans suitable in all respects for the intended ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.

115.    By using a ██████ that caused buildup, slowdown, shutdown and disruption on ACB's Filling Process lines, Ardagh breached the Agreements.

116.    ACB gave notice to Ardagh of the failures described herein.

117.    As a direct and proximate result of Ardagh's material breach of the Agreements, ACB has suffered significant monetary damages, totaling in excess of $75,000.

**COUNT III (Breach of Contract – █████████)**

118.    ACB incorporates by reference paragraphs 1-117 of these Counterclaims as if fully set forth and repeated herein.

119.    The Agreements are valid and enforceable agreements.

120.    ACB fully performed its obligations pursuant to the terms of the Agreements.

121.    As detailed above, the Agreement requires, among other things, that cans manufactured by Ardagh for ACB meet certain Specifications provided in Exhibit D1 of the Agreement, and that the cans meet the Container Warranty.

122.    Included among the Specifications in Exhibit D1 of the Agreement is the requirement that the cans are suitable in all respects for the intended ████████████████████ ██████████████████████████████.

123.    Section 20.4 of the Agreement's Container Warranty requires Ardagh to supply aluminum beverage cans free from ████████████████████████████████████ ██████████████.

124.    By using a ████████████ that caused buildup, slowdown, shutdown and disruption on ACB's Filling Process's lines, Ardagh failed to manufacture cans suitable in all respects for the intended ██████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████.

125.    By using a ████████████ that caused buildup, slowdown, shutdown and disruption on ACB's Filling Process's lines, Ardagh breached the Agreements.

126.    ACB gave notice to Ardagh of the failures described herein.

127.    As a direct and proximate result of Ardagh's material breach of the Agreements,

ACB has suffered significant monetary damages, totaling in excess of $75,000.

**COUNT IV (Breach of the Duty of Good Faith and Fair Dealing - ███████**

128.    ACB incorporates by reference paragraphs 1-127 of these Counterclaims as if fully set forth and repeated herein.

129.    Under New York law, all agreements include an implied covenant of good faith and fair dealing, under which a party may not exercise discretion in its performance of contractual obligations in a way that deprives the counterparty of the benefits of the agreement.

130.    After being informed of multiple slowdowns and breakdowns on ACB's filling lines caused by Ardagh's use of an unsuitable █████ Ardagh committed to immediately switching its ████

131.    Contrary to its affirmative representations, and without informing ACB, Ardagh continued to use the unsuitable █████ for ACB cans for more than two years.

132.    To the extent that Ardagh's use of the unsuitable █████ on ACB's cans, directly contrary to its representations to ACB, does not constitute the breach of an express obligation under the Agreements, Ardagh had an obligation not to undertake its performance of the Agreements in a way that deprived ACB of the benefits owed to ACB under the Agreements.

133.    By failing to change to a █████ appropriate for ACB's cans and Filling Process Lines, and knowingly allowing ACB to continue to sustain damages incurred by repeated slowdowns and breakdowns of its filling lines due to Ardagh's use of the unsuitable █████ Ardagh arbitrarily and unreasonably deprived ACB of the benefits of the Agreements' terms, in violation of the implied covenant of good faith and fair dealing.

134.    ACB gave notice to Ardagh of the failures described herein.

135.    ACB has been damaged by Ardagh's breach of the implied covenant of good faith

and fair dealing in excess of $75,000.

**COUNT V (Breach of the Duty of Good Faith and Fair Dealing – ███████████)**

136.     ACB incorporates by reference paragraphs 1-135 of these Counterclaims as if fully set forth and repeated herein.

137.     Under New York law, all agreements include an implied covenant of good faith and fair dealing, under which a party may not exercise discretion in its performance of contractual obligations in a way that deprives the counterparty of the benefits of the agreement.

138.     Ardagh used a ███████████ on the cans produced for ACB, which ███████ caused a damaging substance build-up on the cans and Filling Process lines.

139.     Ardagh knew that use of a ███████████ was unsuitable and not in line with industry standards for a beverage manufacturer of ACB's nature and type.

140.     Despite this knowledge, Ardagh did not change its use of a ███████████, nor did it warn ACB of the potential damage to be caused by the particular ███.

