**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ARDAGH METAL PACKAGING USA CORP., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN CRAFT BREWERY LLC, <br><br> Defendant. | Case No. 1:22-cv-07367 (JCD) (JA) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
<u>OF MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ..........................................................................................................................1

FACTS ...........................................................................................................................................2

ARGUMENT .................................................................................................................................7

    I.      ARDAGH IS ENTITLED TO SUMMARY JUDGMENT ON COUNT
          II THAT ACB MUST PURCHASE THE ANNUAL MINIMUM
          VOLUMES IN THE APPLICABLE CALENDAR YEAR.. .................................7

    II.     ARDAGH IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON
          COUNTS I AND II THAT ACB IS LIABLE FOR BREACH OF THE
          AMENDED AGREEMENT FOR FAILING TO PURCHASE ANNUAL
          MINIMUM VOLUMES IN 2021 ...........................................................................9

          A.     ACB Breached the Amended Agreement by Failing to Purchase
                  the Annual Minimum Volumes of Sleeks and 12 oz. standard
                  cans in 2021. .......................................................................................10

          B.     Ardagh Suffered Damages Because of ACB's Failure to Purchase
                  Over 500 Million Cans ........................................................................12

    III.    ARDAGH IS ENTITLED TO SUMMARY JUDGMENT ON ACB'S
          AFFIRMATIVE DEFENSES RELATED TO ACB'S PURCHASE
          OBLIGATIONS ....................................................................................................14

          A.     Mutual Mistake (Affirmative Defense No. 3) ..........................................17
          B.     Estoppel (Affirmative Defense No. 8) .....................................................19
           C.     Waiver (Affirmative Defense No. 9) .......................................................19
           D.     Acquiescence & Consent (Affirmative Defense No. 11) ..........................20
           E.     Impossibility/Impracticability (Affirmative Defense Nos. 14-15) ...........21
           F      Course of Performance (Affirmative Defense No. 16) .............................22
           G      Non-Conformance to Industry Practice (Affirmative Defense No.
                 17) .........................................................................................................22

CONCLUSION .............................................................................................................................23

i

**TABLE OF AUTHORITIES**

**Page(s)**

Cases

*159 MP Corp. v. Redbridge Bedford, LLC*,
    128 N.E.3d 128 (N.Y. 2019)..................................................................................23

*407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*,
    244 N.E.2d 37 (N.Y. 1968)...................................................................................21

*410 Lefferts, LLC v. 408 Lefferts, LLC*,
    229 A.D.3d 439 (N.Y. App. Div. 2024) ...............................................................14

*605 Fifth Prop. Owner, LLC v. Abasic, S.A.*,
    No. 21CV811 (DLC), 2022 WL 683746 (S.D.N.Y. Mar. 8, 2022)........................21

*A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*,
    No. 17-CV-3529 (NG) (RLM), 2018 WL 10517080 (E.D.N.Y. Mar. 6, 2018).....22

*Adidas Am., Inc. v. Thom Browne, Inc.*,
    No. 21-CV-5615 (JSR), 2022 WL 17736799 (S.D.N.Y. Dec. 16, 2022) ...............20

*Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*,
    692 N.E.2d 551 (N.Y. 1998)..................................................................................13

*Cent. Laborers' Pension Fund Bd. of Trustees v. Mike Fasula Concrete Const., Inc.*,
    No. 08 C 50261, 2011 WL 6338904 (N.D. Ill. Dec. 19, 2011) .............................13

*Chimart Assocs. v. Paul*,
    489 N.E.2d 231 (N.Y. 1986)..................................................................................17

*Clarex Ltd. v Natixis Secs. Ams. LLC*,
    No. 1:12-CV-7908, 2014 WL 4276481 (S.D.N.Y. Aug. 29, 2014)........................21

*Cottam v. Glob. Emerging Cap. Grp., LLC*,
    No. 16 Civ. 4584 (LGS), 2020 WL 1528526 (S.D.N.Y. Mar. 30, 2020) ..............18

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
    352 F.3d 775 (2d Cir. 2003)...................................................................................22

*Ebert v. Holiday Inn*,
    No. 11 CIV. 4102 (ER), 2014 WL 349640 (S.D.N.Y. Jan. 31, 2014)....................21

*Edge Grp. WAICCS LLC v. Sapir Grp. LLC*,
    705 F. Supp. 2d 304 (S.D.N.Y. 2010)....................................................................15

*F. Bender Inc. v. Crow Constr. Co.*,
266 A.D.2d 503 (N.Y. App. Div. 1999) ....................................................20

*Fantozzi v. Axsys Techs., Inc.*,
No. 07 CIV. 02667 (LMM), 2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008) ...........................18

*GemShares LLC v. Lipton*,
No. 17 C 6221, 2019 WL 587392 (N.D. Ill. Feb. 13, 2019)...................................13

*George Backer Mgmt. Corp. v. Acme Quilting Co.*,
385 N.E.2d 1062 (N.Y. 1978)...............................................................17

*GFI Realty Servs., LLC v. Long*,
No. 656505/2020, 2022 WL 4131707 (N.Y. Sup. Ct. Sept. 12, 2022)......................9

*Gutman v. Amoco Oil Co.*,
No. 93 CIV. 6377 (LLS), 1993 WL 597381 (S.D.N.Y. Nov. 18, 1993) ...............................19

*Hartford Fire Ins. Co. v. Roadtec, Inc.*,
No. 09 CIV 06747 (PGG), 2010 WL 4967979 (S.D.N.Y. Nov. 29, 2010) ...........................22

*Health-Chem. Corp. v. Baker*,
915 F.2d 805 (2d Cir. 1990)................................................................21

*Healy v. Rich Prods. Corp.*,
981 F.2d 68 (2d Cir. 1992)..................................................................18

*Jarecki v. Shung Moo Louie*,
745 N.E.2d 1006 (N.Y. 2001).................................................................15

*Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*,
902 F.2d 1074 (2d Cir. 1990)...............................................................16

*Jimico Enterprises, Inc. v. Lehigh Gas Corp.*,
No. 1:07-CV-0578, 2010 WL 2985962 (N.D.N.Y. July 27, 2010) ...........................19

*John W. Cowper Co. v. CDC-Troy, Inc.*,
50 A.D.2d 1076 (N.Y. 1975) ................................................................14

*Landmark Ventures, Inc. v. Wave Sys. Corp.*,
No. 11 Civ. 8440 (PAC), 2012 WL 3822624 (S.D.N.Y. Sept. 4, 2012) ..................8

*MacNeil Auto. Prod. Ltd. v. Cannon Auto. Ltd.*,
No. 08 CV 0139, 2014 WL 3396114 (N.D. Ill. July 11, 2014) .........................9-10

*Maxim Grp. LLC v. Life Partners Holdings, Inc.*,
690 F. Supp. 2d 293 (S.D.N.Y. 2010).......................................................19

