**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARDAGH METAL PACKAGING USA CORP., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN CRAFT BREWERY LLC, <br><br> Defendant. | Case No. 1:22-cv-07367 (JCD) (JA) |

**<u>DEFENDANT AMERICAN CRAFT BREWERY LLC'S</u>**
**<u>MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

Defendant American Craft Brewery LLC ("ACB"), pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, submits this motion for judgment as a matter of law on Counts I and II of Plaintiff Ardagh Metal Packaging USA Corp.'s ("Ardagh") complaint and Count VI of ACB's counterclaims. Ardagh has failed to prove its claims related to can bodies or can ends under the Amended Agreement. As a result, ACB requests the Court grant it judgment as a matter of law.

## LEGAL STANDARD

Rule 50(a)(2) of the Federal Rules of Civil Procedure provides that motions for judgment as a matter of law "may be made at any time before submission of the case to the jury. Such motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Fed. R. Civ. P. 50(a)(2). Rule 50 motions allow "a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue.'" *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) (citation omitted).

## ARGUMENT

### I. No Reasonable Jury Can Find for Ardagh on its Breach of Contract Claim (Count I) Related to Can Bodies.

At trial, Ardagh has the burden of proof to show by a preponderance of the evidence that (1) it performed all terms of the Amended Agreement related to can bodies; (2) ACB breached the Amended Agreement related to can bodies; and (3) Ardagh sustained damages as a result of the breach. Ardagh has failed to provide sufficient evidence for a reasonable jury to find for it on damages. As a result, ACB is entitled to judgment as a matter of law on this claim.

### A. *Ardagh Has Failed to Prove Its "Contract Minus Market Price" Damages.*

Section 2-708 of New York's Uniform Commercial Code provides the measure of damages for ACB's alleged breach. *See* NY UCC § 2-709(3) (referring to § 2-708 as providing for

applicable damages upon a buyer's repudiation). Ardagh seeks lost profits under § 2-708. Under New York law, Section 2-708(1) provides Ardagh with its only available remedy: "the difference between the market price at the time and place for tender and the unpaid contract price… but less expenses saved in consequence of the buyer's breach." NY UCC § 2-708(1). Section 2-708(1) is the usual measure of a seller's damages. The seller bears the burden of proving the market price. *See Fuji Photo Film USA, Inc. v. Zalmen Reiss & Assocs., Inc.*, 31 Misc. 3d 1240(A) (Sup. Ct.), *judgment entered,* (N.Y. Sup. Ct. 2011).

Ardagh does not ask for Section 2-708(1) damages. It has not put forward any evidence of market price, nor any calculations of these alleged damages. While Mr. Sladewski, Ardagh's chief commercial officer, vaguely testified that Ardagh attempted to re-sell can bodies, he did not offer any testimony about the prices Ardagh allegedly attempted to obtain for its cans or anything else that would establish the relevant market price for those cans.[1] Moreover, the Court prohibited Ardagh from introducing evidence through its expert, Mr. Richmond, concerning a calculation of these damages as an undisclosed opinion.[2] As such, Ardagh has failed to prove this category of damages. ACB is entitled to judgment as a matter of law on this issue. *See Knic Knac Agencies v. Masterpiece Apparel*, 1999 WL 156379, at *13 (S.D.N.Y. Mar. 22, 1999) (granting summary judgment for defendants where plaintiffs did not submit proof of market price and thus "[could not] prove damages under U.C.C. § 2–708); *Seduka, LLC v. St. Moda, LLC*, 2017 WL 1273959, at *3 (S.D.N.Y. Mar. 23, 2017) ("because Plaintiff has pointed to no evidence that might support market damages, it cannot proceed with this specific theory of recovery").

