**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ARDAGH METAL PACKAGING USA CORP.,<br><br>       Plaintiff,<br><br>  v.<br><br>AMERICAN CRAFT BREWERY LLC,<br><br>       Defendant. | Case No. 1:22-cv-07367 (JCD) (JA) |

**DEFENDANT AMERICAN CRAFT BREWERY LLC'S
MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, FOR A NEW TRIAL
<u>OR AN AMENDED JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

LEGAL STANDARDS ..................................................................................................................... 2

ARGUMENT ................................................................................................................................... 2

I.     ACB Is Entitled To Judgment As A Matter Of Law Per Rule 50(b). ................................ 2

       A.     No Reasonable Jury Could Find That Ardagh Suffered Contract-Minus-Market Damages Or Award Ardagh Lost-Profit Damages ..................................... 3

       B.     Even If Market-Price Evidence Were Not Required, No Reasonable Jury Could Find That Damages Were Inadequate Under § 2-708(2) ............................ 4

           1.     No Reasonable Jury Could Conclude That Ardagh Is a Lost-Volume Seller ...................................................................................... 4

           2.     No Reasonable Jury Could Conclude That Ardagh Is An Unfinished-Goods Seller ................................................................... 6

           3.     No Reasonable Jury Could Conclude That § 2-708(1) Damages Are Inadequate ................................................................................ 7

       C.     No Reasonable Jury Could Find That Section 20.9 Permits Lost Profits .............. 8

II.    Fairness Requires A New Trial Or Amended Judgment Under Rule 59 Because The Cumulative Effect Of Multiple Errors Had A Substantial And Injurious Effect On The Verdict. ...................................................................................................... 12

       A.     Instructional Errors Had a Substantial and Injurious Effect on the Verdict .......... 12

           1.     The Jury Instructions Erroneously Omitted the Lost-Volume-Seller and Unfinished-Goods-Seller Standards .................................................... 12

           2.     The Jury Instructions Erroneously Omitted the New York UCC's Limitation on a Seller's Entitlement to Consequential Damages ............. 15

           3.     The Jury Was Erroneously Instructed That Section 20.9 Is Ambiguous ................................................................................................ 17

           4.     The Jury Instructions Erroneously Failed to Explain The Contract's Rollover Provision And Its Impact on Damages, Thus Allowing An Excessive Damages Award Contrary To Law and Unsupported By the Evidence ......................................................................................... 18

           5.     The Jury Instructions And Verdict Form Erroneously Excluded ACB's Defense Regarding Material Supply Issues ................................. 21

III.   The Court Erred By Not Discounting Pre-Judgment Interest for Present Value. ............. 25

CONCLUSION. ............................................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008)...............................................................................................................9

*Associated Metals & Minerals Corp. v. Sharon Steel Corp.*,
590 F. Supp. 18 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1431 (2d Cir. 1983).............................9, 16

*Baldwin Hacket & Meeks, Inc. v. Early Warnings Servs., LLC*,
2023 WL 7648715 (D. Neb. Oct. 24, 2023) .........................................................................9

*Barton Group, Inc. v. NCR Corp.*,
796 F. Supp. 2d 473 (S.D.N.Y. 2011)..............................................................................22, 23

*Bill's Coal Co. v. Bd. of Pub. Utilities*,
887 F.2d 242 (10th Cir. 1989) ...........................................................................................4, 7

*Callahan v. Wilson*,
863 F.3d 144 (2d Cir. 2017)...............................................................................................12

*Carvel Corp. v. Diversified Mgmt. Grp., Inc.*,
930 F.2d 228 (2d Cir. 1991)...........................................................................................13, 19

*CogniTest Corp. v. Riverside Pub. Co.*,
107 F.3d 493 (7th Cir. 1997) ...............................................................................................11

*CompuSpa, Inc. v. IBM Corp.*,
228 F. Supp.2d 613 (D. Md. 2002) .......................................................................................11

*Conjugal P'ship Comprised by Joseph Jones & Verneta G. Jones v. Conjugal
P'ship Comprised of Arthur Pineda & Toni Pineda*,
22 F.3d 391 (1st Cir. 1994)..................................................................................................25

*Curtis v. Timberlake*,
436 F.2d 709 (7th Cir. 2005) ...............................................................................................24

*DePaepe v. Gen. Motors Corp.*,
33 F.3d 737 (7th Cir. 1994) ......................................................................................12, 13, 19

*Duncan v. Consolidated Freightways Corp. of Delaware*,
No. 94 C 2507, 1995 WL 530652 (N.D. Ill. Sept. 7, 1995)...................................................22

*In re Edgewater Med. Ctr.*,
332 B.R. 166 (Bankr. N.D. Ill. 2005) ...................................................................................24

*Federated Retail Holdings, Inc. v. Sanidown, Inc.*,
    2010 WL 5298113 (S.D.N.Y. Dec. 23, 2010) ...............................................................6

*Gerling & Associates Inc. v. Gearhouse Broadcast Pty.*,
    625 Fed. App'x 289 (2015)........................................................................................13

*Hillard v. Hargraves*,
    197 F.R.D. 358 (N.D. Ill. 2000)...................................................................................2

*Hodes v. Hoffman Int'l Corp.*,
    280 F. Supp. 252 (S.D.N.Y. 1968) ..............................................................................6

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
    2016 WL 6906583 (S.D.N.Y. Nov. 21, 2016)........................................................22, 23

*Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*,
    356 F.3d 731 (7th Cir. 2004) ....................................................................................21

*Jannotta v. Subway Sandwich Shops, Inc.*,
    125 F.3d 503 (7th Cir. 1997) .........................................................................13, 15, 19

*Jordan v. Binns*,
    712 F.3d 1123 (7th Cir. 2013) ....................................................................................2

*Knic Knac Agencies v. Masterpiece Apparel*,
    1999 WL 156379 (S.D.N.Y. March 22, 1999) .............................................................3

*Lemons v. Skidmore*,
    985 F.2d 354 (7th Cir. 1993) ....................................................................................12

*Morse Diesel, Inc. v. Trinity Indus., Inc.*,
    67 F.3d 435 (2d Cir. 1995)........................................................................................17

*Murray v. Ross Dove Co., Inc.*,
    72 F.3d 1 (1st Cir. 1995)......................................................................................15, 17

*Nelson v. City of Chicago*,
    810 F.3d 1061 (7th Cir. 2016) ..............................................................................12, 23

*Passananti v. Cook Cnty.*,
    689 F.3d 655 (7th Cir. 2012) ......................................................................................2

*Petroleo Brasiliero, S.A. Petrobras v. Ameropan Oil Corp.*,
    372 F. Supp. 503 (E.D.N.Y. 1974) ........................................................................10, 16

*Pincus v. Pabst Brewing Co.*,
    893 F.2d 1544 (7th Cir. 1990) ..................................................................................21

iii

*Pitasi v. Stratton Corp.*,
   968 F.2d 1558 (2d Cir. 1992).....................................................................................13, 19, 21

*Posttape Assocs. v. Eastman Kodak Co.*,
   537 F.2d 751 (3d Cir. 1976).................................................................................................14

*Matter of Prescott*,
   805 F.2d 719 (7th Cir. 1986) ..............................................................................................25

*Pryer v. C.O. 3 Slavic*,
   251 F.3d 448 (3d Cir. 2001)................................................................................................17

*Sae Biang Optical v. Kenmark Optical, Inc.*,
   2009 WL 3211083 (W.D. Ky. Sept. 30, 2009), *aff'd sub nom. Sae Biang
   Optical v. Ky. Kenmark Optical, Inc.*, 489 F. Appx. 826 (6th Cir. 2012)..................................8

*Seduka, LLC v. Street Moda, LLC*,
   2017 WL 1273959 (S.D.N.Y. March 23, 2017) .......................................................................14

*Thomas v. McAuliffe*,
   170 F.4th 1057 (7th Cir. 2026) ...........................................................................................15

*Thompson v. City of Chicago*,
   722 F.3d 963 (7th Cir. 2013) ...............................................................................................2

*Ullman-Briggs, Inc. v. Salton, Inc.*,
   754 F. Supp. 1003 (S.D.N.Y. 1991)....................................................................................5, 6

*Union Carbide Corp. v. Consumers Power Co.*,
   636 F. Supp. 1498 (E.D. Mich. 1986)...................................................................................15

*Wigod v. Wells Fargo Bank*,
   No. 10 C 2348, 2012 WL 13395247 (N.D. Ill. 2012)................................................................22

*Wilk v. Am. Med. Ass'n*,
   719 F.2d 207 (7th Cir. 1983) ..............................................................................................15

*Williams v. Lampe*,
   399 F.3d 867 (7th Cir. 2005) ..............................................................................................24