141.     To the extent that Ardagh's use of a ███████ does not constitute the breach of an express obligation under the Agreements, Ardagh had an obligation not to undertake its performance of the Agreements in a way that deprived ACB of the benefits owed to ACB under the Agreements.

142.     By failing to use a ███████ suitable for ACB's facilities, and knowingly allowing ACB to continue to sustain damages incurred by repeated slowdowns and breakdowns of its Filling Process lines due to Ardagh's use of the unsuitable ███████████, Ardagh arbitrarily and unreasonably deprived ACB of the benefits of the Agreements' terms, in violation of the implied covenant of good faith and fair dealing.

143.     ACB gave notice to Ardagh of the failures described herein.

144.     ACB has been damaged by Ardagh's breach of the implied covenant of good faith and fair dealing in excess of $75,000.

## COUNT VI (Declaratory Judgment)

145.     ACB incorporates by reference paragraphs 1-144 of these Counterclaims as if fully set forth and repeated herein.

146.     The parties entered into valid and enforceable Agreements.

147.     ACB fully performed its obligations pursuant to the terms of the Agreements.

148.     The parties agreed to a conspicuous limitation of liability provision in the Amended Agreement.

149.     Specifically, the Amended Agreement expressly provides, in all capital letters:



Amended Agreement § 20.9.

150.     In addition to other and alternative categories of damages, Ardagh has characterized the largest damages it seeks to recover in this case, including in its initial disclosures and answers to ACB's interrogatories, as "Ardagh's direct damages as measured by calculating Ardagh's earnings before interest, taxes, depreciation, and amortization ('EBITDA') as a result of ACB's failure to purchase the requisite Annual Minimum Volumes."

151.     Ardagh quantifies these purported damages by calculating the alleged "EBITDA Impact" per one thousand "Shortfall Units" of ███████ cans from 2021 to ███.

152.     That is, Ardagh seeks to recover the profit it would have made on the cans not purchased by ACB between 2021 and ███ up to the Annual Minimum Volumes.

153.    In other words, Ardagh seeks to recover its lost profits, including purported lost profits in connection with future Annual Minimum Volumes through █████.

154.    The parties specifically and purposefully excluded liability for "████████████" in Section 20.9 of the Amended Agreement.

155.    In such circumstances, a declaratory judgment is appropriate and serves the practical and useful purpose of determining the limit of potential alleged damages, including in connection with future conduct.

156.    ACB is therefore entitled to a declaratory judgment stating that Section 20.9 of the Amended Agreement bars any recovery by Ardagh for any alleged lost profits including Ardagh's alleged "EBITDA Impact" damages.

### PRAYER FOR RELIEF

WHEREFORE, ACB demands judgment in its favor, and against Ardagh, as follows:

(a)  Money damages in an amount to be determined at trial in excess of $75,000;

(b)  Pre-judgment and post-judgment interest as permitted by law;

(c)  A declaratory judgment order confirming that Section 20.9 of the Amended Agreement bars any recovery by Ardagh for any alleged lost profits including Ardagh's alleged "EBITDA Impact" damages;

(d)  Costs and reasonable attorneys' fees incurred in pursuing these claims as provided by the Amended Agreement and as permitted by law; and

(e)  Such other and further relief as shall be just and proper.

### DEMAND FOR JURY TRIAL

ACB demands a jury trial for all issues so triable.

Dated: March 25, 2024

Respectfully submitted,

/s/ *John T. Ruskusky*
One of the Attorneys for American
Craft Brewery LLC

John T. Ruskusky (IL ARDC #6256605)
jtruskusky@nixonpeabody.com
Kathleen M. Mallon (IL ARDC #6336312)
kmallon@nixonpeabody.com
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL  60602-4378
Telephone: (312) 977-4400

Stephen M. LaRose (*admitted pro hac vice*)
(MA BBO #654507)
slarose@nixonpeabody.com
NIXON PEABODY LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835
Telephone: (617) 345-1300

## CERTIFICATE OF SERVICE

On March 25, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically.

/s/ John T. Ruskusky
John T. Ruskusky