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012) ..................................................................19

*Mindspirit, LLC v. Evalueserve Ltd.*,
    470 F. Supp. 3d 366 (S.D.N.Y. 2020) ................................................................19

*MyPlayCity, Inc. v. Conduit Ltd.*,
    No. 10 CIV. 1615 (CM), 2012 WL 2929392 (S.D.N.Y. July 18, 2012) ...............20

*Nassau Beekman LLC v. Ann/Nassau Realty LLC*,
    105 A.D.3d 33 (N.Y. App. Div. 2013) .......................................................... 15-16

*Natural Res. Def. Council v. N.Y. Dep't of Sanitation*,
    83 N.Y.2d 215 (1994) .....................................................................................9

*NutraSweet Co. v. X–L Eng'g Corp.*,
    933 F. Supp. 1409 (N.D. Ill. 1996) ..................................................................10

*Onanuga v. Pfizer, Inc.*,
    369 F. Supp. 2d 491 (S.D.N.Y. 2005) ..............................................................20

*PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc.*,
    131 A.D.3d 1029 (N.Y. App. Div. 2015) .........................................................10

*Raphael v. Booth Mem. Hosp.*,
    67 A.D.2d 702 (N.Y. App. Div. 1979) .............................................................18

*Rekis v. Lake Minnewaska Mountain Houses, Inc.*,
    170 A.D.2d 124 (N.Y. App. Div. 1991) ...........................................................18

*Route 6 Outparcels, LLC v. Ruby Tuesday, Inc.*,
    88 A.D.3d 1224 (N.Y. App. Div. 2011) ...........................................................21

*S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*,
    826 N.E.2d 806 (N.Y. 2005) ..........................................................................14

*St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*,
    918 N.E.2d 124 (N.Y. 2009) ..........................................................................13

*Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*,
    229 F. Supp. 2d 199 (S.D.N.Y. 2002) ..............................................................12

*Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*,
    431 F. Supp. 3d 995 (N.D. Ill. 2020) ................................................................7

*Vill. On Canon v. Bankers Tr. Co.*,
    920 F. Supp. 520 (S.D.N.Y. 1996) ............................................................ 16-17

iv

*W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*,
    928 F. Supp. 2d 976 (N.D. Ill. 2013) ......................................................................7

*Yurman Design, Inc. v. Garden Jewelry Mfg. Corp.*,
    No. 99 CIV. 10507 (TPG), 2003 WL 22047896 (S.D.N.Y. Aug. 29, 2003)...........................18

**Statutes**

N.Y. Gen. Oblig. Law § 15-301 (McKinney 2024).......................................................15

## **INTRODUCTION**

Ardagh seeks summary judgment confirming what is indisputable under the parties' Amended Agreement: ACB must purchase from Ardagh the "Annual Minimum Volumes" of aluminum cans and can ends that are listed in the Amended Agreement for each calendar year from 2021 through 2026. The parties could not have been clearer: "███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████." (Statement of Material Facts ("SMF") ¶ 27 (emphasis added).) Nor is there any genuine dispute that ACB must cure any shortfall from these Annual Minimum Volumes in the following calendar year. This Court has already held the Amended Agreement's text defining ACB's Annual Minimum Volume purchase obligation is unambiguous, but deferred issuing a judgment until the summary judgment stage. That stage has arrived.

Ardagh also seeks a separate judgment of breach of contract for ACB's failure to purchase the Annual Minimum Volumes in 2021. The total of ACB's annual purchasing failures to date are staggering. Between 2021–2024, ACB failed to purchase over ████ 12 oz. Sleek cans from Ardagh. Each year's purchasing failure, each uncured in the following calendar year, is an independent breach of the Amended Agreement for which Ardagh is entitled to relief. At this stage Ardagh requests a narrow judgment that ACB breached the Amended Agreement in 2021, during which ACB made the business decision to breach its obligation by over ██████ 12 oz. Sleek cans and nearly ██████ 12 oz. standard cans, with damages to be assessed later.

Following this 2021 breach, ACB refused to engage meaningfully with Ardagh on the problem of ACB's shortfalls, forcing Ardagh to give notice of a dispute in October 2022 under the Amended Agreement's dispute resolution procedure. ACB then raised for the first time alleged quality issues with Ardagh's 12 oz. Sleek cans as an excuse not to purchase the Annual Minimum

1

Volumes. Ardagh is confident a jury will see through this pretext, but for now Ardagh moves for summary judgment on ACB's purchasing failures in 2021.

The reality is that ACB's breaches in 2021 and beyond are its own doing. ACB chose to lock in significant long-term supply commitments from Ardagh, and eventually another supplier, based on ACB's predictions that its sales in a growing hard seltzer market would continue to expand. As the Boston Beer Company (the parent of ACB) has frequently admitted in public securities filings and public statements, ACB was wrong. Less than a year after the Amended Agreement was signed, the hard seltzer market and ACB's share of that market flattened fast and then declined, with sales of Truly Hard Seltzer, the product driving ACB's purchases of 12 oz. Sleek cans, continuing to deteriorate. Neither the market nor ACB's share has recovered.

With no contractual ambiguity to rely upon and no evidence of any material quality issue to excuse its purchasing failures in 2021, ACB must fall back on a slew of affirmative defenses. Ardagh seeks summary judgment on these affirmative defenses because they fail as a matter of law. No genuine issue of material fact exists to disprove that the parties intended anything other than what is plainly written in the Amended Agreement and no effort by Ardagh to negotiate a remedy changes that fact. For this reason, the third ruling Ardagh seeks now is the dismissal of ACB's Affirmative Defense No. 3 (mutual mistake), No. 8 (estoppel), No. 9 (waiver), No. 11 (acquiescence and consent), No. 14 (impossibility), No. 15 (impracticability), No. 16 (course of performance), and No. 17 (nonconformance with industry practice) because each is without merit as a matter of law.

## **FACTS**

Ardagh has supplied aluminum cans to ACB—a wholly-owned subsidiary of the Boston Beer Company—since July 2018. (SMF ¶¶ 1, 4.) Principally, those cans have been Ardagh's 12 oz. "Sleek" profile cans ("Sleeks"), in which ACB packages its Truly Hard Seltzer beverage. (*Id.*



¶¶ 2, 6.)  Between 2018–2019, ACB purchased approximately ███████ Sleeks from Ardagh. (*Id.* ¶ 55.)  ACB returned none of these cans due to the ██████████ that Ardagh used for these cans, or for any alleged ██████████. (*Id.* ¶ 56.)