   B. *Ardagh Has Not Established that It Is an Unfinished Goods Seller.*

ACB is likewise entitled to judgment as a matter of law on Ardagh's theory that it is an

---

[1] Trial Tr. (Mar. 24) at 367:1-4, 375:6-377:1.
[2] Trial Tr. (Mar. 30) at 198:16-199:25.

unfinished goods seller. Ardagh is an unfinished goods seller only if it proves by a preponderance of the evidence that (1) ACB breached the Amended Agreement before or during Ardagh's manufacture of the cans; (2) Ardagh reasonably stopped manufacturing the cans for ACB or opted not to begin production of the Sleek cans; and (3) there was no market for 12 oz. Sleek cans from 2021-2025 or for 12 oz. standard, or 24 oz., cans in 2021. *M&G Polymers USA, LLC v. Carestream Health, Inc.*, 2010 WL 1611042, at *42 (Del. Super Ct. Apr. 21, 2010); *Hodes v. Hoffman Int'l Corp.*, 280 F. Supp. 252, 254, 257 (S.D.N.Y. 1968); *Federated Retail Holdings, Inc. v. Sanidown, Inc.*, 2010 WL 5298113, at *6, 9 (S.D.N.Y. Dec. 23, 2010).[3] Otherwise, any seller who decided to discontinue manufacturing would automatically qualify, and thereby circumvent the narrow bounds of this limited exception to the general rule that damages are governed by Section 2-708(1).[4] *See also* Dkt. 417 at 3-10; Dkt. 456 at 5-9; Dkt. 490 at 8-9; Dkt. 311 at 10-12.

Ardagh has failed to establish the first and third elements. There are no unfinished or partially made goods at issue. Per the Amended Agreement, ACB provides Ardagh with 180-day rolling forecasts and an annual forecast for its orders.[5] Ardagh only then accepts and manufactures for ACB its cans to order from stock aluminum.[6] Ardagh has not (and cannot) argue that it manufactured cans for ACB that ACB did not purchase. *See also* Dkt. 456 at 5-9; Dkt. 490 at 9.

Moreover, the evidence overwhelmingly establishes that there was not only a market for Sleek cans (from 2021-2025) and in 2021 for both standard cans and 24 oz cans, but it was a

---

[3] This is not an easy standard to meet, as the related cases on custom goods sellers also demonstrate. *See*, *e.g.*, *Federated Retail*, 2010 WL 5298113, at *6, 9.

[4] This general rule has very limited exceptions, which only apply when the damages provided by this general rule are considered "inadequate." *See Bill's Coal Co. v. Bd. of Pub. Utilities of Springfield, Mo.*, 887 F.2d 242, 245 (10th Cir. 1989) ("Section 2–708(2) is basically designed for specific categories of sellers, such as lost volume sellers, component sellers, and jobber sellers."). It is not enough that these damages equate to zero to be "inadequate." *See id.*

[5] JX-007 §6.

[6] *Id*. §7; Trial Tr. (Mar. 24) at 445:22-446:11.

vibrant, growing market.[7] For example, in 2025, Ardagh sold approximately 5.4 billion 12 oz Sleek cans, an increase of roughly 1 billion cans compared to 4.4 billion 12 oz Sleek cans in 2024.[8] Ardagh introduced no evidence suggesting that Sleek can sales dropped below prior year levels, or that the market declined in total volume. That the overall market for Sleek cans did not grow at the rate the parties' expected does not mean there is no market for Sleek cans. Indeed the evidence introduced at trial shows that Ardagh earned (and continues to earn) hundreds of million in revenue from its Sleek lines.[9] This increase in Ardagh's 12 oz. Sleek production was in part driven by new customers.[10] Not even Ardagh viewed the Sleek market as disintegrating or gone entirely. The trial evidence similarly showed that there was a market for 12 oz standard and 24 oz cans in 2021, and further, that Ardagh was capacity constrained for these can types in 2021.[11]

### C. Ardagh Has Not Established that It Is a Lost Volume Seller.

ACB likewise is entitled to judgment as a matter of law on Ardagh's theory that Ardagh is a lost volume seller. "A lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *In re WorldCom, Inc.*, 361 B.R. 675, 685 (S.D.N.Y. 2007) (emphasis added). "A lost volume seller does not minimize its damages by entering into another contract because it would have had the benefit of both contracts even if the first were not breached." *Id.*

In the typical lost volume seller situation, the non-breaching seller has a near-inexhaustible supply of inventory. When a buyer breaches a purchase agreement, the item is returned to inventory, and the seller continues its efforts to sell its goods. *See In re WorldCom*, 361 B.R. at

---

[7] *See* JX-022; PX 383 at AMP0047609; PX 380 at AMP0047529; PX 383 at AMP0047557. In addition, Mr. Richmond acknowledged that there are several products – other than hard seltzer – which are packaged in sleek cans. Trial Tr. (Mar. 31).