*Winforge, Inc. v. Coachman Industries, Inc.*,
   691 F.3d 856 (7th Cir. 2012) ..............................................................................................22

*In re WorldCom, Inc.*,
   361 B.R. 675 (S.D.N.Y. 2007)...............................................................................................4

**State Cases**

*Fuji Photo Film USA, Inc. v. Zalmen Reiss & Assocs.*,
  31 Misc. 3d 1240(A) (N.Y. Sup. Ct. 2011)................................................................4

*Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*,
  227 Ga. App. 641 (1997) ............................................................................................11

*M&G Polymers USA, LLC v. Carestream Health, Inc.*,
  2010 WL 1611042 (Del. Super Ct. Apr. 21, 2010)....................................................6

*Moorer v. City of New York*,
  272 A.D.2d 79 (1st Dep't 2000) ................................................................................25

*Pay v. New York*,
  87 N.Y.2d 1011 (1996) ..............................................................................................25

*Progress Energy, Inc. v. U.S. Glob., LLC*,
  102 So. 3d 768 (Fla. Dist. Ct. App. 2012) ................................................................11

*Shionogi Inc. v. Adrx Labs*,
  187 A.D.3d 422 (1st Dept. 2020)...............................................................................11

**State Statutes**

New York UCC § 2-708 ................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 15.......................................................................................................24

Fed. R. Civ. P. 50..................................................................................................1, 2, 16

Fed. R. Civ. P. 59............................................................................................1, 2, 11, 25

The jury entered a verdict against ACB[1] and awarded over \$175 million in lost profits to Ardagh despite the absence of evidence establishing the legal prerequisite for any lost-profit damages, a contract that precludes "EITHER PARTY" from recovering "ANY LOST PROFITS," the UCC's bar on consequential damages for sellers, and Ardagh's material failure to supply the requisite amount and quality of cans. The trial record does not support the verdict, and the verdict is the cumulative product of multiple errors. ACB is therefore entitled to judgment as a matter of law under Rule 50(b) or, alternatively, to a new trial or further amended judgment under Rule 59.

As a threshold matter, Ardagh failed to prove any cognizable damages. To establish breach of contract, Ardagh was required to prove that Ardagh was measurably harmed by some failure to perform by ACB. The default measure of harm for a contract governed by the Uniform Commercial Code ("UCC"), as the contract in this case is, requires evaluating the difference between the market price of goods—here, cans and ends—and the price the buyer was required to pay under the contract. *See* New York UCC § 2-708(1). Ardagh introduced *no evidence* of market price. As a result, a reasonable jury thus could not conclude that Ardagh suffered any harm.

A reasonable jury also could not have awarded Ardagh lost-profit damages under the UCC. A prerequisite for lost-profit damages under § 2-708(2) is a showing that contract-minus-market damages are inadequate—but Ardagh made no such showing. Without evidence on its products' market price, Ardagh failed to demonstrate any inadequacy; it is not possible to conclude that an amount is inadequate without even knowing what it is. Ardagh also failed to put on sufficient evidence that it met the required elements to be an unfinished-goods seller or lost-volume seller. Lost-profit damages are therefore impermissible as a matter of law.

Further, even if Ardagh could have shown it was entitled to lost profits under the UCC, the

---

[1] "ACB" refers to American Craft Brewery. "Ardagh" refers to Ardagh Metal Packaging USA Corp.

1

Parties' Amended Agreement contains a limitation-of-liability provision, Section 20.9, that categorically bars recovery of lost profits here. That provision states that there will be no recovery of "ANY LOST PROFITS" by "EITHER PARTY." Before trial, the Court ruled that Section 20.9 is ambiguous because it is not clear whether "LOST PROFITS" refers to *all* lost profits, including direct ones, or only to incidental lost profits. But that was error—the contract unambiguously bars any and all lost profits, and the damages awarded here are thus barred as a matter of law. In addition, the evidence at trial on contract interpretation was not sufficient to yield a different result.

Each of those errors, and others discussed below, independently warrants relief. Their cumulative effect deprived ACB of a fair trial. For those reasons, the judgment and amended judgment cannot stand. ACB requests that the Court enter judgment as a matter of law on Counts I and II of the Complaint and Count VI of the counterclaims, grant a new trial, or issue a remittitur.

## LEGAL STANDARDS

ACB is entitled to judgment as a matter of law under Rule 50(b) "if a reasonable jury would not have had a legally sufficient evidentiary basis to find for" Ardagh on a particular issue. *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (citation modified). Under Rule 59(a), this Court has broad discretion to order a new trial where the "verdict is against the weight of the evidence" or is "excessive or inadequate"; "conduct by the court, counsel or the jury improperly influences the deliberative process"; or "for any other reasons the trial was not fair." *Hillard v. Hargraves*, 197 F.R.D. 358, 359-60 (N.D. Ill. 2000). That standard is satisfied if the "cumulative effect" of "several errors" "deprives a litigant of a fair trial." *Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013); *see Thompson v. City of Chicago*, 722 F.3d 963, 967 (7th Cir. 2013).

## ARGUMENT

I. **ACB IS ENTITLED TO JUDGMENT AS A MATTER OF LAW PER RULE 50(b).**

ACB renews its previous motions under Rule 50(a)(2). *See* Dkt. 555, 564. ACB is entitled

2

to judgment as a matter of law on Counts I and II and Counterclaim VI because Ardagh presented insufficient evidence that it was harmed at all—let alone that it was entitled to lost-profit damages. Moreover, as a matter of law, any lost profits are barred under Section 20.9 of the Amended Agreement, and the evidence is not sufficient to interpret that agreement in Ardagh's favor.

A. **No Reasonable Jury Could Find That Ardagh Suffered Contract-Minus-Market Damages Or Award Ardagh Lost-Profit Damages.**

To prevail on its breach-of-contract claims, Ardagh had to prove by a preponderance of the evidence that (1) it "did what it was required to do under the contract"; (2) ACB "did not do what it was required to do"; and (3) ACB's "failure" caused "harm to Ardagh."[2] But under New York law's default measure of damages, Ardagh did not offer any evidence to establish that it was harmed. That absence of evidence also precludes any different measure of damages.

First, Ardagh did not establish any entitlement to the "default measure of damages" under New York law "for non-acceptance or repudiation by [a] buyer": the difference between the market price and the contract price of the goods. N.Y. U.C.C. §2-708(1). Ardagh introduced no evidence of market price for its goods and no calculation of contract-minus-market damages. Ardagh's chief commercial officer, Mr. Sladewski, testified at trial, but he never attempted to specify the prices Ardagh sought or obtained in the market for the cans or can ends that Ardagh claimed ACB failed to purchase, and he never provided any other basis for determining a relevant market price. Ardagh's *only* attempt to introduce a market-price calculation was an undisclosed opinion of an expert, Mr. Richmond, that this Court properly excluded from evidence.[3] Ardagh thus did not establish entitlement to §2-708(1) contract-minus-market damages. *See, e.g., Knic Knac Agencies v. Masterpiece Apparel*, 1999 WL 156379, at *13 (S.D.N.Y. March 22, 1999) (plaintiffs "cannot

---

[2] Dkt. 569 at 21 (Inst. No. 20).
[3] Trial Tr. (Mar. 30) (Richmond) at 1341:3–1356:25.

3

prove damages under UCC § 2-708" because they "have submitted no proof of market price"); *Fuji Photo Film USA, Inc. v. Zalmen Reiss & Assocs.*, 31 Misc. 3d 1240(A) (N.Y. Sup. Ct. 2011) ("burden" is on "the seller" to "establish the applicable market price" for §2-708(1) damages).

Second, Ardagh's failure to prove market price precludes a lost-profits award. Under UCC § 2-708(2), a condition precedent to recovering lost profits is proof that contract-minus-market damages under § 2-708(1) are "inadequate" to "put the seller in as good a position as performance would have done." Without any evidence of market price (or contract-minus-market damages), a reasonable jury could not find that contract-minus-market damages were "inadequate." *Id*. Ardagh is thus barred from obtaining § 2-708(2) damages. *See Bill's Coal Co. v. Bd. of Pub. Utilities*, 887 F.2d 242, 245 (10th Cir. 1989) ("Sellers fall into section 2-708(2) only if they can demonstrate that they would receive inadequate damages under section 2-708(1).").

### B.     Even If Market-Price Evidence Were Not Required, No Reasonable Jury Could Find That Damages Were Inadequate Under § 2-708(2).

Setting aside the absence of market-price evidence, Ardagh failed to prove that it falls into one of the seller categories as to which, under New York law, § 2-708(1) damages are generally inadequate. *See Bill's Coal Co.*, 887 F.2d at 245 ("Section 2-708(2) is basically designed for specific categories of sellers, such as lost volume sellers, component sellers, and jobber sellers."). The only such categories that Ardagh ever identified in this case are lost-volume sellers and unfinished-goods sellers—but no reasonable jury could have concluded that Ardagh fell into either category, and Ardagh put on no other evidence that § 2-708(1) damages were inadequate.