In 2020, ACB sought to expand its supply relationship with Ardagh as part of a new dual-supplier strategy.  (*Id.* ¶¶ 12–13.)  For years ACB had relied upon Ball Corporation as its principal can supplier, but decided to dual source cans moving forward for at least two reasons.  (*Id.* ¶ 7.)  First, ACB had experienced problems that year (and before) with Ball, including ████████████ ██████████████████████████ (*id.* ¶ 10), and Ball's ██████████████████████ ██████████████████████████████████████████████████████ (*id.* ¶ 11).  Second, ACB anticipated that the hard seltzer market would continue to grow rapidly, so ACB wanted to secure "██████████████████████" in 2021 and beyond to mitigate the supply risk.  (*Id.* ¶¶ 8–9, 12–13.)

In October 2020, Ardagh and ACB signed the Aluminum Beverage Can Supply Agreement (the "Original Agreement"), under which ACB agreed to purchase ██████████████████████ ██████████████████████████████.  (*Id.* ¶¶ 14–17.)  The Original Agreement was set to run through 2023.  (*Id.* ¶ 15.)  When the Original Agreement was signed, ACB had already purchased about ██████████████ from Ardagh, including ██████████████ in 2020 alone; ACB did not return any of these cans due to the ██████████ that Ardagh used for these cans, or for any alleged ██████████████.  (*Id.* ¶¶ 55–56.)

With the ink still wet on the Original Agreement and ACB's hard seltzer market sales "explosive," ACB initiated negotiations with Ardagh to secure an even greater supply of Sleeks. (*Id.* ¶¶ 8–9, 22.)  The parties executed a First Amendment to the Original Agreement (together, the "Amended Agreement") just two months after signing the Original Agreement.  (*Id.* ¶ 23.)  By this

time, December 2020, ACB had purchased around ▮▮▮▮▮▮▮▮ from Ardagh, including ▮▮▮▮▮▮ in 2020 alone, and never returned any of these cans due to the ▮▮▮▮▮▮ that Ardagh used for these cans, or for any alleged ▮▮▮▮▮▮. (*Id.* ¶¶ 55–56.) The First Amendment extended the contract term to the end of 2026 and expanded purchases to include 12 oz. standard and 24 oz. cans in addition to Sleeks. (*Id.* ¶¶ 24–25.) In exchange for much greater supply, ACB contracted to switch from the requirement that it buy ▮▮▮▮▮▮ from Ardagh up to ▮▮▮▮ cans to the obligation to purchase the Annual Minimum Volume and discretion to purchase up to the Annual Maximum Volume in a new Section 2.2. (*Id.* ¶¶ 26–27.) The new Section 2.2 specifies the Annual Minimum Volume and Maximum Volume for each can type each calendar year. (*Id.* ¶ 27.) In 2021, ACB's Annual Minimum Volume for Sleeks was ▮▮▮▮ and for 12 oz. standard cans ▮▮▮▮. (*Id.* ¶¶ 28–29.) In 2022, ACB's Annual Minimum Volume for Sleeks was ▮▮▮▮ and for 12 oz. standards cans ▮▮▮▮. (*Id.*) In addition, Ardagh committed to supply ACB with the higher Annual Maximum Volumes for each year should ACB order more cans. (*Id.* ¶ 27.)

In Section 2.2.1, the parties agreed that if ACB failed to purchase the Annual Minimum Volume of a can type in a given calendar year, ACB would have until the next calendar year to cure the breach, but that this cure opportunity would not reduce the Annual Minimum Volume for the calendar year in which the shortfall must be cured. (*Id.* ¶¶ 30–31.)

The Original Agreement has an integration clause making it the parties' entire agreement relating to the supply and purchase of 12 oz. Sleek cans. (*Id.* ¶ 21.) Any amendment, waiver, or modification had to be made in a writing signed by both parties. (*Id.* ¶ 20.) All terms in the Original Agreement not amended by the First Amendment were ratified. (*Id.* ¶ 32.) There are no contract terms outside the Amended Agreement. (*Id.* ¶ 36.)



ACB had no written supply agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in 2021. (*Id.* ¶¶ 38–39, 47.) Nevertheless, ACB made the business decision to ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶¶ 12, 40, 44–45.) It was not until ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when ACB contracted with Ball. (*Id.* ¶¶ 23, 41.) That agreement requires ACB ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶¶ 42–43.) ACB contracted with Ball knowing ACB would have to ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶¶ 42– 46.)

By June 2021, only six months into the Amended Agreement, Ardagh saw ACB's sales were not on track and sought confirmation that ACB would purchase the ▮▮▮▮▮ Annual Minimum Volume of Sleeks that year. (*Id.* ¶ 48.) ACB responded that it "▮▮▮▮▮▮▮▮▮▮▮▮", that the number would be met (*id.*), but only weeks later there was a complete about face when Boston Beer publicly disclosed a shortfall in its Truly Hard Seltzer sales and market demand:

> We overestimated the growth of the hard seltzer category in the second quarter and the demand for Truly, which negatively impacted our volume and earnings for the quarter and our estimates for the remainder of the year.

(*Id.* ¶ 49.) At no time before ACB's July 22, 2021 public announcement did ACB inform Ardagh that ACB had "overestimated the growth of the hard seltzer market category." (*Id.* ¶ 50.) A week after this public announcement, ACB reduced its forecast of purchases from Ardagh for the year to ▮▮▮▮▮▮ cans. (*Id.*) The next month ACB slashed its purchase forecast to fewer than ▮ ▮▮▮▮▮▮ for the remainder of the year. (*Id.* ¶ 51.) In October 2021, ACB publicly admitted "higher demand projections earlier in the year" resulted in ACB adding "significant capacity and

prebuilt inventories of cans and finished goods to levels that ended up exceeding actual needs as the category slowed down." (*Id.* ¶ 52.) In short, ACB had bought and filled more cans of Truly Hard Seltzer beverages than it could sell. Boston Beer reported a $51.8 million loss in the fourth quarter of 2021, a significant decline from the $32.8 million profit reported in the same quarter a year earlier, a loss attributed mostly to the decline in Truly Hard Seltzer sales. (*Id.* ¶ 53.) ACB ultimately purchased a total of ███████████ in 2021, but only about ███████████ from Ardagh. (*Id.* ¶¶ 55, 57.) For 12 oz. standard cans, ACB purchased approximately ██████ cans from Ardagh in 2021, which represented ████ of ACB's total purchases of 12 oz. standard cans for that year. (*Id.* ¶¶ 58–59.)

Once it became clear that ACB would not purchase the Annual Minimum Volume of ██ ███████████████████ in 2021, Ardagh sent repeated requests for ACB to discuss and to mitigate its breach. (*Id.* ¶¶ 61, 63, 65–66, 69.) The parties exchanged various communications with no progress. (*Id.*) For example, Ardagh sent a "proposal summary" in December 2021 and another "preliminary proposal" in July 2022. (*Id.* ¶¶ 63, 66.) These proposals contemplated a ██████████████████████████████████████ ███████████████████. (*Id.*) The parties also discussed a Second Amendment memorializing these proposals. (*Id.* ¶ 65.) No Second Amendment or other agreement was ever agreed upon or signed by the parties. (*Id.* ¶¶ 36, 65, 72.)