[8] *See* JX-027.

[9] *See*, *e.g.*, JX-027.

[10] *Id.*

[11] Trial Tr. (Mar. 25) at 506:18-507:20; 510:12-511:13; Trial Tr. (Mar. 27) at 1137:24-1139:5.

686. The seller's continuing efforts to sell, "coupled with a virtually limitless supply," gives rise to the lost volume seller exception to what would otherwise count toward mitigation of damages. *Id*. It makes sense that this exception does not apply where a party has limited capacity and could not have continued its efforts to obtain additional sales but for the buyer's breach. This is because "the lost volume seller's <u>intent</u> to enter into <u>new contracts</u> is the same <u>before</u> and after a purchaser's breach." *Id*. at 689 (emphasis added). "The lost volume seller's desire to sell more units of goods or services is virtually unaffected by the loss of a single sale or agreement." *Id*.

Thus, under New York law, Ardagh is a lost volume seller only if (1) it objectively had the capacity to (a) sell the Amended Agreement's volumes, plus (b) the volumes of cans it had allocated to other existing customers under customer commitments or contracts, and (c) still seek additional sales; (2) it subjectively had the intent to seek out these additional sales; and (3) it could have done so without making any additional capital expenses beyond those that would have been incurred <u>had ACB purchased the full Amended Agreement volumes</u>. *Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008-09 (S.D.N.Y. 1991). As such, Ardagh must put forward evidence of customer contract commitments, and that it objectively could (and also subjectively intended to meet) additional demand beyond the full Annual Minimum Volumes ("AMV") for ACB plus existing commitments to customers, without adding any more staff, overhead costs, or other capital expenditures (such as building more plants or adding new manufacturing lines). *See also* Dkt. 417 at 3-9; Dkt. 456 at 1-9; Dkt. 466 at 6-8; Dkt. 490 at 7-9.

Ardagh has not established the first and third elements of this standard. For 12 oz. Sleek cans, the evidence demonstrates that Ardagh could not have fulfilled ACB's AMVs, plus other customer commitments, and still sought out more customers, without additional capital expenditures. Ardagh's internal long-range planning documents reflect that Ardagh's sellable

capacity was fully utilized through at least late 2021, and that Ardagh's internal planning reflected that these capacity constraints continued through at least 2024, given Ardagh's existing commitments to ACB and other customers. Ardagh did not have unlimited capacity for additional sales beyond its existing commitments (including to ACB). An internal Ardagh long-range plan ("LRP") presentation from December 2020 reflects that Ardagh's Sleek can projected production exceeded its capacity at that time, and Ardagh projected that would continue through at least 2024.[12] A later July 2021 presentation also indicates Ardagh's overall projected demand for cans reflected a sellable capacity of 95% in each year from 2021 to 2024.[13] Given these documents, Ardagh certainly was not seeking out new additional customers (comparable to ACB) beyond ACB plus other existing commitments because they did not have available capacity to sell to such a customer, as would be required to be a lost volume seller.[14] Nor has Ardagh produced any other documents demonstrating its subjective intent to seek out new contracts. To the contrary, in 2025, Ardagh again acknowledged capacity constraints in its Sleek production to ACB.[15] Similarly, the evidence showed that Ardagh was capacity constrained for 12 oz standard and 24 oz cans in 2021.[16]

Ardagh attempted to circumvent the exacting lost volume seller standard by putting forward evidence that they could have met these commitments using other affiliates or "sister companies," and that they only appear to have been capacity-constrained in later years because they cancelled a number of expected imports from these affiliates and sister companies.[17] However, any such imports from these affiliates or "sister companies" cannot be considered as

---

[12] JX-006.

[13] PX-352.