*1.     No Reasonable Jury Could Conclude That Ardagh Is a Lost-Volume Seller*.  A "lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *In re WorldCom, Inc.*, 361 B.R. 675, 685 (S.D.N.Y. 2007) (citation modified). Ardagh could qualify as a lost-volume

4

seller only if it proved that it (1) objectively had the capacity to (a) sell the Amendment's volumes, plus (b) the volumes of cans it had allocated to existing customers under customer commitments or contracts, and (c) still seek additional sales; (2) subjectively had the intent to seek out such additional sales; and (3) could have made such additional sales without incurring capital expenses beyond those that would have been incurred had ACB purchased the full annual minimum volumes ("AMVs"). *See Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008–09 (S.D.N.Y. 1991).

Here, no reasonable jury could find that Ardagh proved the first or third elements of that test. As to 12-ounce Sleek cans, the trial evidence demonstrated that Ardagh could not have supplied ACB's AMVs, plus met other customer commitments, and still sought out more customers without having to make additional capital expenditures. For all three can types (Sleek,[4] 12-ounce standard, and 24 ounce[5]), Ardagh's documents show that its capacity was fully utilized through at least late 2021, and that it projected Sleek capacity constraints through at least 2024 based on customer commitments.[6] Without capacity to produce ACB's AMVs, plus meet other customer commitments and still seek new business, Ardagh could not have supplied the cans under ACB's contract to another buyer, and § 2-708(1) damages were not inadequate. Ardagh cannot circumvent that exacting standard by pointing to "sister companies."[7] Ardagh introduced *no* evidence that it had an affiliate or sister company that had capacity to assist it.[8] Regardless, Ardagh

---

[4] JX-006, at AMP0043968 (reflecting Ardagh's Sleek projected production exceeded capacity at that time (2021) and continuing through 2024); JX-008, at AMP0022685 (reflecting sellable capacity of 95% each year from 2021–2024); JX-004 (reflecting investments into 12-ounce Sleek production at Ardagh's Olive Branch plant); PX-157 (describing Ardagh's multi-year production strategy for 12-ounce Sleek, 12-ounce standard, and 24-ounce cans). In 2025, Ardagh acknowledged capacity constraints for its Sleek production. Trial Tr. (Mar. 27) (Bednarzyk) at 1145:1–1146:19; DX-1100 at ACB_0038919 ("[t]ightness in 12 SL"); DX-1142 (Sleek production constraints). *See also* infra at nn. 11, 12.

[5] Ardagh also was capacity constrained for 12-ounce standard and 24-ounce cans in 2021. Trial Tr. (Mar. 25) (Sladewski) at 506:18–507:20, 510:12–511:13; Trial Tr. (Mar. 27) (Bednarzyk) at 1137:24–1139:5; Trial Tr. (Mar. 30) (Black) 1309:16-24; 1312:14-1313:7; 1321:9-1322:1; DX-650; DX-654; DX-663, at AMP0022841; DX-689.

[6] Mr. Sladewski also testified to Ardagh's existing customer commitments. Trial Tr. (Mar. 24) (Sladewski) 392:8-20 (testifying that Ardagh investments were "[f]irst and foremost" influenced by existing "contracts and commitments") (citing JX-004 at AMP0044285-86 (describing long-term contracts)).

[7] Trial Tr. (Mar. 25) (MacGregor) at 548:22–549:13, 586:16–23, 590:12–19, 594:8–595:3, 684:19–685:1.

[8] To the contrary, Ardagh had to go through a thorough approval process to justify capital expenditures to expand

5

had to prove that it was a lost-volume seller in its own right. *Ullman-Briggs*, 754 F. Supp. at 1008–09. Otherwise, any plaintiff could transform itself into a lost-volume seller, sidestepping the UCC's strict default damages measure, by buying goods from other vendors and re-selling them.

2.      *No Reasonable Jury Could Conclude That Ardagh Is An Unfinished-Goods Seller.*

"Unfinished goods" sellers are sellers who "reasonably stop[] manufacturing the goods or opt[] not to begin production" in the event of a contract breach because "the seller cannot enter the market to recoup the portion of its expected profits." *M&G Polymers USA, LLC v. Carestream Health, Inc.*, 2010 WL 1611042, at *42 (Del. Super Ct. Apr. 21, 2010). Ardagh could qualify as an unfinished-goods seller only if it proved that (1) ACB breached the Amended Agreement before or during Ardagh's manufacture of the cans for ACB, and (2) Ardagh reasonably stopped manufacturing the cans for ACB or opted not to begin production of the cans because (3) there was no market for the cans it was planning to produce (that is, 12-ounce Sleek cans from 2021 to 2025, or 12-ounce standard cans or 24-ounce cans in 2021). *See Federated Retail Holdings, Inc. v. Sanidown, Inc.*, 2010 WL 5298113, at *6, 9 (S.D.N.Y. Dec. 23, 2010) (explaining that plaintiff could not resell product in light of customization to specifications); *Hodes v. Hoffman Int'l Corp.*, 280 F. Supp. 252, 254, 257 (S.D.N.Y. 1968). That is a difficult standard to meet—and purposefully so. If a seller can resell its product and has not tailored the product to a particular buyer, the default damages measured in § 2-708(1) are sufficient to make the seller whole.

No reasonable jury could find that Ardagh proved those elements, as there is no evidence of unfinished or partially made goods here. Only *after* receiving ACB's forecasts did Ardagh accept the orders and manufacture the cans custom to ACB.[9] Ardagh thus did not—and could not—show that it manufactured cans specifically for ACB that ACB did not purchase. And the

_____

capacity and open new plants. Trial Tr. (Mar. 24) (Sladewski) at 389:4–403:5; *see* JX-004; JX-009; JX-010.

[9] JX-007 §§6, 7; Trial Tr. (Mar. 24) (Sladewski) at 445:22–446:11.

trial record overwhelmingly established that Ardagh could have produced the cans for another buyer: a vibrant, growing market existed from 2021 to 2025 for Sleek cans, and in 2021 for both standard cans and 24-ounce cans.[10] In 2025, Ardagh sold approximately 1 billion more 12-ounce Sleek cans than in 2024, and it continues to earn hundreds of millions of dollars in revenue from its Sleek lines, in part driven by new customers for seltzers, other alcoholic beverages, and energy drinks.[11] The trial evidence likewise showed that Ardagh was capacity-constrained for all three can types in 2021.[12] Because Ardagh made cans for ACB only on demand, and could otherwise use the materials to produce cans for other buyers, Ardagh was not an unfinished-goods seller.

       3.       *No Reasonable Jury Could Conclude That § 2-708(1) Damages Are Inadequate.* Even assuming that inadequacy under § 2-708(2) is not limited to lost-volume sellers and unfinished-goods sellers, Ardagh did not attempt to show that it had some similar status because it is a custom-goods, component, or jobber seller or the equivalent thereof. *See, e.g.*, *Bill's Coal*, 887 F.2d at 245.[13] Ardagh attempted only to show that § 2-708(1) damages were inadequate using lost-volume seller and unfinished-goods frameworks, and even confirmed during the charge conference that it intended only to press only those two categories.[14]

---

[10] *See* JX-003, at AMP0022801 (Sleek category "on fire" in November 2019); JX-022 (reflecting millions of 12 oz. Sleek cans sold to ACB); JX-027; PX 383 at AMP0047609 (Ardagh October 2025 long-range plan for 2026 stating that "12 oz Sleek market [was] gaining strength"), AMP0047557 (reflecting Ardagh 12 oz. Sleek sales); PX 380 at AMP0047529 (reflecting high utilization of capacity); JX-006 at AMP0043966 (Ardagh December 2020 long-range plan reflecting Ardagh was at or over capacity for 12 oz. standard cans), AMP0043969 (same for 24 oz. cans), AMP0043886 (reflecting "explosive growth" for "alcoholic seltzer"). Virginia Gonzalez testified to the vibrant 12 oz. Sleek market, covering many beverage types, and Ardagh's and the industry's capacity constraints. Trial Tr. (Apr. 1) at 1888:1-6; *see also* Trial Tr. (Mar. 31) at 1443:7–1444:6 (Richmond). Kevin Bednarzyk also testified to Ardagh's capacity constraints and reduction of orders in 2021. Trial Tr. (Mar. 27) at 1117:4-22 (DX-624), 1119:23-25, 1123:3-23, 1127:3-25 (DX-619); 1130:7-9 (DX-636); 1145:1–1146:19; Trial Tr. (Mar. 31) at 1535:25-1537:11. Sladewski also admitted Ardagh's capacity constraints in 2021. *See supra*, nn. 5, 6.