At no time in 2021 during the parties' discussions about ACB's volume shortfalls did ACB raise the quality of the ████████ that Ardagh used for its cans, or any alleged ████████, as a reason ACB did not purchase the Annual Minimum Volume in 2021. (*Id.* ¶ 64.) At no time

6

in 2021 or before Ardagh initiated the dispute resolution process in November 2022 did ACB give notice of a can defect under the procedures set forth in the Amended Agreement.  (*Id.* ¶ 74.)[1]

In September 2022, ACB proposed to rewrite the Amended Agreement to give Ardagh a percentage of ACB's requirements with no fixed commitment.  (*Id.* ¶ 70.)  Ardagh declined.  (*Id.* ¶¶ 70–71.)  In October 2022, Ardagh gave notice of dispute pursuant to Section 15 of the Amended Agreement, which triggered a 60-day clock to resolve the dispute.  (*Id.* ¶ 73.)  In response to that dispute, ACB for the first time notified Ardagh that ACB would not purchase more 12 oz. Sleeks from Ardagh until an alleged issue with ███████ was resolved.  (*Id.* ¶ 74.)  Without resolution after the time for dispute resolution expired under the Amended Agreement, Ardagh filed this lawsuit.

## ARGUMENT

## I.  ARDAGH IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II THAT ACB MUST PURCHASE THE ANNUAL MINIMUM VOLUMES IN THE APPLICABLE CALENDAR YEAR.

"Because contracts are interpreted as a matter of law, claims that turn on the interpretation and construction of a contract, rather than on disputed material facts, are suitable for resolution on a motion for summary judgment."  *W. Bend Mut. Ins. Co. v. Procaccio Painting & Drywall Co., Inc.*, 928 F. Supp. 2d 976, 981 (N.D. Ill. 2013); *see also Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 431 F. Supp. 3d 995, 998 (N.D. Ill. 2020).  That resolution is



[1]  Section 3.2 of the Amended Agreement provides that ███████████████████████████████████████████████████████████████████████████████████████████."  (SMF ¶ 18.) ████████████████████████████████████████████████████████████████████████████████████████████████████████████.  (*Id.* ¶ 19.)  Even when ACB gave a counter-notice to Ardagh's October 22 dispute notice, ACB did not invoke Sections 3.2 or 3.3.

straightforward here. As this Court already found, "Sections 2.2 and 2.2.1 of the Amended Agreement are not ambiguous." (Mem. Op. & Order at 24, ECF No. 100.) "[T]he contract's terms plainly impose an Annual Minimum Volume purchase obligation on ACB for each calendar year from 2021 through 2026." (*Id.*) And "any purchasing shortfall during the applicable calendar year shall be cured within the following calendar year. . . ."[2] (*Id.*) The Court's ruling is indisputably correct. Under the governing New York law (SMF ¶ 34), "a contract 'that is clear, complete, and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.'" *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440 (PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (citation omitted). And, the grammar matters; the parties used mandatory language—"will" and "shall"—to define ACB's purchase obligations:



- (SMF ¶ 27 (emphasis added).)

- (*Id.* ¶ 27 (emphasis added).)

- (*Id.* ¶ 30 (emphasis added).)

By contrast, the parties chose the permissive "may" to define ACB's purchases of Annual *Maximum* Volumes. (*Id.* ¶ 27.) The Annual Minimum Volumes purchase obligation is "clear when juxtaposed with the language" for the Annual Maximum Volume—the provision with "will"

---

[2] The Court's decision to vacate this order on procedural grounds does not undermine the Court's conclusions about ACB's purchase obligations under Sections 2.2 and 2.2.1. (*See* ECF No. 164.)

and "shall" imposes an obligation and the provision with "may" grants discretion. *See Natural Res. Def. Council v. N.Y. Dep't of Sanitation*, 83 N.Y.2d 215, 220–21 (1994) (contrasting use of "may" as granting discretion and noting that the "use of the verb 'shall' throughout the pertinent provisions illustrates the mandatory nature of the duties contained therein"); *GFI Realty Servs., LLC v. Long*, No. 656505/2020, 2022 WL 4131707, at *4 (N.Y. Sup. Ct. Sept. 12, 2022) ("The clause in the plaintiff-drafted Agreement . . . is a mandatory 'shall' clause not, a discretionary 'may' clause.").

Reinforcing the fact the Annual Minimum Volumes are mandatory, the parties again used mandatory, not discretionary, language to specify the time given ACB to cure any shortfall: "█████████████████████████████████████████████████████████████████ …" (SMF ¶ 30 (emphasis added).) Further, if as ACB has argued, it has multiple years to cure the shortfall, the Amended Agreement would have used the plural "years" rather than "year" and not added for emphasis that shortfall purchases must occur in the "***following*** calendar year." (*Id.* (emphasis added).) The Amended Agreement is also unambiguous that ACB's obligation to cure the shortfall in the following year does not release ACB from its obligation to purchase the Annual Minimum Volumes in the year in which the shortfall must be cured: "████████████████████████████████████████████████████████████████████████" (*Id.*)

## II.  ARDAGH IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II THAT ACB IS LIABLE FOR BREACH OF THE AMENDED AGREEMENT FOR FAILING TO PURCHASE ANNUAL MINIMUM VOLUMES IN 2021.

Ardagh asks for summary judgment on ACB's liability under Counts I and II for breaching the Amended Agreement in 2021. The amount of damages Ardagh is entitled to recover from this breach can be determined at a later stage. *See, e.g.*, *MacNeil Auto. Prod. Ltd. v. Cannon Auto.*

*Ltd.*, No. 08 CV 0139, 2014 WL 3396114, at *4 (N.D. Ill. July 11, 2014) (partial summary judgment on liability for breach of contract appropriate where only genuine issue is attributable damages); *NutraSweet Co. v. X–L Eng'g Corp.*, 933 F. Supp. 1409, 1423 (N.D. Ill. 1996) (same).

The elements for breach of contract are "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach." *PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc.*, 131 A.D.3d 1029, 1030 (N.Y. App. Div. 2015). There is no genuine dispute as to the first two elements. (*See* SMF ¶¶ 35, 54.) There also is no genuine dispute that ACB failed to purchase the Annual Minimum Volumes of Sleeks and 12 oz. standard cans in 2021—falling more than ███ ███████ short of Sleeks and nearly ████████ short of 12 oz. standard cans—which damaged Ardagh due to lost revenue from those sales and the inability to recoup the significant investments Ardagh made to its manufacturing capacity in anticipation of the agreed upon volumes of cans in the Amended Agreement. (*Id.* ¶¶ 28–29, 55, 58, 75–79.)