[14] Ardagh indeed was obligated to be prepared to manufacture the maximums under ACB's contract and had nowhere near the capacity to do so as it was already maxed out on capacity for the minimums, as Ardagh's own documents indisputably demonstrate.

[15] Trial Tr. (Mar. 27) at 1145:1-1146:19; DX-1100.

[16] Trial Tr. (Mar. 25) at 506:18-507:20; 510:12-511:13; Trial Tr. (Mar. 27) at 1137:24-1139:5; Trial Tr. (Mar. 30) at 1321:9-19.

[17] Trial Tr. (Mar. 25) at 537:12-21, 548:22-549:13, 586:16-23, 590:12-19, 594:8-595:3, 684:19-685:1.

part of Ardagh's overall capacity. Ardagh must prove that it is a lost volume seller in its own right – not simply that it could obtain the additional capacity from other companies (which is no different than buying goods from other vendors and re-selling them). *Ullman-Briggs*, 754 F. Supp. at 1008-09. *Cf. Tesoro Petroleum Corp. v. Holborn Oil Co., Ltd.*, 145 Misc. 2d 715 (Sup. Ct. 1989) (gasoline dealer not lost volume seller where dealer argued it could have made more sales by purchasing gasoline on the open market and re-selling it). The plaintiff in this case is Ardagh Metal Packaging USA Corp., not Ardagh Group S.A. or another such entity.

Moreover, Ardagh has introduced no evidence that it had an affiliate or sister company that could and would assist them. To the contrary, the evidence establishes that Ardagh had to go through a thorough approval process to justify capital expenditures to expand capacity and open new plants[18] – something that would never be necessary if it could simply fulfill unlimited demand through an affiliate or sister company. That Ardagh had to make capital expenditures (that it claims it expended to fulfill ACB's demand) demonstrates that Ardagh is not a lost volume seller with unlimited capacity.

### D. Ardagh Cannot Recover Lost Profits Under Section 20.9.

Even if Ardagh could show that it was a lost volume or unfinished goods seller (it cannot), it still cannot recover lost profits. While this Court has ruled that the term "LOST PROFITS" in Section 20.9 is ambiguous, it did so based on Ardagh's contention about Section 3.3 of the Amended Agreement. Ardagh failed to produce evidence for its contention, despite having every opportunity to do so in light of this Court's *in limine* ruling.

It is undisputed that Ardagh (the seller here) cannot recover consequential damages, including consequential lost profits, under the New York UCC. *See Associated Metals & Minerals*

---

[18] Trial Tr. (Mar. 24) at 389:5-403:5; JX-004; JX-010; JX-009.

*Corp. v. Sharon Steel Corp.*, 590 F. Supp. 18, 21 (S.D.N.Y. 1983) ("It is… well settled that the U.C.C. does not provide the remedy of consequential damages for aggrieved sellers."), *aff'd,* 742 F.2d 1431 (2d Cir. 1983); *Petroleo Brasiliero, S.A. Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D.N.Y.1974). As such, the only question that remains is whether Ardagh can seek "direct" lost profits under Section 20.9.

Section 20.9 of the Agreement (excluding "ANY LOST PROFITS") precluded Ardagh from seeking its direct lost profits. There is no limitation on the type of profits barred. Ardagh, as a seller, has no consequential lost profits under the UCC. Ardagh (one of "EITHER PARTY") has only direct lost profits. Here, the parties "EXPRESSLY AGREED" to bar recovery of "ANY LOST PROFITS" by "EITHER PARTY":

> 20.9 <u>LIMITATION OF LIABILITY</u>. IT IS EXPRESSLY AGREED THAT IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES UNDER THIS AGREEMENT . . . .