[11] JX-027 (reflecting Ardagh net revenue); Trial Tr. (Mar. 24) (Sladewski) at 383:22-35, 384:6-16, 21-23, 385:10-12 (testifying to breadth of Sleek market); Trial Tr. (Apr. 1) (Gonzalez) at 1888:1-6 (testifying to increased use of Sleek cans); Trial Tr. (Apr. 1) (Thomas) at 1916:20-1918:2 (testifying regarding Ardagh's new customers).

[12] *See supra*, nn. 5, 6, 11.

[13] *See*, *e.g.*, Trial Tr. (Mar. 23) at 239:4–6 ("THE COURT: I understand what you're saying. There's lost volume seller and unfinished goods are the two theories that are at play[.]").

[14] Trial Tr. (Apr. 1) at 1980:17-23.

As to some other, unidentified theory, at most, Ardagh argued that it *might* have had a hard time selling additional cans. In the context of § 2-708, it is not enough for Ardagh to show it did not *actually* sell additional cans—because Ardagh also did not *make* additional cans. If the market price minus the contract price would have "put [Ardagh] in as good a position as performance would have done," Ardagh could not recover lost profits. In other words, "inadequate" means "legally inadequate" and not just "financially disappointing." *Sae Biang Optical v. Kenmark Optical, Inc.*, 2009 WL 3211083, at \*4 (W.D. Ky. Sept. 30, 2009), *aff'd sub nom. Sae Biang Optical v. Ky. Kenmark Optical, Inc.*, 489 F. Appx. 826 (6th Cir. 2012) (finding no inadequacy in § 2-708(1) damages despite the plaintiff's inability to identify market-minus-contract damages).

### C.      No Reasonable Jury Could Find That Section 20.9 Permits Lost Profits.

Even setting aside damages under § 2-708, the Court should vacate the damages award because Section 20.9 precludes Ardagh from recovering "ANY" lost profits. Prior to trial, this Court ruled that the term "LOST PROFITS" in Section 20.9 was ambiguous based on Ardagh's arguments regarding Section 3.3.[15] That ruling, which ACB maintains is incorrect, allowed Ardagh to argue that under Section 20.9 Ardagh may recover *direct* lost profits from ACB—just not indirect ones. But Ardagh introduced no extrinsic evidence at trial concerning Section 3.3—whether relating to its negotiation, drafting, or course of performance—or concerning any other topic that would support limiting Section 20.9's categorical bar on "LOST PROFITS" to consequential damages alone. As a result, the issue should never have gone to the jury, and no reasonable jury could find that Ardagh presented sufficient evidence to resolve any ambiguity about the scope of "LOST PROFITS" in Ardagh's favor. Rather, the text, context of the UCC, and usage of "ANY LOST PROFITS" in analogous provisions unambiguously establish that Section

---

[15] Dkt. No. 527 at 2–3; Hearing Tr. (Mar. 12) at 111–112; JX-005 at § 3.3.

20.9 bars *all* lost-profits recovery by either party.

First, the text of Section 20.9—including the term "ANY LOST PROFITS"—unambiguously prevents either party from recovering lost profits of *any* kind. It contains no carveout for "direct" lost profits, and the broad and unambiguous word "ANY" confirms that the parties intended to exclude *all* types of lost profits.[16] *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-20 (2008) (discussing "any"). Further, reading "ANY LOST PROFITS" to include only consequential lost profits would make the words "LOST PROFITS" in Section 20.9 superfluous, since that provision already separately bars recovery of "special, incidental or consequential damages"; there would be no reason to list "LOST PROFITS" separately if that term covered only consequential damages. *See Baldwin Hacket & Meeks, Inc. v. Early Warnings Servs., LLC*, 2023 WL 7648715, at *12 (D. Neb. Oct. 24, 2023) (limiting "lost profits" to consequential damages would be a "meaningless redundancy" of the express exclusion of consequential damages).

Even if the term "ANY LOST PROFITS" were ambiguous, Ardagh did not offer extrinsic evidence that the term "ANY" should be narrowed. Mr. Sladewski testified that Section 20.9 bars only "indirect" lost profits, but he did not anchor that conclusion in any facts related to the contract's drafting or performance, and he admitted that the word "indirect" is not in Section 20.9.[17]

Second, reading "ANY LOST PROFITS" in the context of the UCC dictates the conclusion that "ANY LOST PROFITS" includes *all* lost profits. It is undisputed that a seller like Ardagh cannot recover consequential damages, including consequential lost profits, under the New York UCC—regardless of what its contracts do and do not say. *See Associated Metals & Minerals Corp.*

---

[16] The trial evidence confirmed this fact. Trial Tr. (Mar. 30) (Black) at 1276:12–1277:24 (testifying that "ANY" in the Amended Agreement means "any"); Trial Tr. (Mar. 27) (Smalla) at 1031:1-1033:14 (testifying that Section 20.9 meant that "nobody's liable for the other party's lost profits, like in any case, in any shape or form"); Trial Tr. (Apr. 2) (Koch) at 2060:5-2063:11 (testifying that the phrase "lost profits" covered both direct and consequential damages); *see* Trial Tr. (Mar. 24) (Sladewski) at 454:12-456:16, 466:6-16 (testifying to his understanding of Section 20.9 and admitting that he did not inform ACB of Ardagh's consequential-only interpretation).

[17] Trial Tr. (Mar. 24) (Sladewski) at 454:9–11.

9

*v. Sharon Steel Corp.*, 590 F. Supp. 18, 21 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1431 (2d Cir. 1983); *Petroleo Brasiliero, S.A. Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D.N.Y. 1974). Because the New York UCC already bars "consequential damages" to a seller, it would be nonsensical for "LOST PROFITS" to refer to only *consequential* lost profits, because under that interpretation that contract language would do no work at all. Further, Section 20.9 bars "EITHER PARTY" from recovering lost profits, and Mr. Sladewski admitted that Section 20.9 was intended to be mutual.[18] Ardagh's consequential-only theory makes Section 20.9 non-mutual because under New York law Ardagh can never assert a claim for consequential damages against ACB. That effectively reads the words "EITHER PARTY" out of the provision.[19]

Unable to avoid those issues, and having failed to present extrinsic evidence that was even close to sufficient to allow the jury to construe the prohibition against "ANY LOST PROFITS" in its favor,[20] Ardagh pivoted to arguing about the contract's text. First, Ardagh argued for the first time in closing that Section 3.3, which covers recovery of any "downtime charges," separately lists the terms "direct damages" and "lost profits"—and that as a result the bar on lost profits must not encompass direct damages. But that conclusion does not follow. "Downtime charges" are obviously not "lost profits"; the point of Section 3.3 is to make sure that downtime charges were treated as direct damages. Moreover, on its face Section 3.3 (like Section 20.9) *distinguishes* between "lost profits" and "special, incidental or consequential damages," indicating that it makes no sense to treat the term "lost profits" as meaning nothing more than "consequential damages."

Second, Ardagh argued that Section 20.9 applies only to warranty claims based on that

---

[18] *Id*. at 452:19–21, 453:11–19.

[19] *Id*. at 446:12–24, 452:10–453:10.

[20] Ardagh proposed the "ANY LOST PROFITS" language and no changes were made to it. PX-434, at ACB_0004490. Ardagh failed to offer any other evidence on Section 20.9, other than its claims that the text fit its claimed interpretation. Absent any relevant extrinsic evidence, the interpretation issue should never have gone to the jury.

10

provision's placement within Section 20, which Mr. Sladewski characterized as the "container warranty" section.[21] That warranty-only theory also fails as a matter of law. Section 23 confirms that the Amended Agreement's headings are "for convenience only" and "do not have legal meaning"; Section 20.9's placement within Section 20 thus does not limit its scope. In any event, accepting Ardagh's argument would also render Section 20.9 non-mutual—as Sladewski admitted, Ardagh could never assert warranty claims against ACB. If Section 20.9 were to bar only ACB from recovery, then the words "EITHER PARTY" again would be read out of the provision.[22]

Finally, Ardagh's interpretation of Section 20.9 is not consistent with how courts have interpreted limitation-of-liability language that is indistinguishable from the language at issue here. That cements the conclusion that Section 20.9 unambiguously forbids all of the lost profits that Ardagh sought and the jury awarded.[23] *See CompuSpa, Inc. v. IBM Corp.*, 228 F. Supp.2d 613, 626-27 (D. Md. 2002) (New York law) ("compensatory damages" and "lost profits" were "unquestionably covered" by limitation of liability that excluded recovery for "any lost revenues, lost profits, incidental, indirect, consequential, special or punitive damages"); *Shionogi Inc. v. Adrx Labs*, 187 A.D.3d 422, 423 (1st Dept. 2020) (upholding exclusion of direct lost profits where clause excluded "any loss of profits*"); CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 496 (7th Cir. 1997) (concluding that clause precluding "*ANY* LOST PROFITS, special, contingent, incidental, or consequential damages" precluded the plaintiff from recovering $30 million in "profits lost . . . as a direct and proximate result of the breach" or any other lost profits).[24]

---

[21] Trial Tr. (Mar. 24) (Sladewski) at 274:17–18.