### A. ACB Breached the Amended Agreement by Failing to Purchase the Annual Minimum Volumes of Sleeks and 12 oz. standard cans in 2021.

**<u>Sleeks</u>**

The below chart lists the undisputed number of Sleeks ACB purchased from Ardagh in 2021 compared to the Annual Minimum Volume that ACB was required to purchase that year. ACB's shortfall of Sleeks was *over* ████████ in 2021. (SMF ¶¶ 28, 55, 75.)

|  | Approximate Purchases from Ardagh | Annual Minimum Volume | Approximate Volume Shortfall | ACB Approximate Total Purchases (All Suppliers) |
|---|---|---|---|---|
| 2021 | █████████████████████████████████████████████████████████████ | | | |

---

[3] ACB did not cure this volume shortfall in 2022, as required under the Amended Agreement. (SMF ¶¶ 30, 55.)

The reason for ACB's breach is simple and was repeatedly represented to the public by Boston Beer at the time in SEC filings and public statements: ACB misread the trajectory of the hard seltzer market and its own sales. (*Id.* ¶¶ 49, 52–53.) In 2020 ACB secured for itself dramatically increased can supplies and transitioned to a dual-supplier strategy—planning to purchase cans from both Ardagh and Ball—based on a business calculus that the continued growth in the hard seltzer market and ACB's market share would justify ACB securing long-term supply of Sleeks to guard against the ███████████████████████. (*Id.* ¶¶ 8–13.) Following its dual-supply strategy, ACB purchased Sleeks from both suppliers throughout 2021, even though ACB had ████████████████████████. (*Id.* ¶¶ 38–40, 55, 57.) ACB kept on this course even after it became clear to ACB that the hard seltzer market trajectory ACB expected never materialized and ACB's purchase forecasts continued to drop, with Boston Beer admitting in October 2021 that the "higher demand projections earlier in the year" led to "significant capacity and prebuilt inventories of cans and finished goods to levels that ended up exceeding actual needs as the category slowed down." (*Id.* ¶¶ 49, 51–52, 55, 57.) ACB purchased ████████ Sleeks in 2021, which demonstrates fulfilling the ████████ Annual Minimum Volume to Ardagh was practicable, but ACB chose to purchase only ████████████ ████████ from Ardagh. (*Id.* ¶¶ 28, 55, 57.)

**12 oz. Standard Cans**

The below chart lists the undisputed total number of 12 oz. standard cans purchased by ACB in 2021, its purchases from Ardagh, and the Annual Minimum Volume ACB contracted to purchase.

11

| Approximate Purchases from Ardagh | Annual Minimum Volume | Approximate Volume Shortfall | ACB Total Purchases (All Suppliers) |
|---|---|---|---|
| ███ (SMF ¶ 58) | ███ (SMF ¶ 29) | ███ | ███ (SMF ¶ 58–59) |

This Annual Minimum Volume for these cans reflected less than 2% of ACB's requirements that year, yet ACB purchased a mere ███ cans, ███ of its purchases, from Ardagh in 2021.[4]  (SMF ¶¶ 58–59.)  ACB has never given notice of any alleged quality defects due to the ███ that Ardagh used, or for any alleged ███, with Ardagh's 12 oz. standard cans.  (*Id.* ¶ 60.)  The reason for ACB's breach is straightforward: despite committing itself to the Annual Minimum Volumes, ACB viewed Ardagh as a "███" for 12 oz. standard cans and had ███ ███.  (*Id.* ¶¶ 44–46.)  This fact was confirmed when one year after agreeing to the Annual Minimum Volumes, ACB agreed ███ ███—an amount ACB knew it would never need in 2022.  (*Id.* ¶¶ 43, 45.)

**B.    Ardagh Suffered Damages Because of ACB's Failure to Purchase Over 500 Million Cans.**

To establish liability for breach of contract, Ardagh need only "come forward with specific evidence in order to establish the existence of damages flowing from a breach of contract." *Stanford Square, L.L.C. v. Nomura Asset Cap. Corp.*, 229 F. Supp. 2d 199, 206 (S.D.N.Y. 2002). When "there is no genuine to dispute regarding the fact that [plaintiff] suffered damages resulting from the breach, summary judgment on the question of liability is warranted, leaving for later

---

[4]  ACB also never cured the 2021 shortfall because ACB purchased ██ 12 oz. standard cans from Ardagh in 2022.  (SMF ¶ 58.)

determination what remedy is appropriate." *GemShares LLC v. Lipton*, No. 17 C 6221, 2019 WL 587392, at \*2 (N.D. Ill. Feb. 13, 2019).

There can be no genuine dispute that Ardagh suffered damages because of ACB's failure to purchase the Annual Minimum Volume of Sleeks and 12 oz. standard cans in 2021. Because of ACB's breach, Ardagh lost the sale of more than ███████ Sleeks and nearly ██████████ 12 oz. standard cans to ACB at the Amended Agreement's pricing totaling approximately ███████. (SMF ¶¶ 33, 75.) Despite reasonable efforts, Ardagh was unable to reallocate this capacity to any other customers and, therefore, was unable to recoup these sales. (*Id.* ¶ 76.) Ardagh is entitled to recover its direct damages. *See, e.g.*, *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 692 N.E.2d 551, 553 (N.Y. 1998) ("Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed."). One partial measure of the damage is the investments Ardagh made to its manufacturing capabilities specifically attributable to ACB in anticipation of ACB's contracted-for purchases under the Amended Agreement, (SMF ¶¶ 77–79). *See, e.g.*, *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*, 918 N.E.2d 124, 125 (N.Y. 2009) (plaintiff is entitled to recover the expenses reasonably incurred in preparing to perform the contract). The fact ACB may dispute the *amount* does not preclude summary judgment as to ACB's liability for breach of the Amended Agreement. *See, e.g.*, *Cent. Laborers' Pension Fund Bd. of Trustees v. Mike Fasula Concrete Const., Inc.*, No. 08 C 50261, 2011 WL 6338904, at \*5 (N.D. Ill. Dec. 19, 2011) ("A dispute over the amount of damages will not prevent the court from entering summary judgment against defendant, but will only affect the court's determination of damages and indicates that a hearing to prove damages is appropriate.").