Ex. 1 § 20.9. This provision excludes the hundreds of millions of dollars Ardagh seeks from ACB pursuant to UCC Section 2-708(2) in alleged "direct" lost profit damages. *See GE Transportation Parts, LLC v. Cent. Ty. Mfg., LLC*, 2022 WL 4467192, at \*3 (S.D.N.Y. Sept. 26, 2022) (damages under UCC Section 2-708 are lost profits). Mr. Richmond admitted that his "direct damages" analysis could be called "lost profits," and he does qualify the harm as "lost profits."[19]

Section 20.9's plain terms preclude Ardagh from recovering "ANY" lost profits, whether direct or consequential.[20] The phrase "ANY" lost profits confirms the parties intended to exclude <u>all</u> types of lost profits. Reading any limitation or exception into the clause's exclusion of any lost profits is contrary to its plain language. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-20 (2008)

---

[19] *See* Trial Tr. (Mar. 31).
[20] Lost profits are either direct or consequential. *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009), *aff'd,* 976 F.3d 239 (2d Cir. 2020).

(word "any" before a phrase precludes attempt to limit scope of that phrase). The Seventh Circuit addressed a virtually identical limitation of liability clause—"<u>any</u> lost profits, special, contingent, incidental, or consequential damages"—and concluded that the clause precludes the plaintiff from recovering "any of the damages alleged in its complaint," which included $30 million in "profits lost . . . as a direct and proximate result of the breach." *CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 496 (7th Cir. 1997) (emphasis added). Courts consistently interpret this language the same way. *See CompuSpa, Inc. v. Int'l Bus. Machines Corp.*, 228 F. Supp.2d 613, 626-27 (D. Md. 2002) (New York law) ("compensatory damages" and "lost profits" are "unquestionably covered" by limitation of liability which excluded recovery for "any lost revenues, lost profits, incidental, indirect, consequential, special or punitive damages"); *Shionogi Inc. v. Adrx Labs*, 187 A.D.3d 422 (1st Dept. 2020) (upholding exclusion of direct lost profits where clause excluded "any loss of profits").[21]

Reading lost profits to only mean consequential damages would make the words "LOST PROFITS" redundant, effectively reading them out of the contract. *See Baldwin Hacket & Meeks, Inc. v. Early Warnings Servs., LLC*, 2023 WL 7648715, at *12 (D. Neb. Oct. 24, 2023) (limiting "lost profits" to consequential damages would be a "meaningless redundancy" of the express exclusion of consequential damages).

*Elorac, Inc. v. Sanofi-Aventis Can, Inc.*, 343 F. Supp. 3d 789, 805 (N.D. Ill. 2018) does not apply. *First*, the use of "ANY"—absent from *Elorac*—is an express indication that the clause applies to any direct and consequential lost profits. *See CogniTest*, 107 F.3d at 496 and previously cited cases. *Second*, unlike in *Elorac*, *noscitur a sociis* does not apply because doing so would not

---

[21] *See also Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App. 641, 642 (1997) (vacating award; finding direct lost profits not recoverable with contract "forb[idding] the recovery of 'ANY LOST PROFITS,'" with "[n]o exceptions"); *Progress Energy, Inc. v. U.S. Glob., LLC*, 102 So. 3d 768, 770 (Fla Dist. Ct. App. 2012) (New York law) (vacating direct damages barred by limitation of liability clause excluding "any lost profits").

resolve any ambiguity about the meaning of "ANY LOST PROFITS." *United States v. Stevens*, 559 U.S. 460, 474 (2010) (the canon only applies when choosing between two possible meanings of an "ambiguous term"). Instead, it would change the phrase's meaning by imposing a limitation that is flatly inconsistent with the contract's text, which the Supreme Court has prohibited. *Ali*, 552 U.S. at 227 (canon cannot "create ambiguity where the . . . text and structure suggest none"). *Third*, *Elorac* did not involve a similar context with other contract provisions that would become meaningless if direct lost profits were not excluded. *See also* Dkt. 490 at 1-5.

This Court also did not find that the word "ANY" immediately preceding "LOST PROFITS" is ambiguous. The plain meaning of "ANY" is "all." *Ali*, 552 U.S. at 218-20. The trial evidence uniformly confirmed this fact.[22] As such, no reasonable jury can conclude that the term "ANY LOST PROFITS" means anything other than what it says – that neither Ardagh nor ACB can recover any and all lost profits, no matter how the lost profits are characterized.