[22] *Id*. at 446:12–24, 452:10–453:10.

[23] Mr. Richmond's "direct damages" analysis equaled "lost profits." Trial Tr. (Mar. 31) (Richmond) at 1458:14–17.

[24] *See also Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 227 Ga. App. 641, 644-45 (1997) (vacating award; finding direct lost profits not recoverable with contract "forb[idding] the recovery of 'ANY LOST PROFITS,'" with "[n]o exceptions"); *Progress Energy, Inc. v. U.S. Glob., LLC*, 102 So. 3d 768, 770 (Fla. Dist. Ct. App. 2012) (New York law) (vacating direct damages barred by limitation-of-liability clause excluding "any lost profits").

11

**II.    FAIRNESS REQUIRES A NEW TRIAL OR AMENDED JUDGMENT UNDER RULE 59 BECAUSE THE CUMULATIVE EFFECT OF MULTIPLE ERRORS HAD A SUBSTANTIAL AND INJURIOUS EFFECT ON THE VERDICT.**

"An erroneous jury instruction requires a new trial unless the error is harmless." *Callahan v. Wilson*, 863 F.3d 144, 152 (2d Cir. 2017). And "[a]n error . . . is not harmless if it 'results in actual prejudice because it 'had a substantial and injurious effect or influence in determining the jury's verdict." *Lemons v. Skidmore*, 985 F.2d 354, 359 (7th Cir. 1993). In addition, this Court should grant a new trial "if the cumulative effect of [] otherwise harmless errors deprives a litigant of a fair trial," *Nelson v. City of Chicago*, 810 F.3d 1061, 1075 (7th Cir. 2016), or if the amount of damages is excessive, contrary to law, or unsupported by the evidence.

Here, instructional errors, verdict-form errors, and evidentiary rulings separately and cumulatively omitted the guidance the jury needed to assess whether Ardagh was harmed, whether Ardagh was entitled to lost profits, the lack of support for Ardagh's arguments, and what the proper measure of any damages should be. *See, e.g.*, *DePaepe v. Gen. Motors Corp.*, 33 F.3d 737 (7th Cir. 1994) (granting new trial where "the instructions as a whole g[a]ve the jury a misleading impression or inadequate understanding of the law"). As a result, the jury awarded damages that were excessive and unsupported by the evidence and the law. A new trial is warranted.

**A.    Instructional Errors Had a Substantial and Injurious Effect on the Verdict**

*1.    The Jury Instructions Erroneously Omitted the Lost-Volume-Seller and Unfinished-Goods-Seller Standards.* The final jury instructions omitted any instruction on how to determine whether damages under § 2-708(1) are inadequate—in particular, what Ardagh must prove to be considered either a lost-volume or unfinished-goods seller. The jury therefore had no framework for evaluating whether Ardagh met that condition precedent to an award of § 2-708(2) damages.[25]

---

[25] *See* Dkt. 555 at 3 n.4; Trial Tr. (Mar. 23) (Opening Statements) at 238:3–239:3.

12

ACB presented abundant evidence that Ardagh did not meet the required elements to be such a seller, yet the jury had no reliable way of understanding the relevance of that evidence.

A new trial is warranted where key legal standards are omitted from jury instructions. That includes situations in which the jury is given an otherwise "accurate" instruction that "does not convey" adequately the prerequisites the jury must find before assessing damages. *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 514–15 (7th Cir. 1997); *see Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 231 (2d Cir. 1991) (reversing where instructions lacked "specific guidance" to "assess the significance of" the evidence); *DePaepe*, 33 F.3d at 737; *Pitasi v. Stratton Corp.*, 968 F.2d 1558, 1563 (2d Cir. 1992) (new trial where jury was not adequately instructed regarding language's "construction or consequence"); *Gerling & Associates Inc. v. Gearhouse Broadcast Pty.*, 625 Fed. App'x 289, 294 (2015) (new damages trial where proposed instruction raised "important issue of law" and its omission "impaired Seller's theory of the case").

The parties tried this case on the understanding that the jury would be instructed on the required elements for lost-volume and unfinished-goods sellers.[26] ACB introduced significant trial evidence that Ardagh did not fall into either category for any can type including for capacity and market reasons.[27] Both parties' proposed jury instructions addressed the legal requirements for the categories, although the parties disagreed on some requirements.[28] After the final jury-instruction conference and on the eve of summations, the Court e-mailed the parties its final version of the jury instructions, which surprisingly eliminated for the first time the lost-volume-seller and unfinished-goods-seller standards.[29] The next day, the Court explained that it eliminated those

---

[26] *See*, *e.g.*, Trial Tr. (Mar. 31) (Richmond) at 1427:23–1428:25, 1432:9–1433:1.

[27] *See, e.g.,* Trial Tr. (Mar. 24) (Sladewski) at 392:2-4; Trial Tr. (Mar. 25) (Sladewski) at 510:12-511:13; Trial Tr. (Mar. 25) (MacGregor) at 608:16-609:16, 636:19-22, 670:9-672:19; Trial Tr. (Mar. 27) (Bednarzyk) at 1145:5-1146:21; Trial Tr. (Mar. 31) (Bednarzyk) at 1534:10-1535:9; Trial Tr. (Apr. 1) (Thomas) at 1911:13--1922:4; Trial Tr. (Apr. 2) (Closing) at 2185:20--2187:22. *See supra* nn. 5-8, 10-12.

[28] *See* Dkt. 504-7 at 14; Dkt. 505 at 17–18; Dkt. 521 at 9–10, 17–18, 22–23; Dkt. 522 at 14–16.

[29] Ex. 1, April 1, 2026 Email; Dkt. 569 at 26.

standards on the ground that the language in § 2-708 sufficiently defines "inadequate."[30]

Despite the parties' focus throughout trial on Ardagh's two identified arguments, the Court determined that the jury could find some other inadequacy based on dicta: a single footnote in *Seduka, LLC v. Street Moda, LLC*, 2017 WL 1273959 (S.D.N.Y. March 23, 2017), a non-precedential decision. There, a district court opined that a party need not prove that it is a lost-volume seller to be entitled to damages under § 2-708(2). *Id*. at *3 n.1.[31] That court denied summary judgment because it concluded that "Seduka need not prove that every theory of damages is available to it" to proceed. *Id*. at *3. But that court agreed with ACB's position that contract-minus-market damages cannot be proven inadequate without any evidence of the market price and that damages under § 2-708(1) are not available absent that evidence. *See id.* Moreover, the court stated that the only other theory of damages that might be available to the plaintiff is nominal damages. *Id*. None of that suggests that there was any way for Ardagh to try to show inadequacy of § 2-708(1) damages other than the lost-volume or unfinished-goods seller categories.

Yet the Court's decision to eliminate the lost-volume and unfinished-goods seller standards from the jury instructions on the eve of the parties' closings, after significant trial focus and evidence, left the jurors with "no standard by which to evaluate" the evidence of inadequacy or "to determine" that evidence's "relevance to the case." *Posttape Assocs. v. Eastman Kodak Co.*, 537 F.2d 751, 757 (3d Cir. 1976). Contrary to the Court's characterization or its final jury instruction, § 2-708(2)'s statement that "the measure of damages" may be "inadequate to put the seller in as good a position as performance would have done" offers no meaningful direction to a

---

[30] Trial Tr. (Apr. 2) at 2004:8–22.

[31] *Seduka* disagrees that § 2-708(2) "is primarily applied to lost volume sellers who could always sell an additional unit," in rejecting an argument that § 2-708(2) was not intended to also apply to custom-goods sellers. *See* Ex. 2, *Seduka*, No. 14-271, Dkt. 46 at 8 (S.D.N.Y. May 9, 2016). The *Seduka* court did not hold that there are no standards that must be met to prove inadequacy, whether by establishing status as a custom-goods seller or a lost-volume seller.

14

jury on how to determine whether any § 2-708(1) damages are "inadequate." *See Union Carbide Corp. v. Consumers Power Co.*, 636 F. Supp. 1498, 1501 (E.D. Mich. 1986) (stating that "the key to understanding this passage's meaning is the word 'inadequate'" and proposing its own definition of "inadequate"); *see also Thomas v. McAuliffe*, 170 F.4th 1057, 1063 (7th Cir. 2026) ("Failing to define a term of art can render a jury instruction legally erroneous and confusing."); *supra* at 3-8.