## III. ARDAGH IS ENTITLED TO SUMMARY JUDGMENT ON ACB'S AFFIRMATIVE DEFENSES RELATED TO ACB'S PURCHASE OBLIGATIONS.

ACB's last line of defense is to flood the Court with affirmative defenses in an effort to modify the Amended Agreement or excuse ACB's breaches. These defenses depend upon "statements" or "representations" Ardagh purportedly made before execution of the First Amendment (Defs.' Am. Affirmative Defenses ("Affirmative Defenses") ¶¶ 5, 9, 13, 22–23, 28 36, 50, 57, ECF No. 107 at 23–33), or during the parties' unsuccessful attempts to resolve the breaches (*see id.* ¶¶ 5, 26–29, 33–35, 41–43, 53, 57). It is undisputed, however, that the parties never signed a second amendment to the Amended Agreement and that ACB never received any representation from Ardagh that ACB could ███████████████████████. (SMF ¶¶ 36, 65, 72.) Even if that were not enough, oral statements allegedly made pre- and post-Amended Agreement fail as a matter of law.

The parties' negotiations and discussions before execution of the First Amendment are inadmissible. It is an "established rule of law that a written contract merges all prior and contemporaneous negotiations in reference to the same subject, and that the whole engagement of the parties and the extent and manner of their undertaking is embraced in the writing." *John W. Cowper Co. v. CDC-Troy, Inc.*, 50 A.D.2d 1076, 1076 (N.Y. 1975) (citation omitted). For this reason, extrinsic evidence is inadmissible to alter or add a provision to a written agreement that is clear and unambiguous. *410 Lefferts, LLC v. 408 Lefferts, LLC*, 229 A.D.3d 439, 441 (N.Y. App. Div. 2024). ACB's purchase obligations under Sections 2.2 and 2.2.1 are unambiguous (*see supra* at 7–9), so ACB's attempt to alter those obligations with pre-execution "statements," "representations," or "understandings" inconsistent with the text of the Amended Agreement fails as a matter of law. *See S. Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 809–10 (N.Y. 2005) (refusing to consider extrinsic evidence based on "clear and unambiguous" provision).

14

This is especially so when the parties agreed that the Amended Agreement represents their entire agreement on the subject matter, the purpose of which is to "bar the introduction of extrinsic evidence to alter, vary or contradict the terms of the writing." *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (N.Y. 2001); *see Edge Grp. WAICCS LLC v. Sapir Grp. LLC*, 705 F. Supp. 2d 304, 325 (S.D.N.Y. 2010) (enforcing the contract's merger provision).  The parties through the First Amendment ratified Section 31 ("Entire Agreement"), making clear that " ███████████ ████████████████████████████████████████████████████████████ ███████████████████████ " (SMF ¶¶ 21, 32.)

Evidence of the parties' discussions and negotiations pre-Amended Agreement fail as a matter of fact and common sense as well.  ACB [i.e., the Boston Beer Company] is a sophisticated commercial party that has negotiated many supply agreements.  (*Id.* ¶¶ 1, 3.)  No witness identified in ACB's Rule 26 disclosures has explained why ACB would sign a contract with text that contradicts what ACB allegedly believed was the agreement; nor has any identified ACB witness testified to any such representation made in the negotiations.

ACB cannot rely on any oral statements made after execution of the First Amendment. Section 24 of the Amended Agreement states "[n]o term or provision of this Agreement may be amended, changed, waived, discharged or terminated orally, but only by an instrument in writing signed by both Parties."  (*Id.* ¶ 20.)  New York courts enforce such provisions.  *See, e.g.*, N.Y. Gen. Oblig. Law § 15-301 (McKinney 2024); *Nassau Beekman LLC v. Ann/Nassau Realty LLC*, 105 A.D.3d 33, 39 (N.Y. App. Div. 2013).  Indeed, ACB and Ardagh negotiated over a draft Second Amendment to address ACB's failure to purchase the Annual Minimum Volume in 2021. (SMF ¶ 65.)  There is no dispute that the Second Amendment was never signed, nor was any other amendment.  (*Id.* ¶¶ 36, 65, 72.)  In discovery ACB has not disclosed evidence sufficient to create

an issue of material fact from any alleged "statements" or "representations" made by Ardagh that would allow a reasonable jury to conclude that Ardagh had "agreed" to modify Sections 2.2 and 2.2.1. (*See* Affirmative Defenses ¶¶ 26, 28, 33.) Eric Black—ACB's corporate designee for the Amended Agreement—admitted that ACB never received any representation from Ardagh at any point that ACB could ███████████████████████. (SMF ¶ 37.) The evidence establishes that for nearly a year, the parties discussed "proposals," but neither side ever accepted the other side's proposal (*id.* ¶¶ 61–71). *See, e.g.*, *Nassau Beekman*, 105 A.D.3d at 40 (finding parties' discussions and unexecuted amendment to a contract insufficient to show parties orally modified contract because "all these items were clearly explainable as preparatory steps taken with a view of attempting to arrive at a possible agreement in the future," and "it may be understood to merely reflect that defendant was willing to attempt to negotiate a new modification, as the parties had done once before").

Tellingly, ACB sent the last proposal in September 2022—a month before Ardagh sent to ACB the notice of dispute under Section 15 of the Amended Agreement. (*Id.* ¶¶ 70, 73.) ACB proposed that Ardagh accept a modification to the Amended Agreement that would substitute a commitment to buy 50% of its requirements from Ardagh with no minimum. (*Id.* ¶ 70.) If ACB had believed the parties already had an agreement or a representation modifying the purchase obligations under Section 2 of the Amended Agreement upon which ACB had the legal right to rely upon, then ACB sending that proposal makes no sense commercially or logically. ACB made that proposal in September 2022 because it knew at the time there had been no modification. *See Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1080 (2d Cir. 1990) ("We are satisfied that both sides negotiated in good faith for a written amendment of [their] contract, and we can see no purpose or intent in those lengthy negotiations if a binding amendment already had been agreed

upon."); *Vill. On Canon v. Bankers Tr. Co.*, 920 F. Supp. 520, 529 (S.D.N.Y. 1996) (rejecting formation of contract where "negotiations continued for more than a year after this alleged written agreement by exchange of letters occurred" and "continued negotiations cannot be reconciled with the agreement as alleged by the plaintiffs").

Also defying common sense if ACB's allegations of a modification had any merit, there is not a single communication internally at ACB or at Ardagh relaying that the parties had orally agreed to modify ACB's purchase obligation. It is logically and commercially unreasonable for ACB to allege that such an agreement had been reached without generating any internal communications at either company to ensure everyone—from ACB's CEO to those operating its filling plants and Ardagh's executives and plant personnel—was aware of the new agreement moving forward. Quite the opposite, ACB's Head of Procurement stated internally in August 2022, just weeks before Ardagh's dispute notice, that ACB was "███████████████████████ ███████████████████████████████████████████████████████████████," (*Id.* ¶¶ 68, 73 (emphasis added).) As a matter of pleading ACB concedes no agreement to modify the Annual Minimum Volumes was reached, alleging in its Answer that "the parties discussed various business ***proposals*** to address the demand downturn" and for "many months" were "working together constructively on various revised ***scenarios*** moving forward." (*See, e.g.*, Affirmative Defenses ¶¶ 26, 28, 41 (emphasis added).) Whatever a "revised scenario" might be, it is not an amendment to the Amended Agreement.