To the extent any ambiguity remains in the term "ANY LOST PROFITS" based on Section 3.3 (Dkt. 527 at 2-3), Ardagh introduced no evidence at trial regarding Section 3.3 to resolve that ambiguity. As such, the only extrinsic evidence in the record concerning Section 20.9 is testimony from Mr. Black, who testified that "ANY" means "any."[23] It is Ardagh's burden to establish its breach of contract claim, including actionable damages, and it has utterly failed to do so. No reasonable jury can find from the available extrinsic evidence that Section 20.9 as a whole (including "ANY") bars only consequential damages.

While Mr. Sladewski testified that Section 20.9 only bars "indirect" lost profits, he also admitted that the word "indirect" does not appear anywhere in Section 20.9.[24] By trying to limit

---

[22] Trial Tr. (Mar. 27) at 1032:25-1033:14; Trial Tr. (Mar. 30) at 1213:13-1214:19; 1217:4-8.
[23] Trial Tr. (Mar. 30) at 1276:12-1277:24.
[24] Trial Tr. (Mar. 24) at 454:9-11.

10

Section 20.9 to "indirect" or consequential lost profits, Mr. Sladewski's testimony reads the words "lost profits" out of Section 20.9, as the words "lost profits" become unnecessary in light of the rest of Section 20.9 that focuses on consequential damages.

Additionally, through Mr. Sladewski, Ardagh attempted to show that Section 20.9 only applies to warranty claims,[25] but such an interpretation is clearly illogical, and no reasonable jury can reach this conclusion based on this evidence. Section 20.9 clearly bars "EITHER PARTY" from recovering lost profit damages. Mr. Sladewski admitted that Section 20.9 was intended to be mutual.[26] However, Mr. Sladewski also recognized that there are no warranty claims that Ardagh could have against ACB.[27] If Ardagh's theory were correct, then Section 20.9 would only bar ACB from recovery, and the words "EITHER PARTY" would be read out of the provision. By barring "EITHER PARTY" and "ANY LOST PROFITS," the parties plainly stated and intended Section 20.9 to apply more broadly, and its inclusion under Section 20 has no significance. Indeed, Section 23 confirms: "The headings in this Agreement are for convenience only and do not have legal meaning."

### E. Ardagh's Capital Expenditures Were Not Rendered Useless.

Ardagh cannot recover alternative reliance damages either. It is well-established under New York law that reliance damages are available only for efforts "rendered useless" due to a party's breach. That is so because compensating a "non-breaching party [who] continues to receive benefits under the terms of a contract would constitute a windfall for that party." *LPD New York, LLC v. Adidas America, Inc.*, 2024 WL 4467187, at \*5 (E.D.N.Y. Oct. 10, 2024) (internal quotations omitted); *see V.S. Intern., S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1198

---

[25] Trial Tr. (Mar. 24) at 274:17-18.
[26] Trial Tr. (Mar. 24) at 452:19-21; 453:11-19.
[27] Trial Tr. (Mar. 24) at 446:12-24; 452:10-453:10.

(S.D.N.Y. 1994).[28] Without this rule, the non-breaching party would be reimbursed for investments made in anticipation of the contract and then collect again from using the investments.

In denying ACB's motion in limine to exclude Mr. Richmond's testimony, this Court allowed Mr. Richmond to testify based on the assumption that he would opine that Ardagh added capacity "solely" for ACB that was never used: "That is, that it built some capacity <u>solely</u> to accommodate its agreement with defendant <u>which it has not used</u> because of the defendant's breach." Dkt. 475 at 3 (emphasis added). Contrary to its claim in multiple prior briefs that Mr. Richmond would say Ardagh added capacity "solely" for ACB, and that this "sole" capacity has not been used, Ardagh has put in no such proof. Rather, the evidence Ardagh presented overwhelmingly shows that its new Sleek manufacturing lines were not "solely" for ACB, but for other customers as well, and have been and continued to be used for other customers.[29] Specifically, Mr. Richmond testified that the buildouts were attributable to ACB and a number of other customers.[30] In fact, Mr. Richmond attributed only about 22% of Ardagh's capital spend on expanding Sleek capacity to ACB, and he stated that the capacity being invested was going to serve ACB and other customers.[31] As such, the cases ACB relies on, *supra*, are fully applicable.