The Court's omission here also was prejudicial and clearly affected the verdict by permitting the jury to award lost profits under § 2-708(2) without the predicate findings the law requires. *Jannotta*, 125 F.3d at 515. Indeed, "it is obvious that because" evidence on the relevant seller categories "was received in such abundance, the significance of the jury instructions . . . was sharply enhanced." *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 217 (7th Cir. 1983) (granting new trial). The last-minute change to the jury instructions deprived the jury of the necessary law, including as to the elements the Court had said it would explain to the jury, and confused the jury as to the relevance of evidence. After two weeks of evidence on the two seller categories on which Ardagh had relied, the Court's change in the instructions impaired ACB's ability to structure its trial presentation and closing around § 2-708(2)'s governing legal tests for "inadequacy."

Moreover, as discussed above, *supra* at 4-7, Ardagh did not provide a sufficient evidentiary basis for any finding by a reasonable jury that it is a lost-volume or unfinished-goods seller. Had the Court correctly instructed the jury on those categories and the standards governing them, the jury likely would not have found Ardagh entitled to § 2-708(2) damages. *See Murray v. Ross Dove Co., Inc.*, 72 F.3d 1, 2 (1st Cir. 1995) (remanding for new trial where the court could not "say that the jury would have awarded the same amount of damages" absent the instructional error).

2.       *The Jury Instructions Erroneously Omitted the New York UCC's Limitation on a Seller's Entitlement to Consequential Damages*. The jury instructions thus prejudiced ACB by

15

omitting any instruction on a critical UCC limitation bearing on the implausibility of Ardagh's ambiguity claim and its claimed interpretation of Section 20.9: as a matter of New York law, an aggrieved seller may not recover consequential damages, including consequential lost profits. *Associated Metals*, 590 F. Supp. at 21; *Petroleo Brasiliero*, 372 F. Supp. at 508; *see supra*, at 9-10. ACB raised this limitation in its proposed instructions, its Rule 50(a) motion, and its response to Ardagh's objections to the Court's proposed jury instructions.[32] Nonetheless, the Court omitted it.[33] The jury was told it could award Ardagh lost profits if it found that the bar on an award of "LOST PROFITS" in Section 20.9 covered "consequential" lost profits damages "only," even though such a provision would be entirely superfluous given background New York law that already forbids an award of consequential damages to sellers.[34]

That omission was not harmless. As discussed above, *supra* at 8-11, Ardagh (1) presented Sladewski and then argued in closing that Section 20.9 barred only consequential lost profits but (2) admitted that Ardagh intended Section 20.9 to be mutual (i.e., by barring "EITHER PARTY" from "ANY LOST PROFITS").[35] A jury instruction on the legal unavailability of consequential lost profits to Ardagh under the UCC would have allowed the jury to conclude that Ardagh's claimed limitation of Section 20.9 to consequential lost profits was not credible or permissible because Ardagh's consequential-only theory makes Section 20.9 non-mutual and effectively reads the words "EITHER PARTY" out of the provision. Without that instruction, the jury was not adequately informed of the legal context or governing law on a central, contested issue bearing on the scope and meaning of "LOST PROFITS" in Section 20.9. Individually and in combination with other errors, that omission amounted to prejudice that resulted in an unfair verdict. *See*

---

[32] Dkt. 505 at 15–16; Dkt. 522 at 13; Dkt. 555 at 7–8; Dkt. 559 at 2–3.
[33] Dkt. 569 at 27 (Instr. No. 26).
[34] Dkt. 568 at 4 (Verdict Form Q11-Q12).
[35] *See* Trial Tr. (Mar. 24) (Sladewski) at 452:19–21, 453:11–19; Trial Tr. at 2110-2111:19, 2125:11-21.

16

*Murray*, 72 F.3d at 2; *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 451–54, 458 (3d Cir. 2001).

       3.      *The Jury Was Erroneously Instructed That Section 20.9 Is Ambiguous*. Whether a contract is ambiguous is a question of law for the Court, and it is reversible error to treat unambiguous language as ambiguous and instruct the jury accordingly. *See Morse Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 439–40 (2d Cir. 1995) (new trial where court erroneously instructed the jury to "ascertain what the parties intended" as to an unambiguous provision). Such an erroneous instruction is not harmless when the jury may have awarded damages based on a mistaken view of the contract's damages limitations. *Id*. Here, the Court erred in its pretrial ruling that Section 20.9 is ambiguous because Section 20.9 unambiguously bars "EITHER PARTY" from recovering "ANY LOST PROFITS," whether direct or consequential. *See supra* at 8-11.

      The Court's erroneous ambiguity ruling allowed the jury to determine the scope of "LOST PROFITS" in Section 20.9. But because Section 20.9 unambiguously excludes "ANY LOST PROFITS," the Court should have instructed the jury that "LOST PROFITS" were barred by Section 20.9 and thus not available. *Morse Diesel*, 67 F.3d at 439. And the Court should not have fashioned the verdict form to direct the jury to decide whether "LOST PROFITS" in Section 20.9 means "Direct Damages and Consequential Damages" or "Consequential Damages Only" and to instruct that only the latter answer permitted a lost-profits award, which was contrary to the UCC, applicable law, and the evidence.[36]

      That error was especially prejudicial because the Court first offered an incomplete instruction during ACB's initial cross-examination and then limited ACB's ability to develop testimony on the scope of Section 20.9.[37] The Court sustained Ardagh's relevance objection to a

---

[36] Dkt. 568 at 4 (Verdict Form Q11-Q12).
[37] Trial Tr. (Mar. 24) (Sladewski) at 461:12-463:2.

line of questioning about the significance of the phrase "UNDER THIS AGREEMENT."[38] That limitation was prejudicial because whether Section 20.9 applied only in a narrower warranty context was a central, contested issue that the jury was required to decide in answering Verdict Form Question 11, which in turn controlled whether the jury could award lost profits.[39] Given that ACB had to prove its interpretation of a contract the Court ruled was ambiguous, the Court could not fairly curtail ACB's ability to present evidence about its interpretation.

4.      *The Jury Instructions Erroneously Failed to Explain The Contract's Rollover Provision And Its Impact on Damages, Thus Allowing An Excessive Damages Award Contrary To Law and Unsupported By the Evidence*. Section 2.2.1 of the Amendment provides that ACB could roll over any shortfalls in meeting the AMVs to purchases in the following calendar year.[40] ACB sought to have the Court instruct the jury on the rollover.[41] After ACB submitted its proposed instructions, the Court granted partial summary judgment and accepted Ardagh's interpretation of the rollover provision, ruling that ACB must cure any year's purchasing shortfall the following calendar year.[42] But the Court's final instructions made no reference to the rollover, despite the Court's acceptance of that cure period.[43] Without such an instruction, the jury had no legal

---

[38] Trial Tr. (Mar. 30) (Black) at 1278:1-6.

[39] Dkt. 568 (Verdict Form Q11–Q12); *see also* Trial Tr. (Mar. 24) (Sladewski) at 461:18-463:2.

[40] *See* JX-007. Section 2.2.1 provides in full: "Should [ACB] fail to purchase the Annual Minimum Volumes during the applicable calendar year, the volume shortfall will be purchased by Customer in the following calendar year and the term of this Amended Agreement shall be extended until all such purchases have been made." The Court is aware of ACB's position that the rollover is not limited to one year, which will be addressed separately on appeal.

[41] *See* Dkt. 505 at 6, 10 (including the following in ACB's Issue-Specific Proposed Instruction No 1: "there is no breach by ACB because the Amended Agreement permits ACB to 'roll over' any remaining Annual Minimum Obligation to future years 'until all such purchases were made,' which ACB continues to do" and "Ardagh contends that under the Amended Agreement between Ardagh and ACB, ACB was required to purchase the Annual Minimum Volumes of 12-ounce sleek, 12-ounce standard, and 24-ounce cans in each calendar year of the Amended Agreement and purchase any shortfall volume within the following calendar year such that shortfall volume for year 2021 must be purchased in year 2022 and so forth. ACB denies this assertion and contends that there is no breach, in part, because the Amended Agreement permitted ACB to 'roll over' any remaining Annual Minimum Obligation to future years 'until all such purchases were made' and it was not contractually obligated to purchase the Annual Minimum Volumes of 12-ounce sleek, 12-ounce standard and 24-ounce cans solely in a particular year. . .").

[42] *See* Dkt. 511.

[43] *See* Dkt. 569.

18

guidance about a key contractual limitation on breach and damages.