## A. Mutual Mistake (Affirmative Defense No. 3)

ACB cannot produce "evidence of a very high order" to overcome the "heavy presumption that a deliberately prepared and executed written instrument manifested the true intention of the parties." *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1066 (N.Y. 1978). The decision in *Chimart Assocs. v. Paul*, 489 N.E.2d 231 (N.Y. 1986) is instructive. The New

York Court of Appeals affirmed summary judgment in favor of plaintiff on defendant's mutual mistake defense because (1) the contract was "part of a multimillion-dollar transaction involving sophisticated, counseled parties dealing at arm's length"; (2) "the language of the agreement was plain and unambiguous"; and (3) there was "no unequivocal evidence of mutual mistake or fraud." *Id.* at 234–35. The same is true here. (*See, e.g.*, SMF ¶¶ 3, 5.)

To state the obvious, ACB cannot produce any evidence that Ardagh shared any mistaken belief in support of a mutual mistake defense. *See Yurman Design, Inc. v. Garden Jewelry Mfg. Corp.*, No. 99 CIV. 10507 (TPG), 2003 WL 22047896, at *3 (S.D.N.Y. Aug. 29, 2003) (parties must "share a substantially similar erroneous belief as to the facts"). Ardagh never made any representation that ACB could ███████████████████ (SMF ¶ 37); there is no evidence that Ardagh has ever shared that belief. *See Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 Civ. 4584 (LGS), 2020 WL 1528526, at *9 (S.D.N.Y. Mar. 30, 2020) (dismissing mutual mistake defense where no evidence "of Plaintiff's intent to agree exactly to the terms put forward by Defendants"). The parties' conflicting views over application of Sections 2.2 and 2.2.1 simply confirm there was no ***mutual*** mistake. *See Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (affirming rejection of mutual mistake defense where parties "offered conflicting versions").[5]

---

[5] For mutual mistake, a mistake of fact must have "existed at the time contract was entered into." *See Rekis v. Lake Minnewaska Mountain Houses, Inc.*, 170 A.D.2d 124, 130 (N.Y. App. Div. 1991). ACB's misjudgment of the market is not sufficient. *See, e.g.*, *Fantozzi v. Axsys Techs., Inc.*, No. 07 CIV. 02667 (LMM), 2008 WL 4866054, at *11 (S.D.N.Y. Nov. 6, 2008) (granting summary judgment against mutual mistake when party was "aware of a number of choices and ma[de] a bad choice"); *Raphael v. Booth Mem. Hosp.*, 67 A.D.2d 702, 703 (N.Y. App. Div. 1979) ("Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain.").

### B.  Estoppel (Affirmative Defense No. 8)

ACB cannot prove the elements of estoppel, including a false representation by Ardagh and reasonable reliance on such a representation. *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 714 (S.D.N.Y. 2012).  ACB admits that Ardagh never represented that ACB could ███████████████████████. (SMF ¶ 37.)  ACB cannot produce a single piece of evidence that ACB made any decision based upon an alleged representation by Ardagh that ACB could defer its purchase obligations into the future without consequences. *See Mindspirit, LLC v. Evalueserve Ltd.*, 470 F. Supp. 3d 366, 376, 382–83 (S.D.N.Y. 2020) (no evidence party changed its position in reliance and therefore no equitable estoppel).

Even if in response to this motion an ACB employee would allege a statement by Ardagh and ACB's reliance as predicates to an estoppel, any asserted reliance cannot be reasonable given the clear terms of the Amended Agreement and the record of Ardagh's repeated demands that ACB remedy its breaches (*see, e.g.*, SMF ¶¶ 61–69).  *See Gutman v. Amoco Oil Co.*, No. 93 CIV. 6377 (LLS), 1993 WL 597381, at *2 (S.D.N.Y. Nov. 18, 1993) (rejecting estoppel defense because asserted reliance was "unjustified" given unambiguous contract terms); *Jimico Enterprises, Inc. v. Lehigh Gas Corp.*, No. 1:07-CV-0578, 2010 WL 2985962, at *7 (N.D.N.Y. July 27, 2010) (same).

### C.  Waiver (Affirmative Defense No. 9)

ACB's waiver defense fails for two reasons.  First, the Amended Agreement requires any waiver to be signed, in writing by both parties (SMF ¶ 20), and there is no dispute that the parties never signed the Second Amendment or any another amendment (*id.* ¶¶ 36, 65, 72).  *See Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (granting summary judgment against waiver defense because no written waiver excused its contractual obligations).

19

Second, the evidence ACB offers—Ardagh's good-faith attempts to resolve the dispute—falls well short of evidence that is "clear, unmistakable, and without ambiguity." *See Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 499 (S.D.N.Y. 2005). Quite the opposite, Ardagh continued to enforce the Amended Agreement and demand a remedy while the parties explored whether an amicable resolution was feasible (*see, e.g.*, SMF ¶ 69). *See F. Bender Inc. v. Crow Constr. Co.*, 266 A.D.2d 503, 504 (N.Y. App. Div. 1999) ("Far from intending to relinquish its right to the bond, [Defendant] never ceased to pursue its contractual right. . . .").

### D. Acquiescence & Consent (Affirmative Defense No. 11)

ACB pleads that Ardagh acquiesced and consented to ACB's "reduced purchases and to any alleged breach of the parties' Amended Agreement in connection with the Annual Minimum Volumes," again alleging the parties' attempts to resolve their dispute after ACB failed to purchase the Annual Minimum Volume. (*See* Affirmative Defenses ¶¶ 41–45). ACB has no evidence sufficient to create a genuine issue of fact for the jury.

It is undisputed that there was no representation made by Ardagh to ACB that ACB could ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (SMF ¶ 37) and Ardagh continued to assert its contrary rights under the Amended Agreement beginning in the Summer of 2021 (*id.* ¶¶ 48, 51). *See Adidas Am., Inc. v. Thom Browne, Inc.*, No. 21-CV-5615 (JSR), 2022 WL 17736799, at *4 (S.D.N.Y. Dec. 16, 2022) (acquiescence defense fails absent an active representation plaintiff would not pursue a claim); *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 CIV. 1615 (CM), 2012 WL 2929392, at *13 (S.D.N.Y. July 18, 2012) (no acquiescence because "[t]here was virtually no delay between the effective date of the termination and [plaintiff's] assertion of a claim of trademark infringement").