Ardagh has tried to put forward evidence that its capital investments were rendered useless

---

[28] *See also Kleartex (U.S.A.), Inc. v. Kleartex SDN BHD*, 1994 WL 733688, at *7 n.6 (S.D.N.Y. June 9, 1994) (finding that reliance damages are available "only for wasted efforts," and plaintiff had not shown that its marketing expenditures were wasted where it "obtained and filled substantial orders based on its marketing efforts"); *Summit Properties Intern., LLC v. Ladies Professional Golf Ass'n*, 2010 WL 4983179, at *6 (S.D.N.Y. Dec. 6, 2010) (plaintiff's efforts were not "rendered useless" where it continued to receive royalty payments and precluding plaintiff from offering evidence related to a reliance damages theory at trial; "[w]here a non-breaching party continues to receive benefits under the terms of the contract compensation for the initial expenses that enabled those benefits . . . constitute[] a windfall"); *V.S. Intern, S.A.*, 862 F. Supp. at 1198 (finding expenses made in expectation of a long-term relationship with defendant were not "rendered useless" where "plaintiffs continue[d] to operate their business" and "increased revenue for the year after the contract [] terminated"; any compensation "would not place plaintiffs in the same position as they were prior to the execution of the contract… but would instead constitute a windfall").

[29] Trial Tr. (Mar. 24) at 394:23-395:14; 423:16-427:5; Trial Tr. (Mar. 25) at 610:4-611:8; 611:24-612:6; 637:8-641:8; 650:6-651:11; Trial Tr. (Mar. 30) at 244:9-23; 245:25-246:10.

[30] Trial Tr. (Mar. 30) at 244:9-23; 245:25-246:10.

[31] Trial Tr. (Mar. 30) at 248:14-249:6.

12

or unnecessary, only "in part." This evidence fails to satisfy clear New York law. There is no partial use exception. Reliance damages are unavailable where investments were not rendered "completely worthless." *Merry Gentleman, LLC v. George and Leona Productions, Inc.*, 799 F.3d 827, 830-31 (7th Cir. 2015). If Ardagh continued to use and generate revenue from its capital investments after the alleged breach, then Ardagh cannot obtain reliance damages. *See V.S. Intern, S.A.*, 862 F. Supp. at 1198. *See also* Dkt. 311 at 12; Dkt. 417 at 10-15; Dkt. 456 at 9-15.

The evidence is uncontradicted that Ardagh has profitably used (since 2021), and will continue for years to use, its Sleek manufacturing line investments to generate billions in revenue from ACB and other customers. Mr. MacGregor's testimony establishes that Ardagh has made hundreds of millions of sales, and generated and continues to generate hundreds of millions in revenue, from its Olive Branch, Huron, and Winston-Salem facilities.[32] Mr. Richmond squarely testified that Ardagh's investments in these facilities were <u>not</u> "rendered useless."[33]

No reasonable jury can find that Ardagh is entitled to this alternative type of damages in place of NY UCC 2-708(1) or 2-708(2) damages. Allowing Ardagh to recoup the amount of its capital expenditures allegedly attributable to ACB (approximately $124 million) when it has used those expenditures to obtain hundreds of millions of dollars in sales to ACB and even more to other customers does not fulfill the purpose of reliance damages and amounts to a windfall. It does not restore Ardagh to a position of never having entered in the Amended Agreement, i.e., as if Ardagh did not make the capital expenditures. *LPD New York*, 2024 WL 4467187, at *5. Based on the undisputed record, it is abundantly clear that Ardagh's alleged expenditures for investments into its Sleek manufacturing lines were not "wasted" or "rendered useless, and that any related reliance

---

[32] Trial Tr. (Mar. 25) at 628:3-629:5, 646:24-648:4, 655:12-656:15.
[33] *See* Trial Tr. (Mar. 31).

13

damages would be a windfall. ACB is therefore entitled to judgment as a matter of law on Ardagh's theory related to reliance damages.

Because no reasonable jury could find that Ardagh sustained damages in connection with its breach of contract claim related to can bodies, ACB is entitled to judgment as a matter of law on Counts I and II of Ardagh's complaint and Count VI of ACB's counterclaims.