At trial, multiple fact witnesses described how a given year's shortfall was rolled over under the contract and that both parties understood that ACB had the opportunity to roll over a year's shortfall to (at least) the next year.[44] Mr. Richmond testified that the rollover affected the timing and calculation of any recoverable loss, providing three scenarios dependent on the timing of the breach and operation of the rollover.[45] Despite that evidence, the jury did not apply the rollover in its verdict, contrary to the Court's interpretation of the Amended Agreement and to the trial evidence. The lack of a rollover instruction prevented the jury from placing this evidence in its legal context. *See Pitasi*, 968 F.2d at 1563 (new trial where court did not instruct the jury on how exculpatory language of a ski pass "should be construed . . . or what effect, if any, the pass should be given"); *Jannotta*, 125 F.3d at 514–15; *DePaepe*, 33 at 737; *Carvel*, 930 F.2d at 231.

A proper understanding of the rollover provision precludes any finding of a breach in or an award of damages for 2021. Indeed, Section 2.2.1 provides that ACB could at least roll over any 2021 shortfalls until 2022, such that ACB had the entirety of 2022 to purchase any 2021 shortfalls. And the Court ruled on summary judgment that "the first opportunity to find [ACB] in breach" of the Amended Agreement "was December 31, 2022" (at which time it would be known whether ACB purchased all of its 2021 shortfall).[46] Despite that ruling, the jury awarded "2021 damages" in Q13(a) after finding a "breach" "in 2021" in Q1, an award legally unavailable to Ardagh.[47]

The jury's damages verdict also fails to account for the rollover in other ways. Ardagh sought damages for shortfalls in ACB's AMVs for each year from 2021-2025. The jury awarded

---

[44] *See, e.g.*, Trial Tr. (Mar. 24) (Sladewski) at 285:17–19; Trial Tr. (Mar. 25) (MacGregor) at 580:23–581:23; Trial Tr. (Mar. 30) (Black) at 1185:25–1186:2, 1194:6–8. ACB preserves its argument that the Court's interpretation of the rollover provision is erroneous and that a rollover of more than one year is permissible under that provision.
[45] Trial Tr. (Mar. 30) (Richmond) at 1371:1–14, 1382:25–1383:3, 1383:18–1385:5, 1390:16–20; Ex. 3, Slides from Andrew Richmond Testimony, at Slides 36-38.
[46] Dkt. 511 at 5; *see also* Dkt. 600.
[47] *See* Dkt. 568 (Verdict Form).

Ardagh the following damages: $13,246,829 for 2021, $28,921,045 for 2022, $44,379,415 for 2023, $47,871,583 for 2024, and $42,254,522 for 2025.[48] As a threshold matter, the jury miscalculated damages for each year by multiplying the shortfall amount listed in PX444 (the "Shortfall") for each year by $.026067 per can, regardless of the year or can type.[49] For example, the "Shortfall" for 2022 is 1,109,489,440. Multiplying that number by $.026067 results in $28,921,061. Similarly, the "Shortfall" for 2025 is 1,620,997,630. Multiplying that number by $.026067 results in $42,254,545. But that calculation, among other errors, excludes the continued rollover purchases in 2026. Lacking the instruction requested by ACB, the jury ignored the rollover for over *500 million* 2026 Sleek can purchases in calculating damages.

The failure to instruct on the rollover thus produced a verdict that is against the weight of the evidence and contrary to law. Under Section 2.2.1, ACB had until the end of 2026 to cure any 2025 shortfall. At the time of trial, ACB had purchased nearly 200 million 12-ounce Sleek cans in 2026 and forecasted purchasing a total of 588 million of them by the end of 2026.[50] ACB has no AMV for 2026, so all of ACB's 2026 purchases apply to any 2025 shortfall. The jury should have credited ACB's 2026 purchases toward the 2025 shortfall—a credit of over $15.3 million.[51]

The jury's confusion, and the lack of legal and evidentiary support for the damages award, is further shown by the jury's 12-ounce Sleek damages award for 2022 and its 12-ounce standard can damages award for 2021, both of which are higher than Ardagh sought.[52] For 2022, the jury awarded $28,921,045 for Sleek cans—which is $2,465,767 higher than Ardagh's Scenario 1 and

---

[48] *See id.*
[49] *See id.*; PX-444. The "Shortfall" for 2023 is 1,702,514,272. Multiplying that number by $2.6067 results in $44,379,439. The "Shortfall" for 2024 is 1,836,483,296. Multiplying that number by $2.6067 results in $47,871,610.
[50] *See* PX-459; Trial Tr. (Mar. 24) (Sladewski) at 360:1-7 (admitting ACB "on pace" to meet its forecast of 587 million cans); Trial Tr. (Mar. 27) (Hodges) at 1105:4-11; Trial Tr. (Mar. 30) (Richmond) 1382:17-18; Ex. 3, at Slide 20.
[51] Multiplying 588 million (ACB's 2026 purchases) by $.026067 (the jury's per can number) results in $15,350,566.64.
[52] *See* Ex. 3, at Slides 36-37.

2.[53] The jury could not have arrived at numbers nearly 10% higher than Ardagh's request if it properly understood how to calculate damages, even under Ardagh's interpretation of the contract.

"It is the responsibility of the trial judge to provide the jury with sufficient instruction to enable it to assess the evidence within the proper legal framework and to render a rational verdict." *Pitasi*, 968 F.2d at 1563 (citation modified). But because the jury "was not adequately instructed on issues essential to the case," i.e., the rollover, it rendered an irrational verdict, contrary to the trial evidence, the Amended Agreement's undisputed terms and at times more than Ardagh sought.

Because this error was not harmless, ACB is entitled to a new trial. ACB alternatively is entitled to a remittitur of these damages ($17,878,046) because "[t]he jury clearly misapprehended" the "damages" and "ignored evidence central to the damages question." *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554–55 (7th Cir. 1990) (affirming judgment contingent on plaintiff's acceptance of remittitur where the verdict did not "meet the test for rationality in light of the evidence" because the verdict placed the plaintiff in a "better position than his rational expectation could have justified" and was inconsistent with "crucial facts not in dispute"); *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 739 (7th Cir. 2004) ("irrational" for the jury to have awarded more than the amount sought on plaintiff's breach of contract claim).

5.      *The Jury Instructions And Verdict Form Erroneously Excluded ACB's Defense Regarding Material Supply Issues*. The jury instructions and verdict form did not include ACB's defense that Ardagh failed to perform its contractual obligations under Section 10 of the Agreement and Section 2.2.4 of the Amendment in 2021 and 2025. To establish a breach-of-contract claim Ardagh had to prove that it met all of its contractual obligations, which included supplying ACB without any material supply issues.[54] If Ardagh had such issues, then Ardagh violated Section 10,

---

[53] *Id*. Ardagh Scenario 2 assessed the alleged 2022 breach in 2023.
[54] Dkt. 569 at 21 (Instr. 20).

and under Section 2.2.4, that violation erased ACB's AMV obligation for that year.[55] ACB requested a separate instruction regarding the material-supply-problem defense[56] and argued that it was Ardagh's burden to show performance.[57] The Court agreed until the eve of closing, but then ruled at the last minute that this issue was to an affirmative defense that ACB had not timely pleaded.[58]

That is legally erroneous. "[A] defense is an affirmative defense (a) 'if the defendant bears the burden of proof' under state law or (b) 'if it does not controvert the plaintiff's proof.'" *Winforge, Inc. v. Coachman Industries, Inc.*, 691 F.3d 856, 872 (7th Cir. 2012). "[A] claim which simply controverts an element of a plaintiff's prima facie case is not considered an avoidance or affirmative defense." *Duncan v. Consolidated Freightways Corp. of Delaware*, No. 94 C 2507, 1995 WL 530652, at *4 (N.D. Ill. Sept. 7, 1995). But ACB's argument—supported by the evidence—that Ardagh had material supply issues is an argument that Ardagh cannot meet an essential element of its breach of contract claim: performance. That is exactly the situation in which the "affirmative defense" label does not apply. *See, e.g.*, *Wigod v. Wells Fargo Bank*, No. 10 C 2348, 2012 WL 13395247, at *4 (N.D. Ill. 2012) ("Plaintiffs have the burden of demonstrating their own performance; therefore, failing to include material breach as an affirmative defense does not constitute a waiver of the defense."); *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 2016 WL 6906583, at *8 (S.D.N.Y. Nov. 21, 2016) (asserting that a party did not perform its obligation under a contract is not an affirmative defense). Unlike *Barton Group, Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011), a decision on which Ardagh relied at trial,[59] ACB's supply

---

[55] *See* JX-007 at 6.
[56] *See* Dkt. 522 at 8–9; Dkt. 552 at 9.
[57] Trial Tr. (Apr. 1) at 1958:21–1967:20.
[58] *See* Ex. 1, April 1, 2026 Email; Trial Tr. (Apr. 2) at 2004:2–7. ACB objected to that finding. *Id*. at 2003:6–11.
[59] Trial Tr. (Apr. 1) at 1964:9–24.