### E.    Impossibility/Impracticability (Affirmative Defense Nos. 14-15)[6]

ACB alleges that it was impossible or impractical to purchase the Annual Minimum Volume of cans from Ardagh given the "significant and unexpected downturn in the market in 2021" and the alleged quality issues in the cans.  (*See* Affirmative Defenses ¶¶ 48–56.)  First, any subsequent change in the hard seltzer market—no matter how "significant" or "unexpected"—is insufficient to establish this defense, because "changes in market conditions or economic hardship do not excuse performance."  *Ebert v. Holiday Inn*, No. 11 CIV. 4102 (ER), 2014 WL 349640, at *7 (S.D.N.Y. Jan. 31, 2014); *see 605 Fifth Prop. Owner, LLC v. Abasic, S.A.*, No. 21CV811 (DLC), 2022 WL 683746, at *4–5 (S.D.N.Y. Mar. 8, 2022) (rejecting impossibility based on COVID-19 pandemic); *Route 6 Outparcels, LLC v. Ruby Tuesday, Inc.*, 88 A.D.3d 1224, 1225–26 (N.Y. App. Div. 2011) ("Economic factors are an inherent part of all sophisticated business transactions and, as such, while not predictable, are never completely unforeseeable[.]"); *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37, 41 (N.Y. 1968) ("[W]here impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused."); *Health-Chem. Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) (upholding denial of impracticability where a decline in stock price made performance "onerous").

Second, ACB's allegation that it was impossible or impractical to purchase Ardagh cans due to market conditions is belied by the fact ACB did purchase more than the ▮▮▮▮ minimum of Sleeks and the ▮▮▮▮▮ minimum of 12 oz. standard cans in 2021.  (SMF ¶¶ 28–29, 55, 57–59.)

---

[6]  Impracticability and impossibility are not separate affirmative defenses.  *See Clarex Ltd. v Natixis Secs. Ams. LLC*, No. 1:12-CV-7908, 2014 WL 4276481, at *11 (S.D.N.Y. Aug. 29, 2014).

### F.      Course of Performance (Affirmative Defense No. 16)

For its sixteenth affirmative defense, ACB offers a single, conclusory assertion that Ardagh "engaged in a course of performance by which it agreed that Defendant was entitled to ████ ████████████████████████████████████████████████████████████████████████████ ████████████████ accordingly." (Affirmative Defenses ¶ 57.) Any "course of performance" after ACB failed to purchase the Annual Minimum Volumes cannot modify the Amended Agreement, because it is comprehensive and requires any amendment to be in a writing signed by both parties (SMF ¶ 20). *See A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*, No. 17-CV-3529 (NG) (RLM), 2018 WL 10517080, at \*5 n.6 (E.D.N.Y. Mar. 6, 2018).

Nor can ACB present any evidence to prove that Ardagh's "course of performance" after that was "unequivocally referable" to the alleged modification. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003). Ardagh continued to press ACB following ACB's failure to purchase the Annual Minimum Volumes. (SMF ¶¶ 61, 63, 66.) That Ardagh ***considered*** potential changes to ACB's obligation to purchase the Annual Minimum Volumes is not evidence of an "unequivocal" course of performance contradicting Sections 2.2 and 2.2.1 of the Amended Agreement sufficient to create a genuine, material issue of fact. *See Hartford Fire Ins. Co. v. Roadtec, Inc.*, No. 09 CIV 06747 (PGG), 2010 WL 4967979, at \*6–7 (S.D.N.Y. Nov. 29, 2010) (terms of the agreement and any course of performance shall be construed whenever reasonable as consistent with each other).

### G.      Non-Conformance to Industry Practice (Affirmative Defense No. 17)

Finally, ACB pleads the Annual Minimum Volumes purchase requirement in the Amended Agreement is not enforceable because it "does not conform to standard industry practice." (Affirmative Defenses ¶ 58.) ACB has proffered no expert and no ACB fact witness has testified

the Amended Agreement does not conform with industry practice or how. This defense is all the more perplexing because the fact a sophisticated purchasers and supplier, both with decades of experience entering into can supply agreements (SMF ¶¶ 3, 5), would choose to contract outside "standard industry practice" is not an affirmative defense under New York law. It is a measure of ACB's desperation that it would plead that only contracts conforming with "industry practice" are enforceable under New York law. *Contrast 159 MP Corp. v. Redbridge Bedford, LLC*, 128 N.E.3d 128, 130 (N.Y. 2019) ("In New York, agreements negotiated at arm's length by sophisticated, counseled parties are generally enforced according to their plain language pursuant to our strong public policy favoring freedom of contract.").

## CONCLUSION

Ardagh respectfully requests that the Court enter summary judgment in Ardagh's favor on the following for which there is no genuine dispute of material fact:

(1) ACB is required to purchase the Annual Minimum Volumes of 12 oz. Sleek, 12 oz. standard, and 24 oz. cans each calendar year as set forth in Sections 2.2 and 2.2.1 of the Amended Agreement, and if ACB fails to purchase the Annual Minimum Volumes in any applicable calendar year, the shortfall must be cured by ACB in the following calendar year;

(2) ACB is liable under Counts I and II of Ardagh's Complaint for breaching the Amended Agreement by failing to purchase the Annual Minimum Volumes of 12 oz. Sleek cans and 12 oz. standard cans in 2021; and

(3) Dismissal of ACB Affirmative Defense Nos. 3, 8, 9, 11, 14, 15, 16, and 17.

Dated: March 7, 2025

**Ardagh Metal Packaging USA Corp. f/k/a Ardagh Metal Beverage USA Inc.,**

| | |
|---|---|
| /s/ Adam J. Glazer | James P. McLoughlin, Jr. |
| Adam J. Glazer | (admitted *pro hac vice*) |
| Richard M. Goldwasser | Christopher D. Tomlinson |
| **SCHOENBERG FINKEL BEEDERMAN BELL** | (admitted *pro hac vice*) |
| **GLAZER, LLC** | Benjamin E. Shook |
| 300 South Wacker Drive, #1500 | (admitted *pro hac vice*) |
| Chicago, Illinois 60606 | Elena F. Mitchell |
| Telephone: (312) 648-2300 | (admitted *pro hac vice*) |
| Facsimile: (312) 648-1212 | Drew P. Newman |
| Adam.Glazer@sfbbg.com | (admitted *pro hac vice*) |
| Richard.Goldwasser@sfbbg.com | **MOORE & VAN ALLEN PLLC** |
| | 100 North Tryon Street, Suite 4700 |
| | Charlotte, North Carolina 28202-4003 |
| | Telephone: (704) 331-1000 |
| | Facsimile: (704) 331-1159 |
| | jimmcloughlin@mvalaw.com |
| | christomlinson@mvalaw.com |
| | benshook@mvalaw.com |
| | elenamitchell@mvalaw.com |
| | drewnewman@mvalaw.com |

**<u>CERTIFICATE OF SERVICE</u>**

I, Adam J. Glazer, hereby certify that I have served all counsel of record by filing the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** using the Court's electronic case filing system.

Dated:  March 7, 2025

                                           */s/ Adam J. Glazer*
                                           Adam J. Glazer