**II. No Reasonable Jury Can Find for Ardagh on its Breach of Contract Claim Related to Can Ends.**

Ardagh has attempted to link its separate claims related to can bodies and can ends, including through its proposed jury instructions (Dkt. 521), but its claims related to can bodies and can ends are entirely separate. The two types of products are addressed by entirely different contract provisions and different expectations or obligations. In particular, ends are not subject to the AMV provision and any obligation as to ends depends on the contract year.

Section 2 of the Agreement references "ACB purchasing one can end for each can body purchased to the extent that Ardagh manufactures and warrants ends that can be used by ACB or its third party fillers or agents." One of ACB's defenses relating to ends addresses the fact that Ardagh never warranted certain ends that could be used by ACB until February 2026. In addition, Section 2.2.2 of the Amended Agreement provides that, through December 31, 2022, "ACB expects to purchase approximately 2/3 of its can bodies with a can end manufactured by Ardagh." This provision does not obligate ACB to purchase can ends from Ardagh. The phrase "expects to purchase" is "precatory language," because it concerns the intention of the parties or the goal of the contract. *WCA Holdings III, LLC v. Panasonic Avionics Corporation*, 704 F. Supp. 3d 473, 497 (S.D.N.Y. 2023). Precatory language, such as a statement of an expectation, is not an enforceable contractual obligation. *Id*. Moreover, this Court has found that the phrase "expects to purchase" is unambiguous, as this Court sustained an objection to ACB from introducing extrinsic evidence as

14

to this provision.[34] ACB had no obligation to purchase ends from Ardagh through December 31, 2022. ACB included proposed instructions concerning this precatory language based on this well-settled principle. *See* Dkt. 522 at 22.

Section 2.2.2 then provides "[b]eginning January 1, 2023, ACB will purchase each can body with a can and [sic] made by Ardagh." In contrast to "expects to purchase," the phrase "will purchase" may implicate an actual contractual obligation (subject to any defenses and affirmative defenses). For these reasons, the only question in this case is whether ACB was obligated to purchase ends beginning on January 1, 2023, with any associated damages first occurring in 2024.

Ardagh has not shown any such obligation. Mr. Richmond opined that Ardagh incurred damages from ACB's failure to purchase can ends in 2021 and 2022,[35] but it did not establish a contractual obligation on ACB's part to purchase ends in those years.

In addition to putting forward no evidence relating to can ends, Ardagh has not and cannot establish that it is entitled to any lost profit damages related to end for the same reasons discussed in Part I *supra*. Ardagh is not an unfinished goods or lost volume seller vis-à-vis ends, and even if it were, Section 20.9 bars its damages. No reasonable jury can find otherwise. ACB is therefore entitled to judgment as a matter of law on Ardagh's breach of contract claim related to ends.

## CONCLUSION

For the foregoing reasons, ACB respectfully requests the entry of judgment as a matter of law in its favor on Counts I and II of Ardgah's complaint related to can bodies and can ends, and Count VI of ACB's counterclaims for declaratory judgment.

---

[34] Trial Tr. (Mar. 30) at 134:12-135:25.
[35] Trial Tr. (Mar. 30) at 238:1-21

15

Dated: March 31, 2026

Respectfully submitted,

*/s/ John T. Ruskusky*

One of the Attorneys for *American Craft Brewery LLC*

John T. Ruskusky (IL ARDC #6256605)
jtruskusky@nixonpeabody.com
Christopher P. Hotaling (IL ARDC #3272432)
chotaling@nixonpeabody.com
David M. Pattee (IL ARDC #6317265)
dmpattee@nixonpeabody.com
Kathleen M. Mallon (IL ARDC #6336312)
kmallon@nixonpeabody.com
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL 60602-4378
Telephone: (312) 977-4400

Stephen M. LaRose (*admitted pro hac vice*)
(MA BBO #654507)
slarose@nixonpeabody.com
NIXON PEABODY LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835
Telephone: (617) 345-1300

16

## CERTIFICATE OF SERVICE

On March 31, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically.

*/s/ John T. Ruskusky*

John T. Ruskusky