22

argument does not give rise to a separate breach-of-contract claim. It goes to an essential element of a claim. *Nelson*, 169 A.D.3d at 113; *Hudson Bay*, 2016 WL 6906583, at *8.

The Court's erroneous classification of this defense was extremely prejudicial.[60] Ardagh admitted that it had material supply issues for 12-ounce Sleek cans in 2021, 2025, and 2026 and for 12-ounce standard and 24-ounce cans in 2021 and 2022. Mr. Bednarzyk informed Ardagh in late 2020 that ACB sought to purchase sixty percent of its total Sleek can volume (600 million) for 2021 during the first half of that year and then spread the remaining "40 percent in the back half" to "hit [ACB's] need during peak season."[61] Ardagh supplied ACB with only about 412 million cans in the first six months.[62] As a result, ACB was forced to use other suppliers (Ball or A.L.N.A.) for about 188 million cans at a higher cost.[63] Those supply issues caused massive gaps and operational difficulties for ACB in 2021, including during ACB's "busiest time."[64] Mr. Sladewski admitted that ACB's third-party filler was "waiting for over 14 million cans from Ardagh" in May 2021.[65] He also conceded that Ardagh was "very tight on capacity" around this time and into July 2021.[66] In 2021, Ardagh was capacity-constrained for 12-ounce standard and 24-ounce cans and not able to supply them to ACB.[67] In 2025, Ardagh had capacity constraints for its Sleek cans.[68]

By omitting this defense, the instructions and verdict form failed to address whether Ardagh had performed as the contract required, at least for 2021 and 2025. That prejudicially

---

[60] The Court also misclassified ACB's quality defense as only an affirmative defense, which ACB preserves for appeal along with all other legal issues raised before this Court.

[61] Trial Tr. (Mar. 31) (Bednarzyk) at 1548:11–25.

[62] *Id*. at 1549:1–20.

[63] *Id*. at 1550:11–25, 1151:1–14, 1552:1–23; Trial Tr. (Mar. 31) (Bednarzyk) at 1540:19–23 (testifying that Ardagh's fulfillment failures forced ACB to "pivot to another vendor to support [ACB]").

[64] Trial Tr. (Mar. 27) (Bednarzyk) at 1131:16–21; Trial Tr. (Mar. 27) (Smalla) at 1059:1–24, 1062:1–10, 1133:14–18.

[65] Trial Tr. (Mar. 24) (Sladewski) at 442:1–12, 442:18–21 (citing DX-1189).

[66] Trial Tr. (Mar. 25) (Sladewski) at 511:4–13 (citing DX-663).

[67] *Id*. at 506:18–507:20, 510:12–511:13; Trial Tr. (Mar. 25) (MacGregor) 586:16–23, 590:12–19, 594:8–595:3, 684:19–685:1.

[68] Trial Tr. (Mar. 27) (Bednarzyk) at 1145:1–1146:19; DX-1100.

affected the jury's understanding of (1) ACB's evidence in support of this defense, and (2) Ardagh's lack of evidence on the same issue, even though Ardagh had the burden.[69]

Even if material supply issues were an affirmative defense, given the fact that the parties presented trial evidence about it, the Court should have included the affirmative defense in jury instructions. *See* Fed. R. Civ. P. 15(b). In the Seventh Circuit, a delay in asserting an affirmative defense waives it only if the plaintiff was harmed as a result. *Curtis v. Timberlake*, 436 F.2d 709, 711 (7th Cir. 2005). Here, Ardagh was not prejudiced because it knew of ACB's material-supply-issues defense for years. ACB raised Section 2.2.4's excusal of the AMVs upon the occurrence of material supply issues in discovery, in its Amended Disclosures, and in the Amended Answer, and the parties briefed Ardagh's supply issues during summary judgment.[70] *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (no prejudice where plaintiff confronted the defense on summary judgment); *In re Edgewater Med. Ctr.*, 332 B.R. 166, 176 (Bankr. N.D. Ill. 2005) (no prejudice where the plaintiff "has been able to fully brief all the issues"); *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005) (no prejudice where only asserted prejudice was trial preparation). There was no timely objection by Ardagh at any of those points, which amounts to a forfeiture.

In addition, ACB requested an instruction on this defense in its March 11 revised proposed jury instructions and March 28 objections to the Court's proposed jury instructions.[71] Ardagh did not object until March 30 in its objections and requested revisions to the Court's proposed jury instructions.[72] There were no objections during opening or to trial testimony about the material

---

[69] Trial Tr. (Apr. 2) at 2218:4–24, 2219:18–19. ACB identified material supply issues in its Initial Disclosures and in its Supplemental Disclosures. Trial Tr. (Apr. 1) at 1958:21–25 and 1960:1-25. *See* Ex. 4, ACB's Initial Disclosures (disclosing witnesses with information regarding ACB's procurement and supply chain needs, forecasts, and order history); Ex. 5, ACB's Supplemental Disclosures (supplement to disclose as a subject of information "supply issues with Ardagh's cans"). The Court concluded that ACB properly preserved this issue. *Id*. at 1962:10–11.

[70] *See* Exs. 4, 5; Dkt. 107, at 16, 20-24, 32; Dkt. 310, at 12-16; Dkt. 312, at 2; Dkt. 330, at 16; Dkt. 331, at 3-5.

[71] Dkt. 522, at 8-10; Dkt. 552, at 9.

[72] Dkt. 560, at 3.

24

supply issues, including Kevin Bednarzyk's extensive March 27 testimony.[73] *See Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) ("One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by counsel"); *Conjugal P'ship Comprised by Joseph Jones & Verneta G. Jones v. Conjugal P'ship Comprised of Arthur Pineda & Toni Pineda*, 22 F.3d 391, 400 (1st Cir. 1994) ("when an affirmative defense that has not been raised in the pleadings has actually been tried by implied consent of the parties, the court must treat the defense as if it had been raised in the original responsive pleading"). Ardagh's baseless objection came too late and should have been overruled.

## III. THE COURT ERRED BY NOT DISCOUNTING PRE-JUDGMENT INTEREST FOR PRESENT VALUE.

The Court erred by not discounting interest for present value for Ardagh's 2025-2026 claim. New York law calculates prejudgment interest on future damages based on their present value. *See Moorer v. City of New York*, 272 A.D.2d 79 (1st Dep't 2000); *Pay v. New York*, 87 N.Y.2d 1011 (1996). The Court found that damages for each contract year do not accrue until the end of ACB's cure period for a year's AMVs (e.g., December 31, 2022 for the 2021 AMVs).[74] Thus, regardless of the jury's findings of breach for 2025, damages do not accrue for the 2025 AMVs until the end of 2026. Discounting prejudgment interest back to April 3, 2026 for present value of the future 2025 damages (amounting to a $2.6 million reduction in prejudgment interest on the incorrect 2025 verdict) correctly considers the present value of such damages under New York law.

## CONCLUSION

ACB respectfully requests the entry of judgment as a matter of law in its favor or, alternatively, a new trial or further amended judgment under Rule 59 or a remittitur.

---

[73] Trial Tr. (Mar. 23) at 194:3-5, 206:9-207:5, 216:18-219:24, 227:22-228:13; Trial Tr. (Mar. 27) (Bednarzyk) at 1115:11-1139:5, 1144:12-1147:2.
[74] Dkt. 511, at 5 (summary judgment ruling); Dkt. 600, at 1 (pre-judgment interest ruling).

Dated: June 8, 2026

Respectfully submitted,

*/s/ John T. Ruskusky*

One of the Attorneys for *American Craft Brewery LLC*

John T. Ruskusky (IL ARDC #6256605)
jtruskusky@nixonpeabody.com
Christopher P. Hotaling (IL ARDC #3272432)
chotaling@nixonpeabody.com
David M. Pattee (IL ARDC #6317265)
dmpattee@nixonpeabody.com
Kathleen M. Mallon (IL ARDC #6336312)
kmallon@nixonpeabody.com
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL 60602-4378
Telephone: (312) 977-4400

Stephen M. LaRose (*pro hac vice*)
(MA BBO #654507)
slarose@nixonpeabody.com
NIXON PEABODY LLP
Exchange Place, 53 State Street
Boston, MA 02109-2835
Telephone: (617) 345-1300

Donald B. Verrilli, Jr. (*pro hac vice*)
donald.verrilli@mto.com
Elaine Goldenberg (*pro hac vice*)
elaine.goldenberg@mto.com
Stephany Reaves (*pro hac vice*)
stephany.reaves@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
Telephone: 202-220-1100

26

**CERTIFICATE OF SERVICE**

On June 8, 2026, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Illinois, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically.

/s/ John T. Ruskusky
John T. Ruskusky